1    ROB BONTA
     Attorney General of California
2    ANTHONY R. HAKL
     Supervising Deputy Attorney General
3    GABRIELLE D. BOUTIN
     Deputy Attorney General
4    State Bar No. 267308
       1300 I Street, Suite 125
5      P.O. Box 944255
       Sacramento, CA 94244-2550
6      Telephone:  (916) 210-6053
       Fax:  (916) 324-8835
7      E-mail:  Gabrielle.Boutin@doj.ca.gov
     *Attorneys for Defendant Dr. Shirley Weber, in her*
8    *official capacity as California Secretary of State*

9                   IN THE UNITED STATES DISTRICT COURT

10                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13   **PEACE AND FREEDOM PARTY;**          3:24-cv-08308-MMC
     **LIBERTARIAN PARTY OF**
14   **CALIFORNIA; GREEN PARTY OF**        **DEFENDANT'S REQUEST FOR**
     **CALIFORNIA; GAIL LIGHTFOOT; JOE**   **JUDICIAL NOTICE IN SUPPORT OF**
15   **DEHN; SEAN DOUGHERTY; WILLIAM**     **MOTION TO DISMISS COMPLAINT**
     **PATTERSON; AARON REVELES;**
16   **SHANNEL PITTMAN,**                  Date:       March 28, 2025
                                           Time:       9:00 a.m.
17                            Plaintiff,   Courtroom:  Courtroom 7 – 19th Floor
                                           Judge:      The Honorable Maxine M.
18          v.                                         Chesney
                                           Trial Date:  None set
19                                         Action Filed: November 21, 2024
     **DR. SHIRLEY N. WEBER, CALIFORNIA**
20   **SECRETARY OF STATE,**

21                            Defendant.

22

23          Defendant Dr. Shirley Weber, in her official capacity as California Secretary of State,

24   requests that this Court take judicial notice of the following facts and documents cited in the

25   Motion to Dismiss Complaint.

26          1.     Second Amended Complaint for Declaratory, Injunctive, and Other Relief in *Rubin v.*

27   *Bowen*, No. RG11605301 (Cal. Super. Ct. Feb. 14, 2013).

28

                                              1

1      **Grounds for judicial notice:** This fact can be accurately and readily determined from

2  sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2); *see also Lee*

3  *v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take notice of facts and

4  documents that are "not subject to reasonable dispute").  Judicial notice may be taken of

5  documents filed and orders or decisions entered in any federal or state court proceeding.  *See*

6  *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 756, n.1 (9th Cir.

7  2014) (granting judicial notice of state court proceedings); *see also Asdar Group v. Pillsbury,*

8  *Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (judicial notice of court order).

9      **Source of facts and document:** Document is a publicly available court document.  A true

10  and correct copy of document is attached hereto as "Exhibit A."

11

12      2.     Order of Dismissal and Final Judgment Upon Sustaining of Demurrer Without Leave

13  to Amend [C.C.P. 581d] in *Rubin v. Bowen*, No. RG11605301 (Cal. Super. Ct. Oct. 4, 2013).

14      **Grounds for judicial notice:** This fact can be accurately and readily determined from

15  sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2); *see also Lee*

16  *v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take notice of facts and

17  documents that are "not subject to reasonable dispute").  Judicial notice may be taken of

18  documents filed and orders or decisions entered in any federal or state court proceeding.  *See*

19  *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 756, n.1 (9th Cir.

20  2014) (granting judicial notice of state court proceedings); *see also Asdar Group v. Pillsbury,*

21  *Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (judicial notice of court order).

22      **Source of facts and document:** Document is a publicly available court document.  A true

23  and correct copy of document is attached hereto as "Exhibit B."

24

25      3.     Order in *Rubin v. Padilla*, No. A140387 (Cal. Ct. App. Feb. 27, 2015).

26      **Grounds for judicial notice:** This fact can be accurately and readily determined from

27  sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2); *see also Lee*

28  *v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take notice of facts and

documents that are "not subject to reasonable dispute").  Judicial notice may be taken of documents filed and orders or decisions entered in any federal or state court proceeding.  S*ee ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 756, n.1 (9th Cir. 2014) (granting judicial notice of state court proceedings); *see also Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (judicial notice of court order).

**Source of facts and document:** Document is a publicly available court document.  A true and correct copy of document is attached hereto as "Exhibit C."


4.    Order in *Rubin v. Padilla*, No. S224970 (Cal. Sup. Ct. Apr. 29, 2015).

**Grounds for judicial notice:** This fact can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take notice of facts and documents that are "not subject to reasonable dispute").  Judicial notice may be taken of documents filed and orders or decisions entered in any federal or state court proceeding.  S*ee ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 756, n.1 (9th Cir. 2014) (granting judicial notice of state court proceedings); *see also Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (judicial notice of court order).

**Source of facts and document:** Document is a publicly available court document.  A true and correct copy of document is attached hereto as "Exhibit D."


5.    Order in *Rubin v. Padilla*, No. 15-135 (U.S. Oct. 23, 2015).

**Grounds for judicial notice:** This fact can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take notice of facts and documents that are "not subject to reasonable dispute").  Judicial notice may be taken of documents filed and orders or decisions entered in any federal or state court proceeding.  S*ee ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 756, n.1 (9th Cir.

1   2014) (granting judicial notice of state court proceedings); *see also Asdar Group v. Pillsbury,*

2   *Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (judicial notice of court order).

3   **Source of facts and document:** Document is a publicly available court document, including at

4   https://www.supremecourt.gov/orders/courtorders/101315zor_2c8f.pdf (last visited Jan. 31,

5   2025).  The order is also published at *Rubin v. Padilla*, 577 U.S. 923 (2015).  A true and correct

6   copy of document is attached hereto as "Exhibit E."

7

8       6.      Official Voter Information Guide for California primary election held June 8, 2010.

9       **Grounds for judicial notice:** This fact can be accurately and readily determined from

10  sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2); *see Lee v.*

11  *City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take notice of facts and

12  documents that are "not subject to reasonable dispute"); *Lake v. Fontes*, 83 F.4th 1199, 1202 n.3

13  (9th Cir. 2023) (taking judicial notice of Arizona Secretary of State's 2019 Election Procedures

14  Manual); *Montana Green Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir. 2021); (taking judicial

15  notice of "maps and official election results from the Montana Department of State website").

16  **Source of facts and document:** Document is publicly available at the California Secretary of

17  State website at https://vig.cdn.sos.ca.gov/2010/primary/pdf/english/complete-vig.pdf (last visited

18  Jan. 31, 2025).  A true and correct copy of document is attached hereto as "Exhibit F."

19

20

21

22

23

24

25

26

27

28

1    Dated:  January 31, 2025                    Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California
3                                                ANTHONY R. HAKL
                                                 Supervising Deputy Attorney General
4

5                                                *s/ Gabrielle D. Boutin*
6                                                GABRIELLE D. BOUTIN
                                                 Deputy Attorney General
7                                                *Attorneys for Defendant Dr. Shirley Weber,*
                                                 *in her official capacity as California*
8                                                *Secretary of State*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Def.'s Request for Judicial Notice  (3:24-cv-08308-MMC)

# EXHIBIT A

1  DAN SIEGEL, SBN 56400
2  MICHAEL SIEGEL, SBN 269439
   SIEGEL & YEE
3  499 14th Street, Suite 300
   Oakland, California 94612
4  Telephone: (510) 839-1200
   Telefax: (510) 444-6698
5
6  Attorneys for Plaintiffs
   MICHAEL RUBIN, *et al.*
7

8              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                         COUNTY OF ALAMEDA

10

11  MICHAEL RUBIN, STEVE COLLETT,          Case No. RG11605301
    MARSHA FEINLAND, CHARLES L.
12  HOOPER, KATHERINE TANAKA, C. T.        **SECOND AMENDED COMPLAINT**
    WEBER, CAT WOODS, GREEN PARTY          **FOR DECLARATORY,**
13  OF ALAMEDA COUNTY, LIBERTARIAN         **INJUNCTIVE, AND OTHER**
    PARTY OF CALIFORNIA, and PEACE         **RELIEF**
14  AND FREEDOM PARTY OF
    CALIFORNIA,                            Assigned for all Purposes to the
15                                         Hon. Lawrence John Appel
16              Plaintiffs,                Department 16

17                                         Suit filed: November 21, 2011
    v.                                     Trial date: TBD
18
19  DEBRA BOWEN, in her official capacity as
    Secretary of State of California,
20
21              Defendant.

22

23       Plaintiffs MICHAEL RUBIN, STEVE COLLETT, MARSHA FEINLAND,

24  CHARLES L. HOOPER, KATHERINE TANAKA, C. T. WEBER, CAT WOODS, GREEN

25  PARTY OF ALAMEDA COUNTY, LIBERTARIAN PARTY OF CALIFORNIA, and PEACE

26  AND FREEDOM PARTY OF CALIFORNIA (hereinafter, "Plaintiffs") complain of

27  defendant DEBRA BOWEN, SECRETARY OF STATE OF CALIFORNIA, and allege:

28

**PRELIMINARY STATEMENT**

1.   Plaintiffs bring this action based upon defendant Bowen's implementation of Proposition 14, the "top two" electoral reform, which prevented minor political parties, minor party voters, and minor party candidates from participating in the November 6, 2012 statewide general election, despite the fact that many minor party candidates received substantial voter support in the June 5, 2012 primary election. Plaintiffs bring causes of action for deprivation of rights protected by the First and Fourteen Amendments of the U.S. Constitution.

2.   Plaintiff's first cause of action, for denial of ballot access, alleges that Bowen's implementation of Prop. 14 unconstitutionally burdened the rights of minor political parties, voters, and candidates to participate in the 2012 general election. During last year's statewide elections, nine minor party candidates—including plaintiff Charles Hooper, candidate for state assembly—received 5% or more of the vote but were not permitted to advance to the general election. Plaintiffs were thus denied access to the majority of California voters: whereas 13.2 million voters statewide participated in the November general election, only 5.3 million participated in the June primary. Bowen's implementation of Prop. 14 deprived plaintiffs of their ability to participate in the electoral process, in violation of their rights of political association and expression.

3.   Plaintiff's second cause of action alleges that Bowen's implementation of Prop. 14 unconstitutionally withdrew the established rights of minor parties, voters, and candidates to participate in the statewide general election. Whereas California's previous electoral system guaranteed that one candidate from each qualified political party could appear on the general election ballot, Prop. 14 prevented minor party candidates from participating in the 2012 general election. Dozens of minor party

candidates, receiving as much as 18% of the vote, were limited to participation in the June primary. In accord with the stated intent of Prop. 14's drafters, the electoral scheme has favored "moderate" candidates from the two major parties while excluding those who represent minor party perspectives. Because the implementation of Prop. 14 was motivated by the discriminatory purpose to exclude minor party political perspectives, and because defendant Bowen's implementation of Prop. 14 has in fact excluded minor party candidates from the general election, even when those candidates receive more than a "modicum of support," plaintiffs' rights under the Equal Protection Clause of the 14th Amendment have been violated.

4.  For these reasons, plaintiffs ask this Court to enjoin, preliminarily and permanently, any further enforcement of Prop. 14 and any other California statutes that permit the abridgment of voter and political party rights of association, expression, and equal protection.

## JURISDICTION AND VENUE

5.  Plaintiffs' claims for injunctive and declaratory relief arise under the First and Fourteenth Amendments to the United States Constitution and article I, sections 2, 3, and 7, and article IV, section 16 of the California Constitution. The Court's jurisdiction is invoked under California Code of Civil Procedure sections 410.10, 526, and 1060.

6.  Venue is proper in Alameda County. The present action is brought against a state officer, Secretary of State Debra Bowen, based upon acts done by virtue of her office. Plaintiffs Michael Rubin, Marsha Feinland, and Katherine Tanaka reside in Alameda County and frequently support minor party candidates for office. Plaintiffs Green Party of Alameda County, Libertarian Party of California, and Peace and Freedom Party of California conduct political activities within Alameda County.

1   Plaintiff Feinland was a 2012 candidate for United States Senate representing the State

2   of California, and conducted campaign activities within Alameda County.

### PARTIES

7.  Plaintiff MICHAEL RUBIN is a resident of Oakland, California, and a member of the Green Party of California and the Green Party of Alameda County.  Mr. Rubin is also a member of the State Coordinating Committee of the California Green Party and is an alternate member of the Green Party USA, representing California.  He is a regular voter and supporter of Green Party candidates.

8.  Plaintiff STEVE COLLETT is a resident of Venice, California.  Mr. Collett is a member of the Libertarian Party of California.  He is a regular voter and supporter of Libertarian Party candidates.  In 2012, Mr. Collett ran a campaign for United States Congress, 33rd Congressional District, as a candidate of the Libertarian Party.

9.  Plaintiff MARSHA FEINLAND is a resident of Berkeley, California.  Ms. Feinland is a member of the Peace and Freedom Party of California.  She is a regular voter and supporter of Peace and Freedom Party candidates.  In 2012, Ms. Feinland ran a campaign for United States Senate as a candidate of the Peace and Freedom Party.

10. Plaintiff CHARLES L. HOOPER is a resident of Grass Valley, California.  Mr. Hooper is a member of the Libertarian Party of California.  He is a regular voter and supporter of Libertarian Party candidates.  In 2012, Mr. Hooper ran a campaign for California Assembly, District 1, as a candidate of the Libertarian Party.

11. Plaintiff KATHERINE TANAKA is a resident of Oakland, California.  Ms. Tanaka is a member of the Green Party of California and the Green Party of Alameda County.  She is a regular voter and supporter of Green Party candidates.

12. Plaintiff C. T. WEBER is a resident of Sacramento, California. Mr. Weber is a member of the Peace and Freedom Party of California and serves as State Chairperson for the Party. He is a regular voter and supporter of Peace and Freedom Party candidates. He ran as a candidate for the California State Assembly, District 9, in 2012.

13. Plaintiff CAT WOODS is a resident of Novato, California. Ms. Woods is a member of the Peace and Freedom Party of California. She is a regular voter and supporter of Peace and Freedom Party candidates.

14. Plaintiff GREEN PARTY OF ALAMEDA COUNTY (GPAC) is a geographic division of the Green Party of California, which is a qualified political party under the California Elections Code. For the 2012 state and federal elections, the GPAC identified and selected candidates to be the official endorsed candidates of the GPAC.

15. Plaintiff LIBERTARIAN PARTY OF CALIFORNIA is a statewide political party that qualified for the ballot in 2012. For the 2012 state and federal elections, the Libertarian Party identified and selected candidates to be its official endorsed candidates.

16. Plaintiff PEACE AND FREEDOM PARTY OF CALIFORNIA is a statewide political party that qualified for the ballot in 2012. For the 2012 state and federal elections, the Peace and Freedom Party identified and selected candidates to be its official endorsed candidates.

17. Defendant DEBRA BOWEN is Secretary of State of California. In her official capacity, Secretary Bowen administered the 2012 primary and general elections in the State of California.

///

## STATEMENT OF FACTS

18. Prior to January 1, 2011, the State of California utilized an electoral system which guaranteed qualified political parties the right to participate in general elections. Under this system, candidates for statewide office from each recognized party, upon complying with certain requirements, were permitted to participate in a primary election held on the first Tuesday in June in even-numbered years to determine their party's standard-bearer. Following the primary election, the highest vote-getter from each party was permitted to participate in a general election held on the first Tuesday in November in even-numbered years.

19. On June 8, 2010, California voters approved Proposition 14, labeled as the "Top Two Candidates Open Primaries Act." The Act, also known as "Prop. 14," took effect in California on January 1, 2011. In 2011, the Prop. 14 reforms were utilized in several special elections. In 2012, Prop. 14 governed the statewide primary and general elections to be held in June and November, respectively.

20. Prop. 14 initiated amendments to the California Constitution which require that candidates for various state and federal offices run in a single primary election open to all registered voters, with only the top two vote-getters meeting in the general election. As the revised Constitution states:

> A voter-nomination primary election shall be conducted to select the candidates for congressional and state elective offices in California. All voters may vote at a voter-nominated primary election for any candidate for congressional and state elective office without regard to the political party preference disclosed by the candidate or the voter, provided that the voter is otherwise qualified to vote for candidates for the office in question. The candidates who are the top two vote-getters at a voter-nominated primary election for a congressional or state elective office shall, regardless of party preference, compete in the ensuing general election. Cal. Const. Art. II, § 5(a).

21. When the California Legislature proposed Prop. 14 as a constitutional amendment, the stated purpose was "to protect and preserve the right of every Californian to vote for the candidate of his or her choice." Cal. Const. Art. II, §6 (historical notes).

22. In reality, however, the drafters intended to limit the field of political candidates who could appear on the general election ballot. As Abel Maldonado, the self-described legislative author of Prop. 14, declared in a January 24, 2012, sworn statement, the purpose of Prop. 14 is to promote "pragmatic" political perspectives. Maldonado's intent is affirmed by the published 2010 ballot argument in favor of Prop. 14, in which supporters wrote that "Proposition 14 will help elect more practical office-holders who are more open to compromise."

23. On information and belief, the Prop. 14 backers' use of terms such as "pragmatic" and "practical" were code words demonstrating their intent to eliminate varying political perspectives from the statewide general election, including perspectives advanced by minor political parties including plaintiffs Libertarian Party of California, Peace and Freedom Party of California, and Green Party of Alameda County.

24. As a result of Prop. 14, candidates representing minor political parties have been, *de facto*, precluded from consideration on the general election ballot.

25. Prior to defendant's implementation of Prop. 14, a political party could expect its candidates to appear on a general election ballot so long as it either (1) obtained total registrations equal to one percent of the total vote in the state at the most recent gubernatorial election or (2) polled two percent in any statewide race during the previous gubernatorial election.

26. In 2012, however, under defendant Bowen's implementation of Prop. 14, the vast majority of the minor party candidates for United States Senate, United States House of Representatives, State Senate, and State Assembly were denied access to the general election ballot. Out of over 150 races governed by the "top two" electoral change, only three minor party candidates advanced to the general election.[1] In other words, after the implementation of Prop. 14, in some 98% of the elections for major state and federal offices, the political parties were denied access to the general election ballot.

27. Numerous minor party candidates garnered substantial support in races for major state and federal political offices. Nine candidates from the Green, Peace and Freedom, and Libertarian parties received more than 5% of the vote. But none of those nine were permitted to advance to the general election ballot.

28. Among the minor party candidates for United States Senator, Gail K. Lightfoot of the Libertarian Party garnered 2.1% of the vote, and was the leading vote-getter from her party. Plaintiff Marsha Feinland of the Peace and Freedom Party garnered 1.2% of the vote, and was the leading vote-getter from her party. Neither candidate was permitted to advance to the general election ballot.

29. Among the minor party candidates for various open seats for United States Representative, several garnered substantial support. Douglas Arthur Tuma

---

[1] The minor party candidates who appeared on 2012 general election ballots were: Mary Catherine McIlroy (Peace and Freedom), candidate for State Senator, District 9; Lee H. Chauser (Peace and Freedom), candidate for State Senator, District 33; and Eugene Ruyle (Peace and Freedom), candidate for State Assembly, District 15. In all three circumstances, no Republic candidate and only one Democratic candidate ran in the primary. McIlroy received 0.6% of the votes in the primary, but nevertheless advanced; Chauser received only 3 votes out of 35,858 votes cast, but was the second of two candidates and advanced anyway; and Ruyle received 0.2% of votes but also advanced, placing second out of two.

(Libertarian) earned 3.1% of the vote in the District 7 election. Barry Hermanson (Green) earned 5.4% of the vote in District 12. Carol Brouillet (Green) earned 4.1% of the vote in District 18. Eric Peterson (Green) earned 2.1% of the vote in District 20. Michael W. Powelson (Green) earned 2.1% of the vote in District 30. In District 33, David William Steinman (Green) earned 3.5% of the vote while plaintiff Steve Collett (Libertarian) earned 4.3%. Anthony W. Vieyra (Green) was the leading minor party vote-getter in 2012, earning 18.6% of the vote in District 35. Yet neither Vieyra nor any of the other minor party candidates for U.S. Representative were permitted to advance to the general election.

30. Among the minor party candidates for State Senator, John H. Webster (Libertarian) earned 15.4% of the vote in District 13, but was denied access to the general election ballot.

31. Several minor party candidates for State Assembly also garnered substantial support, but were denied access to the general election ballot. These include: David Edwards (Green), who earned 6.1% of the vote in District 1; plaintiff Charley Hooper (Libertarian), who earned 5.4% of the vote in District 1; Pamela Elizondo (Green), who earned 8.8% of the vote in District 2; Janice Marlae Bosner (Libertarian), who earned 4.3% of the vote in District 8; plaintiff C. T. Weber (Peace and Freedom), who earned 3.0% of the vote in District 9; and John Paul Lindblad (Green), who earned 7.6% of the vote in District 39.

32. Because the California general election ballot is the moment of peak participation by voters, media, and the candidates themselves, defendant Bowen's implementation of Prop. 14 excluded voters from minor political parties from effective civic engagement at the most important stage of the electoral process. California's decision to hold the

primary election in June, five months before the general election, accentuates the exclusion of the minor parties from participation at times when voters' interest in the political process is at its highest. Substantially greater numbers of voters participate in the general election as opposed to the primary election.

33. In 2012, a total of 5,328,296 voters participated in the statewide primary elections held on June 5, 2012. By comparison, a total of 13,202,158 voters participated in the statewide general election held on November 6, 2012.

34. Thus, for political parties that previously had access to the general election ballot, Prop. 14 reduced their ability to reach individual voters by nearly 60%. Some eight million voters participated in the general election who did not participate in the primary election; only a tiny fraction of these voters had access to minor party candidates or minor party perspectives when they prepared to cast their ballot in the general election. Furthermore, because Bowen held the primary election in June, a full five months before the November general election, the minor parties' ability to influence the political debate was further diminished, and whatever messages the parties were able to disseminate during their primary election participation had likely dissipated by the time the general election occurred.

35. The State of California does not possess regulatory interests that are sufficiently compelling to justify Prop. 14's intrusion on voter, candidate, and minor party rights.

36. Since Secretary Bowen's implementation of Prop. 14 on January 1, 2011, California voters who support minor political parties, including the individual plaintiffs, have suffered a "chilling effect" on their rights of political association. On information and belief, because candidates of minor political parties no longer have a realistic chance to appear on a general election ballot, fewer individuals have undertaken

political campaigns on behalf of the minor parties, and the minor parties themselves suffer a threat of diminution or even destruction. As a result, the minor party voter plaintiffs suffer a substantially diminished ability to effectively participate in the electoral process as members of minor political parties.

37. In addition, since Bowen's implementation of Prop. 14, California voters from major parties have suffered and will suffer from a marked decrease in candidate viewpoints on general election ballots. Voters no longer have the opportunity to review candidate statements from minor political parties and are denied a free and full exchange of ideas in connection with the electoral issues to be decided.

38. If defendant's implementation of Prop. 14 is not enjoined, plaintiffs will continue to suffer deprivations of their constitutional rights under the United States and California Constitutions. The declaratory and injunctive relief sought by plaintiffs, on the other hand, will end an electoral scheme that actively deprives minor party voters, minor party candidates, and the minor parties themselves of established rights of political association and equal protection.

**FIRST CLAIM FOR RELIEF: BALLOT ACCESS**
(United States Constitution, Amendments 1 and 14;
California Constitution, Article 1, sections 2 and 3)

39. Plaintiffs reallege and fully incorporate herein paragraphs 1 through 38, above.

40. Prop. 14, as applied, has unconstitutionally burdened the rights of minor party voters, minor party candidates, and the minor parties themselves from effective participation in California's general elections, even when those parties and candidates demonstrated substantial support in the primary election. Although plaintiffs still have the opportunity to participate in a primary election, defendant's implementation of Prop. 14 demonstrated that the primary election is an inadequate substitute. In 2012,

nearly five months passed between the primary and general elections, and eight million more voters participated in the general election, as compared to the primary. Because Prop. 14 has severely burdened voter, candidate, and party rights without fulfilling a compelling state interest, it should be declared unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution, and article 1, sections 2 and 3 of the California Constitution.

### SECOND CLAIM FOR RELIEF: EQUAL PROTECTION CLAUSE
(United States Constitution, 14th Amendment;
California Constitution, article I, section 7 and article IV, section 16)

41. Plaintiffs reallege and fully incorporate herein paragraphs 1 through 40, above.

42. Prop. 14 violates the Equal Protection Clause of the Fourteenth Amendment and the equal protection rights of the California Constitution, article I, section 7 and article IV, section 16, both on its face and as applied to plaintiffs.

43. Defendant's implementation of Prop. 14 withdrew an established right from plaintiffs, namely, the right of minor political parties, their voters, and their candidates to participate in statewide general elections. The drafters of Prop. 14 intended this result: in order to achieve their desire to elect "pragmatic" or "practical" politicians, they have intentionally excluded the standard-bearers from minor political parties from participating in general elections. Because Prop. 14 drafters were motivated by an invidious purpose when they enacted electoral reform, and because Secretary Bowen's implementation of Prop. 14 in 2012 denied numerous well-supported minor party candidates from participating in the general election, plaintiffs' equal protection rights have been violated, and Prop. 14 should be enjoined.

## IRREPARABLE INJURY

44. Plaintiffs are now severely and irreparably injured by Prop. 14, a state law that violates the First Amendment and the Fourteenth Amendment of the United States Constitution as well as article 1, sections 2, 3, and 7 and article IV, section 16 of the California Constitution. In 2012, defendant Bowen denied plaintiff minor party voters Rubin, Collett, Feinland, Hooper, Tanaka, Weber, and Woods the ability to effectively participate as members of their respective political parties in the general election. In 2012 Bowen denied plaintiff minor party candidates Collett, Feinland, Hooper, and Weber the ability to communicate their message to general election voters. And in 2012 Bowen denied plaintiffs Green Party of Alameda County, Libertarian Party of California, and Peace and Freedom Party of California the right to participate in general elections. Plaintiffs' injuries will be redressed only if this Court declares Prop. 14 unconstitutional and enjoins defendant Bowen from further enforcing it.

45. An actual and judicially cognizable controversy exists between plaintiffs and defendant regarding whether Prop. 14 violates the First Amendment and the Fourteenth Amendment of the United States Constitution and article 1, sections 2, 3, and 7 and article IV, section 16 of the California Constitution. Defendant is presently enforcing this state law to the detriment of plaintiffs.

## PRAYER

WHEREFORE, plaintiffs pray for judgment against defendant Bowen on each of the aforementioned claims. Plaintiffs request this Court grant them relief as follows:

1. A declaratory judgment, pursuant to California Code of Civil Procedure section 1060, holding that:

a.  Prop. 14 violates the rights of minor political parties and registered members of minor political parties under the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §1983, and article 1, sections 2, 3, and 7 and article IV, section 16 of the California Constitution by barring minor political parties and voters registered with such parties from effective participation in general elections;

b.  Prop. 14 violates the rights of plaintiffs under the Equal Protection Clause of the Fourteenth Amendment and the equal protection rights of the California Constitution, by withdrawing established rights and privileges from minor political parties, their candidates, and their supporters.  Prop. 14 converted plaintiff minor parties into "second class" parties which, unlike the major political parties, are denied the ability to access the voters at the moment of peak political participation, the statewide general election.

2.  Injunctive relief including a preliminary injunction and a permanent injunction against defendant Bowen enjoining enforcement of Prop. 14 in whole or in part;

3.  Attorneys' fees;

4.  Costs of suit; and

5.  Such other and further relief as the Court may deem proper.

Dated: February 14, 2013

SIEGEL & YEE

By _____
Dan Siegel
Michael Siegel

Attorneys for Plaintiffs
MICHAEL RUBIN; et al.

PROOF OF SERVICE

I, BARBRA FRANK, declare as follows:

I am over eighteen years of age and a citizen of the State of California. I am not a party to the within action. My business address is 499 14th Street, Suite 300, Oakland, CA 94612.

On February 14, 2013, I served copies of the following documents:

1. **SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

on the parties to this action by mailing the documents by U.S. Mail to the offices of the attorneys for defendant and the defendant-interveners:

Mark R. Beckington
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

Christopher Skinnell
Nielsen Merksamer Parrinello Gross & Leoni
2350 Kerner Boulevard, Suite 250
San Rafael, CA 94901

I declare under penalty of perjury that the foregoing is true and correct. Executed February 14, 2013, at Oakland, California.

_____
Barbra Frank

EXHIBIT B

1
2
3
4
5
6
7
8

FILED
ALAMEDA COUNTY

OCT - 4 2013

CLERK OF THE SUPERIOR COURT
By _____
                              Deputy

9

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10

IN AND FOR THE COUNTY OF ALAMEDA

11
12
13

MICHAEL RUBIN, STEVE COLLETT,                    )   Case No.: RG11605301
MARSHA FEINLAND, CHARLES L. HOOPER,              )
KATHERINE TANAKA, C.T. WEBER, CAT                )   ASSIGNED FOR ALL
WOODS, GREEN PARTY OF ALAMEDA                    )   PURPOSES TO JUDGE
COUNTY, LIBERTARIAN PARTY OF                     )   LAWRENCE JOHN APPEL
CALIFORNIA, and PEACE AND FREEDOM                )
PARTY OF CALIFORNIA,                             )   [Proposed] ORDER OF
                                                 )   DISMISSAL AND FINAL
                      Plaintiffs,                )   JUDGMENT UPON
                                                 )   SUSTAINING OF DEMURRER
       vs.                                       )   WITHOUT LEAVE TO
                                                 )   AMEND [C.C.P. § 581d]
DEBRA BOWEN, in her official capacity as         )
California Secretary of State,                    )   DEPT: 16
                                                 )
                      Defendant.                 )
_____)
                                                 )
INDEPENDENT VOTER PROJECT, DAVID                 )
TAKASHIMA, ABEL MALDONADO &                      )
CALIFORNIANS TO DEFEND THE OPEN                  )
PRIMARY,                                         )
                      Intervener-Defendants.     )
_____)

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Pursuant to the Court's Amended Order, filed September 23, 2013, which sustained

2 Defendant's and Interveners' demurrers as to all the causes of action in the Second

3 Amended Complaint without leave to amend as to any of them (attached as Exhibit A),

4    **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

5    1.    This case is dismissed in its entirety, with prejudice.

6    2.    Judgment is hereby entered in favor of DEFENDANT SECRETARY OF STATE

7 DEBRA BOWEN ("Defendant") and Intervener-Defendants CALIFORNIANS TO DEFEND THE

8 OPEN PRIMARY, INDEPENDENT VOTER PROJECT, ABEL MALDONADO, and DAVID

9 TAKASHIMA ("Interveners"), and against Plaintiffs MICHAEL RUBIN, STEVE COLLETT,

10 MARSHA FEINLAND, CHARLES L. HOOPER, KATHERINE TANAKA, C. T. WEBER, CAT

11 WOODS, GREEN PARTY OF ALAMEDA COUNTY, LIBERTARIAN PARTY OF CALIFORNIA, AND

12 PEACE AND FREEDOM PARTY OF CALIFORNIA ("Plaintiffs"), on all causes of action.

13    3.    Plaintiffs shall take nothing by their complaint.

14    4.    Upon filing a memorandum of costs, and subject to any motion to tax said

15 costs permitted by law, Defendant and Interveners shall have their costs of suit.

16    5.    Any claim for attorney's fees in this action and upon any appeal shall be

17 determined by separate motion or by agreement of the parties.

18 Dated: October __, 2013

19                                         _____

20                                         Hon. Lawrence John Appel
                                          Judge, Alameda County Superior Court

21

22 APPROVED AS TO FORM:

23 Dated: October 4, 2013              SIEGEL & YEE

24

25                                         _____

26                                         DAN SIEGEL
                                          MICHAEL SIEGEL
27                                         *Attorneys for Plaintiffs*
                                          *Michael Rubin, et al.*
28

ORDER OF DISMISSAL AND                                    CASE NO. RG11605301
FINAL JUDGMENT [CCP § 581d]                                           Page 1

Dated: October 4, 2013

KAMALA D. HARRIS
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General

KARI KROGSENG
Deputy Attorney General
*Attorneys for Defendant Debra Bowen,*
*As California Secretary of State*

Dated: October 4, 2013

NIELSEN MERKSAMER
    PARRINELLO GROSS & LEONI LLP

JAMES R. PARRINELLO
MARGUERITE MARY LEONI
CHRISTOPHER E. SKINNELL
*Attorneys for Intervener-Defendants*
*Californians to Defend the Open Primary, et al.*



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

**Amended Order Filed September 23, 2013**



RECEIVED
SEP 2 4 2013
NIELSEN MERKSAMER PARRINELLO
GROSS & LEONI

ENDORSED
FILED
ALAMEDA COUNTY

SEP 2 3 2013

CLERK OF THE SUPERIOR COURT

By _____ A. Armorong
Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

Michael Rubin, et al.,                    )    Case No. RG11605301
plaintiffs,                               )
                                          )
        vs.                               )
                                          )
                                          )    ORDER
Debra Bowen, in her official capacity     )    [Amended-Corrected]
as Secretary of State of California,      )
defendant.                                )
                                          )
Independent Voter Project, et al.,        )
Intervener-Defendants.                    )
                                          )
                                          )
                                          )

## I. Introduction.

This case challenges the constitutionality of Article 2, section 5(a) of the California Constitution ("Top Two Candidates Open Primary Act" or "Prop. 14") and is presently before the court on demurrers to the second amended complaint (the "SAC").

Plaintiffs jointly request that the court enter a judgment declaring that "Prop. 14 violates the rights of minor political parties and registered members of minor political parties under the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. section 1983, and Article 1, sections 2, 3, and 7 and Article IV, section 16 of the California Constitution by barring minor political parties and voters registered with such parties from effective participation in general elections;" and declaring that "Prop. 14 violates the rights of plaintiffs under the Equal Protection Clause of the Fourteenth Amendment and the equal protection rights of the California Constitution, by withdrawing established rights and privileges from minor political parties, their candidates, and their supporters. Prop 14 converted plaintiff minor parties into 'second class' parties which, unlike the major political parties are denied the ability to access voters at the moment of peak political participation, the statewide general election."  (SAC, Prayer for Relief, ¶¶ 1(a) and 1(b).)

## II. Pertinent Law-Selected.

As background, the court sets forth the various constitutional provisions cited in the SAC.  Article 2, section 5(a) provides: "A voter-nomination primary election shall be conducted to select the candidates for congressional and state offices in California. All voters may vote at a voter-nominated primary election for any candidate for congressional and state elective office without regard to the political party preference disclosed by the candidate or the voter, provided that the voter is otherwise qualified to vote for candidates for the office in question. The candidates who are the top two vote-getters at a voter-nominated primary election for a congressional or state elective office shall, regardless of party preference, compete in the ensuing general election."

The First Amendment to the Constitution of the United States of America states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

The Fourteenth Amendment provides in part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article 1, section 2 of the Constitution of the State of California provides in part: "(a) Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

Article 1, section 3 of the Constitution of the State of California provides: "The people have the right to instruct their representatives, petition for the redress of grievances, and assemble freely to consult for the common good."

Article 1, section 7 of the Constitution of the State of California provides in part: "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws... (b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. Privileges or immunities granted by the Legislature may be altered or revoked."

Article IV, section 16 of the Constitution of the State of California provides: "(a) All laws of a general nature have uniform operation. (b) A local or special statute is invalid in any case if a general statute can be made applicable."

### III. Procedural Background.

On November 21, 2011, plaintiffs filed a verified complaint for declaratory, injunctive, and other relief and named Debra Bowen in her official capacity as Secretary of State of California (the "Secretary") as defendant. The complaint asserts that Article 2, section 5 of the California Constitution (referred to as the "Top Two Candidates Open Primary Act" and "Prop. 14") is unconstitutional, and purports to plead three causes of action: a "First Claim For Relief: Ballot Access," a "Second Claim For Relief: Violation Of Rights To Freedom Of Speech And Association," and a "Third Claim For Relief: Elections Clause."

While the initial complaint employs the phrase "by implementing an electoral process," and makes passing reference to Elections Code sections 2150, 1930 and 5100 et seq., the complaint centers on the alleged unconstitutionality of Article 2, section 5(a) without reference to any statute or other law. The complaint does not allege the creation or imposition of any burden or restriction on candidate access to the ballot for primary elections or on the ability of voters to cast their vote for the candidates of their choice at primary elections. Rather, the complaint focuses on the general ballot and alleges: "[I]n June 2010, California voters approved Proposition 14, an electoral scheme which prevents general election voters from selecting their candidate of choice. Under Proposition 14, voters in a general election may select from only two candidates for most political offices." (Complaint, ¶ 1; see also id., ¶¶ 21-22, 25.)

On January 11, 2012, the Independent Voter Project, David Takashima, Abel Maldonado & Californians to Defend the Open Primary ("Interveners") filed a complaint in intervention, stating that they intervene "as defendants, and do hereby seek an order of this Court denying any relief to Plaintiffs." (Signed Complaint In Intervention, ¶ 1.) The complaint in intervention makes specific reference to the complaint filed on November 11, 2011, and alleges: "Plaintiffs seek[] an order enjoining Defendant Secretary of State from implementing and enforcing Proposition 14, California's new Top Two Candidate Open Primary law, and S.B. 6, a statutory scheme enacted by the California Legislature on February 19, 2009 to implement Proposition 14." (*Id.*, ¶¶ 2, 6, 8 and 10.) It is not at all clear to the court that the original complaint filed by plaintiffs challenged "S.B. 6," and the SAC does not do so. On February 10, 2012, plaintiffs filed an answer and thereby generally denied each and every allegation of the complaint in intervention.

On April 24, 2012, the court issued and served orders granting interveners' application for joinder in the Secretary's demurrer and sustaining demurrers to the initial complaint. Based on the record before it, leave to amend was granted. For example, with regard to the first cause of action (ballot access) the court granted leave to amend "to plead facts sufficient to state a cognizable cause of action challenging the Proposition 14 ("Prop 14") laws based on the United States Constitution, Amendments 1 and 14, and/or the California Constitution, Article 1, sections 2 and 3, based on a restriction to access to the ballot or otherwise." (*See* Order Demurrer to Complaint Sustained, April 24, 2013.)  By separate order issued the same date, the court denied plaintiffs' motion for preliminary injunction.

On May 10, 2012, plaintiffs filed a first amended complaint. The first amended complaint purported to plead the same three causes of action ("claims") contained in the original complaint, but added a "Fourth Claim For Relief: Equal Protection Clause." Like the original complaint, the first amended complaint was laden with conclusion, assertion, and legal argument, including citation and quotation of case authorities. (See: Order on Demurrers to First Amended Complaint, filed January 25, 2013, 16:9-15.)

On January 25, 2013, the court issued and filed an order sustaining demurrers to the first cause of action (ballot access) and the fourth cause of action (equal protection clause) of the first amended complaint with leave to amend, and sustaining demurrers to the second cause of action (freedom of speech and association) and the third cause of action (elections clause) of the first amended complaint without leave to amend. With regard to the first cause of action, the court granted leave to amend to seek to state an "as applied" challenge to Proposition 14. (Order, 8:19-10:2.)

## IV. The Second Amended Complaint.

On February 14, 2013, plaintiffs filed the second amended complaint (sometimes referred to as the "SAC"). The SAC is filed on behalf of ten named plaintiffs and purports to plead two causes of action, a "First Claim For Relief: Ballot Access" and a "Second Claim For Relief: Equal Protection Clause."

Two of the plaintiffs named in the SAC identify themselves as being "a statewide political party that qualified for the ballot in 2012," the phrase "the ballot" apparently being a reference to the general ballot for an elective office in California. One plaintiff alleges it is a geographic division of a qualified political party. (*Id.*, ¶¶ 14-15.)

Seven of the plaintiffs identify themselves as individuals who are members of one of the plaintiff political parties and allege they regularly support and vote for candidates of one such political party. (*Id.*, ¶¶ 7-13.) Of the seven individual plaintiffs, two (Charles L. Hooper and C.T. Weber) allege that in 2012 they ran a campaign as a candidate for state elective office in California, and two (Steve Collett and Marsha Feinland) allege that in 2012 they ran a campaign as a candidate for congressional elective office. (*Id.*, ¶¶ 8-10 and 12.)

The second amended complaint alleges "Plaintiffs bring this action based upon defendant Bowen's implementation of Proposition 14," and asserts that, as implemented, Article 2, section 5 of the California Constitution violates various provisions of the California and United States constitutions. In a nutshell, plaintiffs complain that defendant Bowen's implementation of Prop. 14 prevented minor political parties, minor party voters, and minor party candidates from participating in the November 6, 2012 statewide *general* election, despite the fact that many minor party candidates received substantial voter support in the June 5, 2012 *primary* election." (*Id.*, ¶¶ 1-3.)

As was the case with the original complaint and the first amended complaint, the second amended complaint does not allege creation or imposition of a burden or restriction on opportunity to participate in a primary election. Rather, the allegation is that Prop. 14 has imposed an unconstitutional burden in connection with plaintiffs' participation in the statewide general election. (*See id.*, ¶¶ 2-3, 19-37, 40, 42-44.)

In support of their allegation that many minor party candidates received substantial voter support in the 2012 primary election, plaintiffs allege: "During last year's [2012] statewide election, nine minor party candidates – including

plaintiff Charles L. Hooper, candidate for state assembly – received 5% or more of the vote [in the primary election] but were not permitted to advance to the general election." (*Id.*, ¶ 2.) The SAC alleges: "Dozens of minor party candidates, receiving as much as 18% of the vote, were limited to participation in the June primary." (*Id.*, ¶ 3.) The SAC alleges that in the 2012 statewide primary Green Party candidate Anthony W. Vieyra received 18.6% of the vote, alleges that Libertarian Party candidate John H. Webster received 15.4% of the vote, and alleges that plaintiff Charles L. Hooper received 5.4% of the vote. (*Id.*, ¶¶ 29-31.)

## V. Demurrers –Second Amended Complaint.

On March 11, 2013, the Secretary filed a demurrer to second amended complaint and memorandum of points and authorities. On the same date, the Secretary filed a request for judicial notice. Also on March 11, 2013, the Interveners filed a demurrer and memorandum of points and authorities and a request for judicial notice. On May 21, 2013, plaintiffs filed a memorandum of points and authorities in opposition to the demurrers and a request for judicial notice. On May 28, 2013, the Secretary filed a reply and a further request for judicial notice and Interveners filed a reply and supplemental request for judicial notice.

The aforementioned requests for judicial notice, all of which are unopposed, are GRANTED. (*See* Evid. Code § 452, subds. (c), (d) and (h), and Evid. Code § 453.) Nevertheless, the court does not take judicial notice of the truth of factual matters asserted in the attached exhibits. For example, as to Interveners' supplemental request filed on May 28, 2013, the court takes judicial notice of the reporting of certain statements purportedly made and published in connection with the debate on Prop. 14 but does not take judicial notice of the truth of such

statements. Also, the court notes some matters subject to the requests are of marginal relevance to the issues presently before the court

On June 7, 2013, the court published a tentative ruling. On June 10, 2013, the parties appeared for hearing on the demurrers and the court entertained oral argument. On June 18, 2013, the parties separately filed further papers as requested by the court, which the court has considered.

On June 19, 2013, the clerk of the court filed a nine-page letter dated June 18, 2013 addressed directly to the undersigned judge by a person identifying himself as an attorney for the Libertarian Party of Washington State. Interveners filed an objection to that letter communication on July 25, 2013, which objection is SUSTAINED. The court did not grant leave for the submission of such additional communication by a purported "amicus."

On June 21, 2013, the court issued an order taking both demurrers under submission. On September 5, 2013, the court issued an order which order is amended by the instant order.

## VI. Discussion and Disposition.

### 1. Standards on Demurrer.

The demurrers filed on March 11, 2013 assert that neither of the claims contained in the second amended complaint states facts sufficient to constitute a cause of action. (*See* C.C.P. § 430.10(e); *see also* C.C.P. §§ 430.30-430.60.)

Interveners cite authority to the effect that the court "should apply federal law to determine whether a complaint pleads a cause of action under section 1983 sufficient to survive a general demurrer." (*See* Memo., p. 2, citing *Catsouras v. Department of California Highway Patrol* (2010) 181 Cal.App.4th 856, 891,

quoting *Bach v. County of Butte* (1983) 147 Cal.App.3d 554, 563). Plaintiffs do not dispute the applicability of such authority. (Opp., p. 5.)

Accordingly, the court has considered the demurrers in light of federal pleading standards, which are not fundamentally different from state pleading standards, including that "the allegations of the complaint are generally taken as true," and that a demurrer may be sustained "only if it 'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (*Catsouras, supra*, 181 Cal.App.4th at p. 891.) "Furthermore, a pleading is insufficient to state a claim ... if the allegations are mere conclusions," and "[s]ome particularized facts demonstrating a constitutional deprivation are needed to sustain a cause of action...." (*Id.*) Nevertheless, as discussed below, the court's determination would be the same regardless of whether state pleading standards are applied.

**2. Voting Rights and Standard Governing Election Law Challenges.**

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections...The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." (*Reynolds v. Sims*, 377 U.S. 533, 554-555 (1964).) And see: (*William v. Rhodes*, 393 U.S. 23, 29-31, 38-39 (1968); (Sto*rer v. Brown*, 415 U.S. 724 (1974)

"The right of suffrage, everywhere recognized as one of the fundamental attributes of our form of government, is guaranteed and secured by the Constitution of this state to all citizens who are within the requirements therein provided.... This constitutional right of the individual citizen includes the right to

vote … at primary elections." (*Communist Party v. Peek* (1942) 20 Cal.2d 536, 542; *see also* Cal. Const. Art. 2, §§ 2 and 5; Elections Code § 2000.)

In *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), the Court stated: "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" (*Id.* [citations omitted.]) "The rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First Amendment and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulations must be 'narrowly drawn to advance a state interest of compelling importance.' [Citation.] But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (*Id.* [citation omitted]; *see, e.g., Williams v. Rhodes, supra*, 393 U.S. at pp. 30-31; *Storer v. Brown*, 415 U.S. 724 (1974); *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-196 (1986); *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 174.)

**3. Ballot Access.**

Plaintiffs do not allege that, on its face or as applied, Prop.14 imposes any restriction or burden on the opportunity of any candidate or voter to participate in a *primary* election. Plaintiffs do not (and cannot) dispute that Article 2, section 5(a) provides all candidates with easy and equal access to the primary election

ballot, and provides all voters with the same opportunity to vote for the primary election candidate(s) of their choice. Rather, plaintiffs allege that, while they "still have the opportunity to participate in a primary election," Prop. 14 as applied "unconstitutionally burdened the rights of minor party voters, minor party candidates, the minor parties themselves from effective participation in California's *general* elections, even when those parties and candidates demonstrated substantial support in the primary election." (SAC, ¶ 40 [italics supplied.]) Plaintiffs' allegations that certain minor-party candidates received more than 5% and as much as 18.6% of the primary election votes cast for particular offices and yet did not qualify for the general election ballot are insufficient to set forth a constitutionally cognizable burden on ballot access.

It is well settled that States have the right to require candidates to make "a preliminary showing of substantial support" in order to qualify for a place on the general election ballot. (*Munro, supra,* 479 U.S. at p. 194, and cases cited; *see also California Democratic Party v. Jones,* 530 U.S. 567, 572 (2000) ["in order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot"].)

Under California law, the purpose of a primary election is to provide the machinery for the selection of candidates to be voted for in the ensuing general election. (*Cummings v. Stanley* (2009) 177 Cal. App. 4th 493, 510.) As observed by the Supreme Court: "[I]t is now clear that States may condition access to the general election ballot by a minor party candidate or independent candidate upon a showing of a modicum of support among the potential voters for the office." (*Munro, supra,* 479 U.S. at pp. 193-194.) But it does not follow that any and every

candidate who receives some percentage of the votes cast in a given primary election thereby obtains a constitutional right to compete in the ensuing general election. Plaintiffs cite no law expressing or supporting such a right. In any event, Article 2, section 5(a) does not restrict access to the general election ballot based on a specified percentage of votes cast in the primary election but instead allows the top two primary election vote-getters, with any percentage of votes, to advance to the general election.

In *Munro, supra,* 479 U.S. 189, the Supreme Court addressed a state statute which required that a minor-party candidate for partisan office receive 1% of all votes cast for that office in the primary election before the candidate's name would be placed on the general election ballot. The Court stated: "The question for decision is whether this statutory requirement, as applied to candidates for statewide offices, violates the First and Fourteenth Amendments to the United States Constitution." (*Id.,* at pp. 190-191.) The Court observed that, as with Prop. 14, "Washington conducts a 'blanket primary' at which registered voters may vote for any candidate of their choice, irrespective of the candidates' political party affiliation." (*Id.,* p. 192.) The Court further observed: "The primary election in Washington, like its counterpart in California, is 'an integral part of the entire electoral process … [that] functions to winnow out and finally reject all but the chosen candidates.'" (*Id.,* p. 196.) After review of pertinent authority, the Court held that the challenged "winnowing" structure was constitutionally permissible. (*Id.,* pp. 194-195, citing, *inter alia, Storer v. Brown, supra*, 415 U.S. at p. 736.) In doing so, the Court pointed out: "States are not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general ballot."

1  (*Id.*, at p. 198.) Similarly, "[i]t can hardly be said that … voters are denied
2  freedom of association because they must channel their expressive activity into a
3  campaign at the primary as opposed to the general election...." (*Id.*, p. 199.)

4        Plaintiffs are correct that the Supreme Court has not yet squarely addressed
5  whether a "top two" primary system such as established by Article 2 section 5(a)
6  affects or could affect ballot access rights in a manner that would be
7  constitutionally impermissible. (*See, e.g., Washington State Grange v. Washington*
8  *State Republican Party*, 552 U.S. 452, 452 (2008) ["Petitioners are correct that we
9  assumed that the non-partisan primary we described in *Jones* would be
10 constitutional"]; *id.*, p. 458, n. 11.)

11       Nevertheless, in a recent decision the United States Court of Appeals for the
12 Ninth Circuit that held that a similar system enacted in the State of Washington
13 did not impose a "severe burden" on the rights of minor parties (or their voters or
14 candidates) regarding access to the general election ballot. (*See Washington State*
15 *Republican Party v. Washington State Grange* (9th Cir. 2012) 676 F.3d 784, 794-
16 795.) Relying on *Munro* and other Supreme Court cases, the court held, among
17 other things, that "because [the law] gives major-and minor-party candidates equal
18 access to the primary and general election ballots, it does not give the 'established
19 parties a decided advantage over any new parties struggling for existence.'" (*Id.*,
20 at p. 795, quoting *Williams v. Rhodes* (1968) 393 U.S. 23, 31; *see also id.*, quoting
21 *Munro, supra*, 479 U.S. at p. 199.) Because the law did not impose a "severe"
22 burden on constitutional rights, the court held that it survived review because it
23 furthered Washington's "important regulatory interests." (*Id.*, at pp. 794-795.)

24       In *Washington State Republican Party v. Washington State Grange, supra*,
25 the court cited *California Democratic Party v. Jones, supra*, in which the Supreme

Court held that California's then existing blanket primary (Proposition 198) violated a political party's First Amendment right of association because it involved a partisan primary in which a party was required to permit non-party members to participate in selecting the party's candidate for the general election, which involved "forced association." (530 U.S. at pp. 578-582.)[1] In evaluating the State's interests, the Supreme Court noted that the First Amendment infringement could be avoided by "resorting to a *nonpartisan* blanket primary," under which each voter, "regardless of party affiliation, may then vote for any candidate, and the top two vote getters (or however many the State prescribes) then move on to the general election." (*Id.*, p. 585.) The Supreme Court stated that under such a system, "a State may ensure more choice, greater participation, increased 'privacy,' and a sense of 'fairness' – all without severely burdening a political party's First Amendment right of association." (*Id.*, p. 586.)

Plaintiffs are correct that the above statements made by the Court in *Jones* are *dicta* as to whether a "top two" non-partisan voter-nomination primary would or could constitute an unconstitutional infringement on ballot access. Nonetheless, such statements provide some indication that the Supreme Court would not consider such a hypothesized system to impose a severe burden on voting and associational rights. *Washington State Republican Party, supra,* 676 F.3d at p. 795 ["the Supreme Court has expressly approved of top two primary systems"]; *see also Coeur D'Alene Tribe of Idaho v. Hammond* (9th Cir. 2004) 384 F.3d 674, 683 ["our precedent requires that we give great weight to dicta of the Supreme

---

[1]    With regard to non-partisan elections, *see Communist Party v. Peek, supra,* 20 Cal.2d at p. 544 ["in a non-partisan election the party system is not an integral part of the elective machinery and the individual's right of suffrage is in no way impaired by the fact that he cannot exercise his right through a party organization."])

Court"]; *California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 114 ["legal pronouncements by the Supreme Court are highly probative and, generally speaking, should be followed even if dictum"]; *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 287.)

Plaintiffs are correct that, notwithstanding the apparently plenary power of the States recognized by Article I, section 4 of the Constitution, the Supreme Court of the United States has invalidated certain state-imposed restrictions on ballot access. However, the Court has not done so in the context of a *non-partisan* election such as is required by Article 2 section 5(a.)

For example, while Article 2 section 5(a) is limited to selection of candidates for congressional and state elective offices in California, in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Court held that an Ohio "early filing deadline" statute which required that an *independent* candidate for President file a statement of candidacy and nominating petition in March in order to appear on the general election ballot in November imposed an unconstitutional burden on voting and associational rights: "A [statutory] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." Id., 793-794. Likewise, in *Williams v. Rhodes, supra*, 393 U.S. at pp. 24-25, the Court invalidated a statute requiring a new party to obtain petitions signed by qualified electors totaling 15% of the number of ballots cast in the last preceding gubernatorial election in order to have any access to the election. That statute imposed a requirement applicable only to new parties and prevented any access to the ballot unless it was met. In contrast, Prop. 14  provides easy (and unchallenged) access to the primary ballot and allows voters to vote for candidates

of any (or no) party affiliation or preference in the primary process at the same time and on the same terms as major party candidates. (And see: *Washington State Republican Party, supra,* 676 F.3d at p. 794.)

Plaintiffs do not dispute that Article 2, section 5 gives all candidates equal access to the primary election ballot. Article 2, section 5 does not, on its face or as applied, give any "established" candidate or party an advantage over plaintiffs, or over any other political party, candidate, or voter. The circumstance that a candidate does not receive enough votes in a primary election to be one of the top two vote-getters cannot be equated or conflated with an absence of access to a ballot.

The court concludes that the primary election required by Article 2 section 5 must be considered as an integral part of the entire election process. (*See, e.g., Donnellan v. Hite* (1956) 139 Cal.App.2d 43, 47 ["The primary election is an integral part of the election process"]; *Munro, supra,* 479 U.S. at p. 196; *Cummings, supra,* 177 Cal.App.4th 493, 509-510.)  The court further concludes that because California affords all candidates easy access to the primary election ballot and the opportunity for the candidates to wage a ballot-connected campaign, the effect of Prop. 14 (Article 2, section 5(a)) on plaintiffs' constitutional rights is slight, and any resulting burden or restriction does not violate any constitutionally guaranteed right. (*See Munro, supra,* 479 U.S. at p. 196 ["We think that the State can properly reserve the general election ballot 'for major struggles'"; "The State of Washington was clearly entitled to raise the ante for ballot access, to simplify the general election ballot, and to avoid the possibility of unrestrained factionalism at the general election"]); *Burdick v. Takushi, supra,* 504 U.S. at p. 434 ["when a state election law provision imposes only 'reasonable, nondiscriminatory

restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."])

Without limiting the generality of the foregoing, with regard to the allegation that as part of the implementation of Article 2, section 5 the Secretary *decided to hold the primary in June*, the court notes the June date was set by the Legislature in 2007, *well prior* to and independent of Prop. 14. Indeed, the second amended complaint alleges as much. (SAC, ¶ 18.) In any event, plaintiffs have failed to cite (and the court has been unable to find) any law tending to support a conclusion that plaintiffs (or candidates, voters, and/or political parties in general) have a constitutionally guaranteed right to require the State to set primary election or general election dates at times and places thought by certain candidates, voters, and/or political parties as conducive to their success at the ballot.

The court determines that, whether the second amended complaint is considered under the rules governing pleading in federal courts or the rules of pleading in California courts, the demurrers to the "First Claim for Relief: Ballot Access" must be sustained without leave to amend. The court's decision is made on the ground that the "First Claim For Relief: Ballot Access" does not state facts sufficient to constitute a cause of action. (*See* C.C.P. § 430.10(e).)

Although plaintiffs' opposition includes a request that leave to amend be permitted if the demurrer is sustained, they have not met their burden of demonstrating how they could amend the cause of action to overcome the deficiencies. (*See Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) The court has sustained two previous demurrers with leave to amend and plaintiffs have not stated a sufficient constitutional claim. Under the circumstances, permitting a

further opportunity to amend would be futile. (*Cf. Hills Transp. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal.App.2d 702, 713-714.)

**4. Equal Protection.**

The court further determines that the demurrers to the "Second Claim For Relief: Equal Protection Clause" must be sustained without leave to amend.

In this claim, plaintiffs allege in relevant part that Prop. 14 "withdrew an established right from plaintiffs, namely, the right of minor political parties, their voters, and their candidates to participate in statewide general elections" and that "[b]ecause Prop. 14 drafters were motivated by an invidious purpose when they enacted electoral reform, and because Secretary Bowen's implementation of Prop. 14 in 2012 denied numerous well-supported minor party candidates from participating in the general election, plaintiffs' equal protection rights have been violated...." (SAC, ¶ 43.) In its order of January 25, 2013, the court sustained a demurrer to a similar claim based on similar allegations in the first amended complaint with leave to amend to plead facts sufficient to state a constitutional equal protection challenge. Plaintiffs have not remedied the deficiencies.

The court's decision is made on the ground that the cause of action as amended does not state facts sufficient to constitute a cause of action (C.C.P. § 430.10(e)), and is based on the points recited in the papers filed by defendants in support of their demurrers. In so ruling, the court concludes that plaintiffs have failed to identify "an established right" which was withdrawn from plaintiffs (or any of them) by the implementation of Prop. 14, have failed to sufficiently allege any instance of invidious intent or conduct, and have failed to meet their burden to show how they could amend this cause of action to overcome the deficiencies pointed to by defendants. (*Goodman, supra,* 18 Cal.3d at p. 349.)

Among other things, and as the court stated in its prior order, Prop. 14 on its face does not appear to be directed to any classification or group. (*See, e.g.*, Cal. Const. Art II, § 5; Nowak & Rotunda, Constitutional Law [5th ed.], § 14.4 [and cases cited therein.]) Nor is there anything in Prop. 14 that "withdraws" an "established right" from a particular group of people. It appears the claim is based largely on principles set forth in *Perry v. Brown* (9th Cir. 2012) 671 F.3d 1052, 1083-1084, vacated and remanded in *Hollingsworth v. Perry* (2013) 133 S.Ct. 2652. Plaintiffs' theory is not supported by *Perry*, in which the court held that "the Equal Protection Clause requires the state to have a legitimate reason for withdrawing a right or benefit from one group but not others, whether or not it was required to confer that right or benefit in the first place." (671 F.3d at pp. 1083-1084.)

Here, in contrast to *Perry*, the challenged law does not on its face or in its application "target" one group or another for disparate treatment. Instead, it allows broad access to candidates identifying with any party (or no party) to participate in the primary election and then permits the top two vote-getters of whatever (or no) party affiliation to advance to the general election. In contrast to circumstances such as those in *Valle Del Sol Inc. v. Whiting* (9th Cir. 2013) 708 F.3d 808, 819, or *Moss v. U.S. Secret Service* (9th Cir. 2012) 675 F.3d 1213, 1224-1225, there are no allegations that the Secretary applied the law in a discriminatory way to deny rights to any particular group or persons with a particular viewpoint as compared to others.

Further, there are insufficient allegations to support a violation of the Equal Protection Clause based on discriminatory intent. "[O]fficial action will not be held unconstitutional solely because it results in a ... disproportionate impact....

Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (*Village of Arlington Heights v. Metropolitan Housing Development Corp.* (1977) 429 U.S. 252, 264-265.)

First, Plaintiffs' allegations regarding the intent of the "drafters" of Prop. 14 are irrelevant because "such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters' intent." (*Taxpayers to Limit Campaign Spending v. Fair Pol. Practices Comm'n* (1990) 51 Cal.3d 744, 765 n.10.) This applies equally to the materials included in Plaintiffs' Request for Judicial Notice, upon which they base an argument that the manner in which the legislature decided to place Prop. 14 on the ballot reflects an invidious purpose. Regardless of how the legislature decided to place it on the ballot, however, such circumstances do not show that the voters lacked ample time to consider and vote on the measure or that they had any discriminatory intent in doing so.

Second, Plaintiffs' selected quotation of an argument against Prop. 14 in the voter guide materials is an insufficient basis on which to support a finding of voter discriminatory intent. (*See, e.g., Legislature v. Eu* (1991) 54 Cal.3d 492, 505; *NLRB v. Fruit & Vegetable Packers & Warehousemen* (1964) 377 U.S. 58, 66; *Ross v. RagingWire Telecommuns., Inc.* (2008) 42 Cal.4th 920, 929 [rejecting opponents' ballot arguments as a guide to voter intent].) As a whole, the statements in the voter guide do not reflect that the proposition was aimed at depriving a particular group of established rights. (*See* Interveners' Request for Judicial Notice, Exh. F.)

To the extent the cause of action is based on a violation of the California Constitution as opposed to the United States Constitution, it is deficient for the

same reasons. "In analyzing constitutional challenges to election laws, [the California Supreme Court] has followed closely the analysis of the United States Supreme Court." (*Edelstein, supra,* 29 Cal.4th at p. 179.) Also, Prop. 14 is itself part of the California Constitution and is accorded equal dignity with other provisions. (*Strauss v. Horton* (2009) 46 Cal.4th 364, 465-469.)

### VII. Conclusion.

The second amended complaint is dismissed. The September 20, 3013 dismissal of the entire action is vacated. The parties shall appear for case management conference on October 4, 2013 at 9 o'clock a.m. and will address the status of the case, including the complaint in intervention and entry of judgment.

The foregoing order augments, amends, and corrects the orders issued and filed herein on September 5, 2013 and September 20, 2013.

**IT IS SO ORDERED.**

Date: September 23, 2013

Lawrence John Appel

_____

Lawrence John Appel
Superior Court Judge

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ALAMEDA

Case Number : RG11605301
Case name: Rubin   vs.    Bowen

**ORDER [AMENDED-CORRECTED]**
**FILED ON SEPTEMBER 23, 2013**

DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document, **ORDER [AMENDED-CORRECTED] FILED ON SEPTEMBER 23, 2013**was mailed first class, postage prepaid, in a sealed envelope, addressed as shown at the bottom of this document, and that the mailing of the foregoing and execution of this certificate occurred at 1221 Oak Street, Oakland, California.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 23, 2013.

A. Tumonong

Executive Officer/Clerk of the Superior Court
By Ana Liza Tumonong, Deputy Clerk

Michael Siegel, Esq.
Siegel & Yee
499 14th Street, Suite 300
Oakland, CA 94612

Mark Beckington, Esq.
Office of the Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013

Christopher Skinnell, Esq.
Parrinello Gross & Leoni LLP
2350 Kerner Blvd., Suite 250
San Rafael, CA 94901

EXHIBIT C

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

Court of Appeal First Appellate District

FILED

FEB 27 2015

Diana Herbert, Clerk

by_____Deputy Clerk

MICHAEL RUBIN et al.,

     Plaintiffs and Appellants,

v.

ALEX PADILLA, as Secretary of State, etc.,

     Defendant and Respondent;

INDEPENDENT VOTER PROJECT et al.,

     Interveners and Respondents.

A140387

(Alameda County
Super. Ct. No. RG11605301)

BY THE COURT:[1]

    Appellants' petition for rehearing is denied.

Date: _____FEB 27 2015_____    HUMES, P.J.

    _____ P.J.

---

[1] Before Humes, P.J., Margulies, J., and Banke, J.

EXHIBIT D

Court of Appeal, First Appellate District, Division One - No. A140387

S224970

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

MICHAEL RUBIN et al., Plaintiffs and Appellants,

v.

ALEX PADILLA, as Secretary of State, etc., Defendant and Respondent;

INDEPENDENT VOTER PROJECT et al., Interveners and Respondents.

---

The petition for review is denied.

SUPREME COURT
FILED

APR 29 2015

Frank A. McGuire Clerk

Deputy

CANTIL-SAKAUYE

*Chief Justice*

EXHIBIT E

(ORDER LIST: 577 U. S.)

TUESDAY, OCTOBER 13, 2015

CERTIORARI -- SUMMARY DISPOSITIONS

14-1422     FIRST MARBLEHEAD CORP., ET AL. V. MA COMMISSIONER OF REVENUE

The petition for a writ of certiorari is granted.  The
judgment is vacated, and the case is remanded to the Supreme
Judicial Court of Massachusetts for further consideration in
light of *Comptroller of Treasury of Md.* v. *Wynne*, 576 U. S. ____
(2015).

15-5330     ROSE, RICHARD W. V. UNITED STATES

The motion of petitioner for leave to proceed *in forma
pauperis* and the petition for a writ of certiorari is granted.
The judgment is vacated, and the case is remanded to the United
States Court of Appeals for the Eleventh Circuit for further
consideration in light of *Johnson* v. *United States*, 576 U. S.
____ (2015).

15-5601     MISSUD, PATRICK A. V. COURT OF APPEALS OF CA

Because the Court lacks a quorum, 28 U. S. C. §1, and since
the only qualified Justices are of the opinion that the case
cannot be heard and determined at the next Term of the Court,
the judgment is affirmed under 28 U. S. C. §2109, which provides
that under these circumstances "the court shall enter its order
affirming the judgment of the court from which the case was
brought for review with the same effect as upon affirmance by an
equally divided court."  The Chief Justice, Justice Scalia,
Justice Kennedy, Justice Thomas, and Justice Alito took no part

1

in the consideration or decision of this petition.

15-5654    McCARTHREN, BACARI V. UNITED STATES

15-5667    JONES, JAMES B. V. UNITED STATES

   The motions of petitioners for leave to proceed *in forma pauperis* and the petitions for writs of certiorari are granted. The judgments are vacated, and the cases are remanded to the United States Court of Appeals for the Eleventh Circuit for further consideration in light of *Johnson* v. *United States*, 576 U. S. ____ (2015).

## ORDERS IN PENDING CASES

14A1153    NECHOVSKI, PETE V. UNITED STATES

   The application for certificate of appealability addressed to Justice Sotomayor and referred to the Court is denied.

15A216    MANSKA, CHRISTOPHER L. V. MINNESOTA

15A293    WATSON, LAURA M. V. FLORIDA JUDICIAL QUAL. COMM'N

   The applications for stays addressed to Justice Sotomayor and referred to the Court are denied.

15M30    COLON, CHRISTIAN R. V. FOSTER, WARDEN

15M31    THOMPSON, BEVERLY, ET AL. V. RUDDY, GREGORY P., ET AL.

   The motions to direct the Clerk to file petitions for writs of certiorari out of time are denied.

15M32    NEALY, DARWIN M. V. USPS

   The motion to direct the Clerk to file a petition for a writ of certiorari out of time under Rule 14.5 is denied.

15M33    BROCK, MICHAEL V. SMALL, WARDEN

15M34    UPSON, WILLIE D. V. JONES, SEC., FL DOC, ET AL.

   The motions to direct the Clerk to file petitions for writs of certiorari out of time are denied.

142, ORIG.    FLORIDA V. GEORGIA

        The motion of the Special Master for allowance of fees and disbursements is granted, and the Special Master is awarded a total of $70,245.52, for the period April 1, 2015, through August 31, 2015, to be paid equally by the parties.

15-5539    BROWN, TRACY V. KLEEREKOPER, JANET

15-5686    FRANCO-BARDALES, MARVIN A. V. LYNCH, ATT'Y GEN.

        The motions of petitioners for leave to proceed *in forma pauperis* are denied.  Petitioners are allowed until November 3, 2015, within which to pay the docketing fees required by Rule 38(a) and to submit petitions in compliance with Rule 33.1 of the Rules of this Court.

### CERTIORARI DENIED

14-1153    LaCHANCE, EDMUND D. V. MASSACHUSETTS

14-1286    UNITED HEALTHCARE OF AZ, ET AL. V. SPINEDEX PHYSICAL THERAPY

14-1331    KIRSCHENBAUM, KENNETH V. DEPT. OF LABOR

14-1436    HAMBLETON, MICHAEL, ET AL. V. WA DEPT. OF REVENUE

14-1464    OAKLAND PORT SERVICES CORP. V. GODFREY, LAVON, ET AL.

14-1497    )    KANE COUNTY, UT V. UNITED STATES
          )
15-27    )    UTAH V. UNITED STATES

14-9416    DIAZ, RAFAEL V. QUINTANA, WARDEN

14-9470    LEE, LEDELL V. KELLEY, DIR., AR DOC

14-9875    WEST, BERNARD V. UNITED STATES

14-10066    SMITH, CHARLES A. V. COLORADO

14-10405    LOPEZ, VICTOR V. UNITED STATES

14-10443    WILLIAMS, ROCKY J. V. UNITED STATES

15-16    JOHNSON, ALLEN R. V. UNITED STATES

15-17    DAVIS, CAROLYN L. V. U.S. BANK, N.A., ET AL.

15-22          GERHARTZ, WILLIAM N. V. RICHERT, DAVID, ET AL.

15-23          PRAIRIE COUNTY, MT, ET AL. V. UNITED STATES

15-130         ANGLIN, MARTHA L. V. CERES GULF, INC., ET AL.

15-135         RUBIN, MICHAEL, ET AL. V. PADILLA, ALEX, ET AL.

15-139         VOLK, LEANNA V. WILLIAMS, NICHOLAS G.

15-143         GJOKAJ, SHACE, ET VIR V. HSBC MORTGAGE SERVICES, ET AL.

15-165         HINDO, NAZAR R., ET UX. V. BANK OF NEW YORK MELLON

15-167         CHRISTAKIS, PAGONA V. JEANNE D'ARC CREDIT UNION

15-171         DeFAZIO, JAMES P., ET AL. V. HOLLISTER, INC., ET AL.

15-177         NOATEX CORPORATION, ET AL. V. AUTO PARTS MANUFACTURING, ET AL.

15-184         OVERTON, ALAN L. V. TN DEPT. OF CHILDREN'S SERVICES

15-190         HARDIN, RUTH V. WAL-MART STORES, INC.

15-192         HENDERSON, GLENN V. HOPE MILLS, NC, ET AL.

15-207         VAN TASSEL, LYNN A. V. PICCIONE, JUDGE, ETC., ET AL.

15-211         HOLLIER, AARON, ET UX. V. WATSON, RANDY, ET AL.

15-212         HARRIS, JAY M. V. FIESTA TEXAS, INC., ET AL.

15-213         LIM, CHANG V. TERUMO CORPORATION, ET AL.

15-223         CORNELIUS, E. FRANK V. DYKEMA GOSSETT PLLC, ET AL.

15-231         SMITH, DAVID R. V. UNITED STATES

15-246         MAXITRATE TRATAMENTO, ET AL. V. ALLIANZ SEGUROS S.A.

15-251         McRAE, MARGIE V. DOERING, MATTHEW, ET AL.

15-261         ROSSCO HOLDINGS, INC., ET AL. V. McCONNELL, MICHAEL, ET AL.

15-271         REED, SAMUEL V. KANSAS

15-275         CHAMBERLAIN, JERAMIAH V. VIRGINIA

15-279         SONE, KENSHO, ET AL. V. HARVEST NATURAL RESOURCES, INC.

15-285         ANDERSON, RODNEY J. V. UNITED STATES

15-309         KERLEY, JERRY D. V. UNITED STATES

15-5137        ALLEN, NORMAN S. V. UNITED STATES

```
15-5140      DRISKILL, JESSE V. MISSOURI

15-5474      KOPATZ, KIM R. V. CALIFORNIA

15-5479      FISHER, TWANA V. IRONTON, OH

15-5484      WAGONER, RICHARD V. LEMMON, COMM'R, IN DOC, ET AL.

15-5487      LANDERS, RODNEY V. NORRIS, MARCIA L.

15-5490      MAZIN, ELIAHU V. NORWOOD POLICE DEPT., ET AL.

15-5494      BERNIER, REJEANNE M. V. COURT OF APPEAL OF CA, ET AL.

15-5496      COWART, GARDELL V. SHERMAN, WARDEN

15-5497      HARNAGE, JAMES A. V. TORRES, RAQUEL, ET AL.

15-5501      HOUSWERTH, RICHARD V. JONES, SEC., FL DOC, ET AL.

15-5502      HIGGINBOTHAM, J. C. V. MISSISSIPPI

15-5505      HARNAGE, JAMES A. V. RELL, JODI M., ET AL.

15-5512      CLAYTON, GLORIA A. V. BANK OF AMERICA, ET AL.

15-5513      CREAMER, KENNETH F. V. VIRGINIA

15-5520      TAYLOR, THERL V. PATE, WARDEN

15-5521      LEWIS, ANTHONY V. AMERICAN AIRLINES, INC.

15-5522      MELTON, ANTONIO L. V. JONES, SEC., FL DOC, ET AL.

15-5524      JOHNSON, KENIS R. V. PERRY, SEC., NC DPS

15-5525      MARTINEZ, MIGUEL V. WINN, WARDEN

15-5526      JOHNSON, HERMAN V. ZATECKY, SUPT., PENDLETON

15-5528      JOHNSON, THADDEUS V. TENNESSEE

15-5541      BRAMAGE, WALTER J. V. DISCOVER BANK

15-5542      ALFRED, JERRY N. V. JONES, SEC., FL DOC, ET AL.

15-5546      REYNA, LOREN V. YOUNG, WARDEN, ET AL.

15-5550      ABNEY, CAREY V. COURT OF COMMON PLEAS OF PA

15-5552      PAWLEY, CASH W. V. FLORIDA

15-5553      SKINNER, STEVE V. JOHNSON, WARDEN

15-5555      MAGWOOD, BOBBY V. FLORIDA
```

15-5556      CASTANEDA, YVETTE V. BURTON-CAHILL, MARGARET, ET AL.

15-5558      DONOFRIO, MICHAEL V. NEW YORK

15-5562      POWERS, THOMAS V. WEXFORD HEALTH SERVICES, ET AL.

15-5567      PETRANO, DAVID F., ET UX. V. NATIONWIDE MUTUAL FIRE, ET AL.

15-5568      WRIGHT, FRANKLIN H. V. U.S. INTERAGENCY COUNCIL, ET AL.

15-5570      COLEMAN, GARCEIA V. BARTOW, DIR., WI RESOURCE CENTER

15-5571      CAISON, NORMAN E. V. JONES, SEC., FL DOC

15-5572      CROWELL, ERIC R. V. CLARKE, DIR., VA DOC

15-5573      CROWELL, ERIC R. V. CLARKE, DIR., VA DOC

15-5590      MOODY, PAULINE V. DELRAY BEACH, FL, ET AL.

15-5591      McCARTHY, RICHARD W. V. FLORIDA

15-5594      BELL, WADE W. V. VIRGINIA NATURAL GAS, INC.

15-5596      BAKALIK, DANIEL J. V. QUINN, PAT, ET AL.

15-5597      PICKENS, BRANDON M. V. PERRITT, SUPT., LUMBERTON

15-5599      RAMIREZ, CARLOS J. V. CALIFORNIA

15-5600      WATFORD, MARLON L. V. QUINN, PAT

15-5602      ARRIAGA, ISAAC F. V. BEARD, SEC., CA DOC

15-5603      DAVIS, BEULAH V. COLVIN, ACTING COMM'R, SOC. SEC.

15-5609      ROBERTS, ARRIE V. FLORIDA

15-5614      McNAMARA, GREGG V. CALIFORNIA

15-5615      DeHENRE, MALACHY V. MISSISSIPPI, ET AL.

15-5616      DAVIS, MORRIS D. V. ARKANSAS

15-5621      BARRERA, VICTOR V. INDUSTRIAL CLAIM APPEALS, ET AL.

15-5622      BOYD, TERENCE O. V. MISSISSIPPI

15-5623      BOND, PAMELA V. DEPT. OF EDUCATION

15-5640      DANIHEL, JOSEPH O. V. OFFICE OF THE PRESIDENT, ET AL.

15-5641      ELERI, CHARLES C. V. HARTLEY, WARDEN

15-5655      VERNON, MAURICE V. UNITED STATES

```
15-5663     PARTIDA-RODRIGUEZ, JUAN A. V. PERRY, FRANK

15-5665     PELA, LAWRENCE U. V. KATAVICH, WARDEN

15-5672     OFELDT, JAMES D. V. COX, DIR., NV DOC, ET AL.

15-5675     VOGT, SHELBY A. V. IOWA STATE PENITENTIARY, ET AL.

15-5676     WAGNER, SHAWN M. V. SMITH, WARDEN

15-5680     CLARK, LARRY E. V. USDC WD LA

15-5681     SABIN, RICKEY L. V. TRUJILLO, ERNEST, ET AL.

15-5707     PHILLIPS, DELORIS V. TX DEPT. OF PUBLIC SAFETY

15-5726     DUNCAN, WENDELL V. MISSISSIPPI

15-5727     ELFADLY, RAID V. COLVIN, ACTING COMM'R, SOC. SEC.

15-5747     CLUGSTON, CHARLES T. V. BATISTA, DIR., MT DOC, ET AL.

15-5763     LEE, DERRYEL V. PREMO, SUPT., OR

15-5772     KENDRICK, EDWARD T. V. TENNESSEE

15-5784     STANTON, JOHN D. V. UNITED STATES

15-5790     VALENTINE, DAWNA V. JPMORGAN CHASE BANK, N.A.

15-5803     NELSON, JOHN V. KANE, ATT'Y GEN. OF PA, ET AL.

15-5817     DAVIS, D'ANGELO D. V. UNITED STATES

15-5818     CORREA-OSORIO, JORGE V. UNITED STATES

15-5821     LOWE, MICHAEL C. V. MINNESOTA

15-5822     USMAN, MUHAMMED N. V. UNITED STATES

15-5829     BARRINGTON, JOHN E. V. BABCOCK, WARDEN, ET AL.

15-5830     SMITH, PATRICK V. FISCHER, COMM'R, NY DOC

15-5831     NUNEZ, DANIEL V. UNITED STATES

15-5833     FREEMAN, EARL W. V. UNITED STATES

15-5836     YOUNG, DONNELL V. UNITED STATES

15-5838     MARTINEZ-MONTALVO, DAVID A. V. UNITED STATES

15-5841     QUALLS, THOMAS W. V. UNITED STATES

15-5843     ENYART, RICHARD V. ERDOS, WARDEN
```

```
15-5844     DIAZ-SOTO, SANTOS V. UNITED STATES

15-5848     WEBB, KEITH B. V. UNITED STATES

15-5849     WATSON, ANTHONY V. UNITED STATES

15-5852     SPENCER, RANDY L. V. TIFFT, WARDEN, ET AL.

15-5855     MARTIN, EDGAR K. V. UNITED STATES

15-5857     WILLIAMS, ERNEST C. V. GRIFFITH, WARDEN

15-5859     LEVERETTE, DAVID B. V. FLORIDA

15-5861     BAL, JOHN A. V. ITEX CORPORATION, ET AL.

15-5862     BARTHOLOMEW, KEVIN V. MUHAMMAD, A. F., ET AL.

15-5863     VINES, TONY V. UNITED STATES

15-5871     BRAY, JOHN M. V. PREMO, SUPT., OR

15-5872     BOWERS, JARED T. V. UNITED STATES

15-5873     CREAMER, DENNIS V. FL COMM'N ON OFFENDER REVIEW

15-5876     SOTO, PEDRO V. UNITED STATES

15-5877     TOTTEN, JEROME V. MISSISSIPPI

15-5881     WHITE, JEFFERY V. UNITED STATES

15-5883     CHOI, JULIE V. UNITED STATES

15-5885     CHRISTIAN, GREGORY B. V. PLUMLEY, WARDEN

15-5887     MOE, MARIA L. V. UNITED STATES

15-5888     BAINE, MARK A. V. ESTES, WARDEN

15-5889     BALSAM, ZANE V. UNITED STATES

15-5891     JONES, SHUNTRELL V. UNITED STATES

15-5892     MAXWELL, MAURICE C. V. UNITED STATES

15-5893     MARQUEZ, JOSE V. UNITED STATES

15-5896     WHITTAKER, SHADDY V. UNITED STATES

15-5897     WHITTAKER, SHADDY V. UNITED STATES

15-5899     ELENES, FORTINO V. UNITED STATES

15-5902     BURG, JAMES P. V. UNITED STATES
```

```
15-5909      LANHAM, WILLIAM C. V. UNITED STATES

15-5911      LINDOR, JEAN M. V. UNITED STATES

15-5913      HAHN, MARCUS V. UNITED STATES

15-5922      LEAKE, KATARIE V. UNITED STATES

15-5931      AMADOR-HUGGINS, ALEXIS V. UNITED STATES

15-5936      WHITFIELD, JAMES V. JONES, SEC., FL DOC, ET AL.

15-5937      MILHOUSE, KAREEM V. UNITED STATES

15-5938      REZENDES, DAVID J. V. UNITED STATES

15-5939      IMPERATO, DANIEL V. SEC

15-5943      SPENCER, JAMES V. UNITED STATES

15-5949      ARGUETA-BONILLA, DAVID J. V. UNITED STATES

15-5950      SAGE, CHRIS D. V. UNITED STATES

15-5951      DIAZ-AGRAMONTE, LUIS A. V. UNITED STATES

15-5952      DOE, JOHN V. UNITED STATES

15-5953      COLONDRES, JOHNNY V. MASSACHUSETTS

15-5955      SACUS, CHARLES V. UNITED STATES

15-5956      JIM, DERRICK V. UNITED STATES

15-5960      MITCHELL, DONALD V. UNITED STATES

15-5962      REYES-LOPEZ, JORGE L. V. UNITED STATES

15-5966      VOLKMAN, PAUL H. V. UNITED STATES

15-5968      MUJAHID, SABIL M. V. UNITED STATES

15-5972      COX, ANTHONY A. V. UNITED STATES

15-5975      JHA, MANOJ K. V. UNITED STATES

15-5978      TAYLOR, JACOREY V. UNITED STATES

15-5981      WOODWARD, EDWARD J. V. UNITED STATES

15-5982      WARREN, DARYL V. UNITED STATES

15-5992      SHANKLE, ADRIAN L. V. UNITED STATES

15-5993      ROBBINS, ALEXANDER V. UNITED STATES
```

9

15-5994    RETTA-REYES, MARCO C. V. UNITED STATES

15-5997    MASSEY, TIMOTHY V. UNITED STATES

15-5999    CORTEZ-GUZMAN, JOSE D. V. UNITED STATES

15-6000    CHIN, TEDRIC J. V. UNITED STATES

15-6010    VILLARREAL-FLORES, JORGE V. UNITED STATES

15-6011    WILLIAMS, LOVONNE V. UNITED STATES

15-6024    MERRIWEATHER, RUSSELL V. JONES, SEC., FL DOC, ET AL.

15-6034    COURVILLE, KEITH D. V. COLORADO

      The petitions for writs of certiorari are denied.

15-31    PRIETO, ALFREDO V. CLARKE, DIR., VA DOC, ET AL.

      The motion of Mark Eric Lawlor for leave to intervene is denied.  The petition for a writ of certiorari is dismissed as moot.

15-173    HARR, SIDNEY B. V. BRODHEAD, RICHARD H., ET AL.

      The petition for a writ of certiorari is denied.  Justice Breyer took no part in the consideration or decision of this petition.

15-5489    LANDRITH, BRET D. V. JORDAN, DON, ET AL.

      The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed.  See Rule 39.8.

15-5495    ENRIQUEZ, JUAN V. STEPHENS, DIR., TX DCJ

      The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed.  See Rule 39.8.  As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the

petition is submitted in compliance with Rule 33.1.  See *Martin*
v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992)
(*per curiam*).

15-5527    KEARNEY, RICHARD V. NY DOC, ET AL.

15-5589    TURNPAUGH, DONALD V. MICHIGAN

The motions of petitioners for leave to proceed *in forma*
*pauperis* are denied, and the petitions for writs of certiorari
are dismissed.  See Rule 39.8.

15-5748    CAMPBELL, JAMES B. V. JONES, SEC., FL DOC

15-5811    O'CONNOR, NYKA T. V. JONES, SEC., FL DOC

The motions of petitioners for leave to proceed *in forma*
*pauperis* are denied, and the petitions for writs of certiorari
are dismissed.  See Rule 39.8.  As the petitioners have
repeatedly abused this Court's process, the Clerk is directed
not to accept any further petitions in noncriminal matters from
petitioners unless the docketing fees required by Rule 38(a) are
paid and the petitions are submitted in compliance with Rule
33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506
U. S. 1 (1992) (*per curiam*).

15-5819    DeWILLIAMS, GARY V. UNITED STATES

The motion of petitioner for leave to proceed *in forma*
*pauperis* is denied, and the petition for a writ of certiorari is
dismissed.  See Rule 39.8.  As the petitioner has repeatedly
abused this Court's process, the Clerk is directed not to accept
any further petitions in noncriminal matters from petitioner
unless the docketing fee required by Rule 38(a) is paid and the
petition is submitted in compliance with Rule 33.1.  See *Martin*
v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992)

(*per curiam*).  Justice Kagan took no part in the consideration
or decision of this motion and this petition.

15-5895    WHITE, WILLIAM A. V. UNITED STATES

15-5907    PAYNE, ADRIAN V. UNITED STATES

The petitions for writs of certiorari are denied.  Justice
Kagan took no part in the consideration or decision of these
petitions.

15-5921    HARVEY, ALVIN V. LOUISIANA

The motion of petitioner for leave to proceed *in forma
pauperis* is denied, and the petition for a writ of certiorari is
dismissed.  See Rule 39.8.  As the petitioner has repeatedly
abused this Court's process, the Clerk is directed not to accept
any further petitions in noncriminal matters from petitioner
unless the docketing fee required by Rule 38(a) is paid and the
petition is submitted in compliance with Rule 33.1.  See *Martin*
v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992)
(*per curiam*).

15-5973    KING, LEON V. UNITED STATES

15-6007    JOHNSON, THOMAS V. UNITED STATES

The petitions for writs of certiorari are denied.  Justice
Kagan took no part in the consideration or decision of these
petitions.

**HABEAS CORPUS DENIED**

15-6143    IN RE ROBERT E. EASON

The petition for a writ of habeas corpus is denied.

15-6113    IN RE TERRY MIDDLETON

The motion of petitioner for leave to proceed *in forma
pauperis* is denied, and the petition for a writ of habeas corpus

is dismissed.  See Rule 39.8.  Justice Kagan took no part in the consideration or decision of this motion and this petition.

### MANDAMUS DENIED

15-5708    IN RE JAMES C. PLATTS

15-5868    IN RE CONSUELO JORDAN

15-5903    IN RE KENDAL TAYLOR, AKA SHAMSIDEEN SALAAM

        The petitions for writs of mandamus are denied.

15-5509    IN RE TOUFIC NADDI

        The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of mandamus is dismissed.  See Rule 39.8.  As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

15-5588    IN RE KENNETH W. PRATT AND CLEO DIXON

        The petition for a writ of mandamus and/or prohibition is denied.

### REHEARING DENIED

14-8938    FIELDS, TYRONE S. V. UNITED STATES

        The petition for rehearing is denied.

# EXHIBIT F

# CALIFORNIA STATEWIDE DIRECT

# PRIMARY

# ELECTION

# TUESDAY, JUNE 8, 2010

★ **OFFICIAL VOTER INFORMATION GUIDE** ★

*Certificate of Correctness*

I, Debra Bowen, Secretary of State of the State of California, hereby certify that the measures included herein will be submitted to the electors at the Statewide Direct Primary Election to be held on June 8, 2010, and that this guide has been prepared in accordance with the law.

Witness my hand and the Great Seal of the State in Sacramento, California, this 18th day of March, 2010.



**Debra Bowen**
*Secretary of State*



*Secretary of State*

Dear Fellow Voter:

By registering to vote, you have taken the first step in playing an active role in deciding California's future.  Now, to help you make your decisions, my office has created this Official Voter Information Guide that contains titles and summaries prepared by Attorney General Edmund G. Brown Jr.; impartial analyses of the law and potential costs to taxpayers prepared by Legislative Analyst Mac Taylor; arguments in favor of and against ballot measures prepared by proponents and opponents; text of the proposed laws prepared by Legislative Counsel Diane F. Boyer-Vine; and other useful information.  The printing of the guide was done under the supervision of Acting State Printer Kevin P. Hannah.

Voting is easy, and any registered voter may vote by mail or in his or her local polling place.  The last day to request a vote-by-mail ballot from your county elections office is June 1.

Primary elections are held to determine which nominee in each political party will represent the party in each contest in the general election.  The winning candidate from each party (or the top two voter-getters in nonpartisan contests) in the June 8, 2010, primary will move on to the November 2, 2010, general election in which all voters, regardless of political affiliation, will be allowed to vote for any candidate on that ballot.

Some political parties are allowing decline-to-state (also known as nonpartisan or unaffiliated) voters to request and vote their party's ballot in this primary election. See page 4 of this guide for more information.

There are more ways to participate in the electoral process.  You can:

- Be a poll worker on Election Day, helping to make voting easier for all eligible voters and protecting ballots until they are counted by elections officials;

- Spread the word about voter registration deadlines and voting rights through emails, phone calls, brochures, and posters; and

- Help educate other voters about the candidates and issues by organizing discussion groups or participating in debates with friends, family, and community leaders.

For more information about how and where to vote, as well as other ways you can participate in the electoral process, call (800) 345-VOTE or visit *www.sos.ca.gov*.

It is a wonderful privilege in a democracy to have a choice and the right to voice your opinion. Whether you cast your ballot at a polling place or by mail, I encourage you to take the time to carefully read about your voting rights and each ballot measure in this information guide.

Thank you for taking your civic responsibility seriously and making your voice heard!

# TABLE OF CONTENTS

PAGE

**QUICK-REFERENCE GUIDE**    **7**

**PROPOSITIONS**
**13** Limits on Property Tax Assessment. Seismic Retrofitting of Existing Buildings. Legislative Constitutional Amendment. ........................................**10**
**14** Elections. Increases Right to Participate in Primary Elections. ........................................**14**
**15** California Fair Elections Act. ........................................**20**
**16** Imposes New Two-Thirds Voter Approval Requirement for Local Public Electricity Providers. Initiative Constitutional Amendment. ........................................**26**
**17** Allows Auto Insurance Companies to Base Their Prices in Part on a Driver's History of Insurance Coverage. Initiative Statute. ........................................**32**

**POLITICAL PARTY STATEMENTS OF PURPOSE**    **36**

**LIST OF CANDIDATES FOR STATEWIDE ELECTIVE OFFICE**    **40**

**CANDIDATE STATEMENTS**    **42**

**TEXT OF PROPOSED LAWS**    **62**

**VOTER BILL OF RIGHTS**    **79**

**INFORMATION PAGES**

Primary Elections and Decline-to-State Voters ........................................ 4
Voter Registration ........................................ 4
State Legislative and U.S. House of Representatives Candidate Statements ........................................ 5
About Ballot Arguments ........................................ 5
About Ballot Measures ........................................ 5
Large Print and Audio Voter Information Guides ........................................ 6
Serve as a Poll Worker ........................................ 6
Find Your Polling Place ........................................ 9
Statewide Elective Office Descriptions ........................................38
Board of Equalization Districts Map ........................................39
County Elections Offices ........................................60

**VISIT THE SECRETARY OF STATE'S WEBSITE TO:**

- View information on statewide ballot measures *www.voterguide.sos.ca.gov*
- Research campaign contributions and lobbying activity *http://cal-access.sos.ca.gov/campaign/*
- Find your polling place on Election Day *www.sos.ca.gov/elections/elections_ppl.htm*
- Obtain vote-by-mail ballot information *www.sos.ca.gov/elections_m.htm*
- Watch live election results after polls close on Election Day *http://vote.sos.ca.gov/*

# Important Information About This Primary Election and Decline-to-State Voters

A **decline-to-state** voter is any registered voter who chose to not affiliate with a political party when he or she registered to vote (also sometimes referred to as a nonpartisan or DTS voter).

**Primary elections** are held to determine which nominee in each political party will represent the party in each **general election** contest. The winning candidate from each party in the June 8, 2010, Statewide Direct Primary Election will move on to the November 2, 2010, General Election.

- If you are registered to vote with a political party, you may only vote in the statewide direct primary election for ballot measures and the candidates running for office from the party with which you are registered.

- If you did not select a political party when you registered to vote, you can request a ballot of any political party that has notified the Secretary of State that it will permit decline-to-state registered voters to help nominate their candidates. You may NOT request more than one party's ballot.

  The following political parties are allowing decline-to-state voters to request and vote their party's ballot (with the exception of county central committee candidates) in the June 8, 2010, Statewide Direct Primary Election:

  - Democratic Party
  - Republican Party

  If you do not request a specific ballot, you will be given a nonpartisan ballot containing only ballot measures and the names of candidates for nonpartisan offices.

**If You Vote by Mail . . .** Each county elections office is required to mail all decline-to-state voters who are registered as permanent vote-by-mail voters a notice and application regarding voting in the primary election. The notice shall inform the voter that he or she may request a vote-by-mail ballot for a particular political party for the primary election if that party authorized decline-to-state voters to vote in its primary. If you have already been issued a nonpartisan ballot but would like to request a ballot from one of the participating parties, you must contact your county elections office. For a list of county elections offices, see page 60 of this guide.

---

# Voter Registration

Registering to vote is simple and free. Registration forms are available online at *www.sos.ca.gov* and at most post offices, libraries, city and county government offices, and the California Secretary of State's Office. You also may have a registration form mailed to you by calling your county elections office or the Secretary of State's toll-free Voter Hotline at (800) 345-VOTE (8683).

To register to vote you must be a U.S. citizen, a California resident, at least 18 years of age on Election Day, not in prison or on parole for the conviction of a felony, and not judged by a court to be mentally incompetent.

You are responsible for updating your voter registration information. You should update your voter registration if you change your home address, change your mailing address, change your name, or want to change or select a political party.

Note: If you moved to your new address after May 24, 2010, you may vote at your old polling place.

# State Legislative and U.S. House of Representatives Candidate Statements

This Voter Information Guide covers statewide ballot measures and some statewide officials. Each State Senate and Assembly office relates to voters in only one or a few counties, so some candidate statements may be available in your county sample ballot booklet.

Proposition 34, approved by voters in November 2000, established voluntary spending limits for candidates running for state legislative office. Legislative candidates who choose to keep their campaign expenses under specified dollar amounts may purchase space in county sample ballot booklets for a 250-word candidate statement. To view a list of legislative candidates who have accepted the campaign spending limits, go to *www.sos.ca.gov/elections/elections_cand_stat.htm.*

State Senate candidates who have volunteered to limit their campaign spending may spend no more than $777,000 in a primary election. Assembly candidates who have volunteered to limit their campaign spending may spend no more than $518,000 in a primary election.

Candidates running for the United States House of Representatives may buy space for a 250-word candidate statement in county sample ballot booklets, and are not subject to voluntary spending limits.

# About Ballot Arguments

The Secretary of State's Office does not write ballot arguments. Arguments in favor of and against ballot measures are provided by the proponents and opponents of the ballot measures. If multiple arguments are submitted for or against a measure, the law requires that first priority be given to arguments written by legislators in the case of legislative measures, and arguments written by the proponents of an initiative or referendum in the case of an initiative or referendum measure. Subsequent priority for all measures goes to bona fide associations of citizens and then to individual voters. According to law, the submitted argument language cannot be verified for accuracy or changed in any way unless a court orders it to be changed.

# About Ballot Measures

There are several types of statewide ballot measures. The June 8, 2010, Statewide Direct Primary Election ballot includes the following three types of ballot measures.

### Legislative Constitutional Amendment

When the State Legislature proposes to amend the California Constitution, the amendment must be approved by a two-thirds vote of each house of the Legislature and then presented to voters on a statewide ballot. A legislative constitutional amendment does not require the Governor's signature. To be enacted, a legislative constitutional amendment requires a simple majority of the total votes cast.

### Legislative Initiative Amendment

When the State Legislature proposes to amend a law that was previously enacted through the initiative process, the amendment must be approved by a majority vote of each house of the Legislature and then presented to voters on a statewide ballot (unless the original measure specifically permits legislative amendment or repeal without voter approval). To be enacted, a legislative initiative amendment requires a simple majority of the total votes cast.

### Initiative

Often referred to as "direct democracy," the initiative process is the power of the people to place measures on a statewide ballot. These measures can either create or change laws and amend the constitution. If the initiative proposes to create or change California laws, proponents must gather petition signatures of registered voters equal in number to five percent of the votes cast for all candidates for Governor in the most recent gubernatorial election. If the initiative proposes to amend the California Constitution, proponents must gather petition signatures of registered voters equal in number to eight percent of the votes cast for all candidates for Governor in the most recent gubernatorial election. To be enacted, an initiative requires a simple majority of the total votes cast.

# Large Print and Audio Voter Information Guides

The Secretary of State provides the Official Voter Information Guide in large-print and audio formats for people who are visually impaired in English, Chinese, Japanese, Korean, Spanish, Tagalog, and Vietnamese.

To order the large-print or audio-cassette version of the Official Voter Information Guide, go to *www.sos.ca.gov/elections/elections_vig_altformats.htm* or call the Secretary of State's toll-free Voter Hotline at (800) 345-VOTE (8683).

For a downloadable audio MP3 version of the Official Voter Information Guide, go to www.voterguide.sos.ca.gov/audio/.

---

# Earn Money and Make a Difference . . .
# Serve as a Poll Worker on Election Day!

In addition to gaining first-hand experience with the tools of our democracy, poll workers can earn extra money for their valuable service on Election Day.

You can serve as a poll worker if you are:
- A registered voter, or
- A high school student who:
  - is a United States citizen;
  - is at least 16 years old at the time of service;
  - has a grade point average of at least 2.5; and
  - is in good standing at a public or private school.

Contact your county elections office, or call (800) 345-VOTE (8683), for more information on becoming a poll worker.

If you are a state government employee, you can take time off work, without losing pay, to serve as a poll worker if you provide adequate notice to your department and your supervisor approves the request.

# QUICK-REFERENCE GUIDE

**PROP 13** LIMITS ON PROPERTY TAX ASSESSMENT. SEISMIC RETROFITTING OF EXISTING BUILDINGS. LEGISLATIVE CONSTITUTIONAL AMENDMENT.

**PROP 14** ELECTIONS.  INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

### SUMMARY
*Put on the Ballot by the Legislature*

Provides that construction to seismically retrofit buildings will not trigger reassessment of property tax value. Sets statewide standard for seismic retrofit improvements that qualify. Fiscal Impact: **Minor reduction in local property tax revenues related to the assessment of earthquake upgrades.**

### SUMMARY
*Put on the Ballot by the Legislature*

Changes the primary election process for congressional, statewide, and legislative races.  Allows all voters to choose any candidate regardless of the candidate's or voter's political party preference. Ensures that the two candidates receiving the greatest number of votes will appear on the general election ballot regardless of party preference. Fiscal Impact: No significant net change in state and local government costs to administer elections.

### WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: Earthquake safety improvements made to unreinforced masonry (such as brick) buildings would not result in higher property taxes until the building is sold.

**NO** A NO vote on this measure means: Earthquake safety improvements made to unreinforced masonry buildings would continue to be excluded from property taxes but for only up to 15 years.

### WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: All voters would receive the same primary election ballot for most state and federal offices. Only the two candidates with the most votes—regardless of political party identification—would advance to the general election ballot.

**NO** A NO vote on this measure means: Voters would continue to receive primary election ballots based on their political party. The candidate with the most votes from each political party would continue to advance to the general election ballot.

### ARGUMENTS

**PRO** Proposition 13 makes a necessary change to our state's constitution in order to eliminate a dangerous disincentive for property owners to upgrade un-reinforced masonry structures in order to improve earthquake safety. This proposition promotes fairness by eliminating the unequal treatment of different types of property which undergo seismic safety improvements.

**CON** No argument against Proposition 13 was submitted.

### ARGUMENTS

**PRO** A YES vote means YOU will be able to vote for any candidate you wish for state and congressional offices, regardless of political party preference. Experts say non-partisan measures like Proposition 14 will result in elected representatives in Sacramento and Washington who are LESS PARTISAN and MORE PRACTICAL.

**CON** The politicians behind Proposition 14 included a deceptive provision, that won't make primaries "Open" at all. Candidates will no longer be required to list their party affiliation on the ballot. They want to look like "independents" while they actually remain in their political party. Business as usual disguised as "reform."

### FOR ADDITIONAL INFORMATION

**FOR**
Senator Roy Ashburn's Support Proposition 13 Committee
P.O. Box 11444
Bakersfield, CA 93389
(661) 861-8100

**AGAINST**
No contact information was provided.

### FOR ADDITIONAL INFORMATION

**FOR**
YES ON 14-Californians For An Open Primary
info@YESON14OPENPRIMARY.COM
www.YESON14OPENPRIMARY.COM

**AGAINST**
California School Employees' Association
2045 Lundy Ave.
San Jose, CA 95131
(408) 473-1000

# QUICK-REFERENCE GUIDE

**PROP 15** CALIFORNIA FAIR ELECTIONS ACT.

**PROP 16** IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

## SUMMARY
*Put on the Ballot by the Legislature*

Repeals ban on public funding of political campaigns. Creates a voluntary system for candidates for Secretary of State to qualify for a public campaign grant if they agree to limitations on spending and private contributions. Each candidate demonstrating enough public support would receive same amount. Participating candidates would be prohibited from raising or spending money beyond the grant. There would be strict enforcement and accountability. Funded by voluntary contributions and a biennial fee on lobbyists, lobbying firms, and lobbyist employers. Fiscal Impact: **Increased revenues (mostly from charges related to lobbyists) totaling over $6 million** every four years. These funds would be spent on public financing for campaigns of Secretary of State candidates for the 2014 and 2018 elections.

## SUMMARY
*Put on the Ballot by Petition Signatures*

Requires two-thirds voter approval before local governments provide electricity service to new customers or establish a community choice electricity program using public funds or bonds. Fiscal Impact: **Unknown net impact on state and local government costs and revenues—unlikely to be significant in the short run—due to the measure's uncertain effects on public electricity providers and on electricity rates.**

## WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: The state ban on public funding for political campaigns for elected offices would be lifted. For the 2014 and 2018 elections, candidates for the office of Secretary of State could choose to receive public funds to pay for the costs of campaigns if they met certain requirements. Charges related to lobbyists would be increased to pay for these costs.

**NO** A NO vote on this measure means: The state ban on public funding for political campaigns for elected offices would continue. Candidates for the office of Secretary of State would continue to pay for their campaigns with private funds subject to current rules. Existing charges related to lobbyists would not change.

## WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: Local governments would generally be required to receive two-thirds voter approval before they could start up electricity services or expand electricity service into a new territory.

**NO** A NO vote on this measure means: Local governments generally could continue to implement proposals involving the start-up or expansion of electricity service either through approval by a majority of voters or actions by governing boards.

## ARGUMENTS

**PRO** YES on 15: The amount of money in politics is outrageous and corrupts the system. The League of Women Voters of California says Prop. 15 will get politicians out of the fundraising game so they will focus on California's priorities. Elections should be won, not bought by special interests. www.YesOnProp15.org

**CON** Proposition 15 is a trick. It raises taxes with no accountability to provide millions in taxpayer money to politicians to fund their negative campaigns AND ALSO ALLOWS politicians to continue to raise money from special interest groups. Prop. 15 is not real campaign reform. Please vote NO on Prop. 15.

## ARGUMENTS

**PRO** Proposition 16 is the Taxpayers Right to Vote Act. It requires two thirds voter approval before local governments can spend or borrow public money to enter the retail electricity business. In tough economic time like these, taxpayers should have the final say in how government spends our money.

**CON** Proposition 16 does two things: First, it drastically limits your choices on who provides you with electricity. Second, it lets the for-profit utilities in California raise your electricity rates again and again, by protecting their monopoly and eliminating competition. For more choice and lower electric bills, NO on Proposition 16.

## FOR ADDITIONAL INFORMATION

**FOR**
Derek Cressman
Californians for Fair Elections
3916 S. Sepulveda, Suite 109
Culver City, CA 90230
(800) 566-3780
Prop15@CommonCause.org
www.YesOnProp15.org

**AGAINST**
STOP PROP 15
455 Capitol Mall, Suite 801
Sacramento, CA 95814
info@stopprop15.com
STOPPROP15.com

## FOR ADDITIONAL INFORMATION

**FOR**
YES On 16/Californians to Protect Our Right to Vote
2350 Kerner Blvd., Suite 250
San Rafael, CA 94901
info@taxpayersrighttovote.com
www.taxpayersrighttovote.com

**AGAINST**
Taxpayers Against the PG&E Powergrab, Sponsored by Local Power, Inc. and The Utility Reform Network
Mindy Spatt
5429 Madison Avenue
Sacramento, CA 95841
(415) 929-8876 x306
www.powergrab.info

# QUICK-REFERENCE GUIDE

**PROP 17** ALLOWS AUTO INSURANCE COMPANIES TO BASE THEIR PRICES IN PART ON A DRIVER'S HISTORY OF INSURANCE COVERAGE. INITIATIVE STATUTE.

**SUMMARY** *Put on the Ballot by Petition Signatures*

Permits companies to reduce or increase cost of insurance depending on whether driver has a history of continuous insurance coverage. Fiscal Impact: **Probably no significant fiscal effect on state insurance premium tax revenues.**

## WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: Insurance companies could offer new customers a discount on their automobile insurance premiums based on the length of time the customer had maintained bodily injury liability coverage with another insurer.

**NO** A NO vote on this measure means: Insurers could provide discounts to their long-term automobile insurance customers, but would continue to be prohibited from providing such discounts to new customers switching from other insurers.

## ARGUMENTS

**PRO** Yes on 17 can save insured drivers up to $250 by eliminating a surcharge for changing insurance companies. 17 allows insured drivers to take continuous coverage discounts with them if they change insurers, just like good driver discounts. A flaw in California law prevents this. 17 saves consumers money. www.YesProp17.org

**CON** Mercury Insurance is spending millions on Proposition 17 so auto insurance companies can RAISE PREMIUMS AS MUCH AS $1,000 on good drivers. It reverses a voter-approved law and allows new insurance surcharges that will harm middle-class families and lead to more uninsured motorists. Consumer advocates OPPOSE Prop. 17.

## FOR ADDITIONAL INFORMATION

**FOR**
Yes on 17-Californians for Fair Auto Insurance Rates
(916) 325-0056
info@YesProp17.org
www.YesProp17.org

**AGAINST**
Campaign for Consumer Rights
(310) 392-0522
VoteNo@StopProp17.org
www.StopProp17.org

## Find Your Polling Place

Polling place locations are coordinated by county elections offices. Your polling place will be listed on the back cover of your county sample ballot booklet.

Many county elections offices offer polling place look-up assistance via websites or toll-free phone numbers. For more information, visit the Secretary of State's website at *www.sos.ca.gov/elections/elections_d.htm* or call the toll-free Voter Hotline at (800) 345-VOTE (8683).

If your name does not appear on the voter list at your polling place, you have the right to cast a provisional ballot at any polling place in the county in which you are registered to vote.

Provisional ballots are ballots cast by voters who:

- Believe they are registered to vote even though their names do not appear on the official voter registration list;
- Believe the official voter registration list incorrectly lists their political party affiliation; or
- Vote by mail but cannot locate their vote-by-mail ballot and want to vote at a polling place.

Your provisional ballot will be counted after elections officials have confirmed that you are registered to vote and you did not vote elsewhere in that election.

(Note: If you moved to your new address after May 24, 2010, you may vote at your old polling place.)

PROPOSITION
# 13
**LIMITS ON PROPERTY TAX ASSESSMENT.**
**SEISMIC RETROFITTING OF EXISTING BUILDINGS.**
**LEGISLATIVE CONSTITUTIONAL AMENDMENT.**

---

**OFFICIAL TITLE AND SUMMARY**                    **PREPARED BY THE ATTORNEY GENERAL**

---

## LIMITS ON PROPERTY TAX ASSESSMENT. SEISMIC RETROFITTING OF EXISTING BUILDINGS. LEGISLATIVE CONSTITUTIONAL AMENDMENT.

- Provides that construction to seismically retrofit existing buildings will not trigger reassessment of property tax value, regardless of the type of building.
- Sets a statewide standard for the types of seismic retrofit improvements exempt from reassessment.
- Limits the exemption from reassessment to specific components of construction or reconstruction that qualify as seismic retrofit improvements, as defined by the Legislature.

**Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:**

- **Minor reduction in local property tax revenues related to the assessment of earthquake upgrades.**

---

### FINAL VOTES CAST BY THE LEGISLATURE ON SCA 4 (PROPOSITION 13)
### (Resolution Chapter 115, Statutes of 2008)

| | | |
|---|---|---|
| Senate: | Ayes 37 | Noes 0 |
| Assembly: | Ayes 78 | Noes 0 |

---

PROP
**13**

**LIMITS ON PROPERTY TAX ASSESSMENT.**
**SEISMIC RETROFITTING OF EXISTING BUILDINGS.**
**LEGISLATIVE CONSTITUTIONAL AMENDMENT.**

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**

---

## BACKGROUND

Local property taxes are based on each property's assessed value. When a property is purchased, it is generally given an assessed value equal to its purchase price. As long as a property has the same owner and there is no new construction on the property, its assessed value generally remains the same, except for a small annual increase for inflation. New construction generally causes a reassessment if it adds a building, adds space, converts a building to a new use, or renovates the building to make it like new. The property's assessed value is increased to reflect the value added by the new construction. In contrast, the assessed value is not increased for normal maintenance and repair, such as replacing a leaky roof.

Currently, there are several specific exclusions in the State Constitution from the new construction rule. Among them are two separate provisions regarding earthquake safety modifications on existing buildings. The first one excludes earthquake safety upgrades on "unreinforced masonry buildings" (such as those made of brick or cement blocks) that are required by local ordinances. Such upgrades are excluded from reassessments for a period of 15 years. The second excludes from reassessment other earthquake safety modifications to any type of building and has no time limit. Both exclusions apply only until the property is sold.

## PROPOSAL

This constitutional amendment deletes both of the existing exclusions and replaces them with a single exclusion for all earthquake safety upgrades. The exclusion would not be time-limited and would last until the property is sold. This amendment has the practical effect of removing the 15-year limit to the exclusion for safety upgrades on unreinforced masonry buildings.

## FISCAL EFFECTS

This measure would allow properties with masonry buildings currently receiving an exclusion from reassessment of 15 years for earthquake upgrades to extend this exclusion. It would also allow any properties with future masonry upgrades to receive exclusions with no time limits. This would reduce local property tax revenues to the extent that properties are no longer reassessed at higher values after 15 years. Many county assessors, however, have indicated that they either: (1) do not track the number of years that unreinforced masonry upgrades have received an exclusion or (2) classify these upgrades as maintenance or repair. In addition, many properties sell before the 15-year period is up, which triggers a reassessment of the entire property. For these reasons, the loss to local property taxes as a result of this measure is probably minor.

---

*For text of Proposition 13, see page 62.*                                                          *Analysis* | **11**

PROP
# 13
**LIMITS ON PROPERTY TAX ASSESSMENT. SEISMIC RETROFITTING OF EXISTING BUILDINGS. LEGISLATIVE CONSTITUTIONAL AMENDMENT.**

---

## ★ ARGUMENT IN FAVOR OF PROPOSITION 13 ★

Proposition 13 makes a necessary change to our state's constitution in order to eliminate a dangerous and unfair disincentive for property owners to upgrade certain types of buildings in order to improve earthquake safety. This proposition promotes equity and fairness among taxpayers by eliminating the unequal treatment of different types of property which undergo seismic safety improvements.

Currently, there exists an inequity in the State Constitution regarding the assessment of buildings which have undergone repairs to make them safer during earthquakes. Some properties, which have repairs made to increase the building's safety in the case of an earthquake, are subject to reassessment and higher taxes while others are not. As a result, property owners who install seismic safety technologies are taxed differently depending on the type of building they improve.

Only property owners with reinforced masonry structures receive an unlimited exclusion from reassessment. Those owners of un-reinforced masonry structures receive only a 15-year exclusion from reassessment. This exclusion creates a wrongful and dangerous disincentive for safety retrofits. What is especially concerning is that older un-reinforced masonry buildings are in the greatest need of retrofitting if they are to survive earthquakes or other natural disasters that frequently occur in California—particularly in the San Francisco Bay Area and Los Angeles County. Seismic retrofits should be made to ALL unsafe buildings, including un-reinforced masonry structures.

The proposition that you are voting on corrects this unfair policy by providing equal treatment for all property owners who incorporate seismic safety improvements regardless of the type of building. It assures that any property having undergone a seismic safety retrofit will be exempt from property tax reassessment for that improvement. This measure is narrowly written and does not change the taxpayer protections afforded by the original Proposition 13 enacted in 1978.

This proposition also eliminates a substantial workload for the State Board of Equalization and County Assessors. They will no longer be required to reassess the property to determine which seismic retrofits are covered and which are not covered under the old law. This decreases the workload and will save taxpayer dollars. Any loss in local property taxes from correcting this inequity in seismic safety retrofitting is minimal, which is why no organized opposition to this proposition exists.

The language for this proposition passed the Legislature unanimously. For seismic safety for all Californians—North, South, East and West—please vote Yes on Proposition 13.

**ROY ASHBURN**
California State Senator
**TOM J. BORDONARO, JR.**
San Luis Obispo County Assessor
**BARBARA ALBY**
Chief-Deputy Board Member
Board of Equalization District 2

---

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

**PROP**
**13**

**LIMITS ON PROPERTY TAX ASSESSMENT. SEISMIC RETROFITTING OF EXISTING BUILDINGS. LEGISLATIVE CONSTITUTIONAL AMENDMENT.**

★   **ARGUMENT AGAINST PROPOSITION 13**   ★

No argument against
Proposition 13 was submitted.

PROPOSITION
# 14

# ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

---

**OFFICIAL TITLE AND SUMMARY**　　　　　　　　　　　　　**PREPARED BY THE ATTORNEY GENERAL**

---

## ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

- Encourages increased participation in elections for congressional, legislative, and statewide offices by changing the procedure by which candidates are selected in primary elections.
- Gives voters increased options in the primary by allowing all voters to choose any candidate regardless of the candidate's or voter's political party preference.
- Provides that candidates may choose not to have a political party preference indicated on the primary ballot.
- Provides that only the two candidates receiving the greatest number of votes in the primary will appear on the general election ballot regardless of party preference.
- Does not change primary elections for President, party committee offices and nonpartisan offices.

**Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:**

- No significant net change in state and local government costs to administer elections.

---

### FINAL VOTES CAST BY THE LEGISLATURE ON SCA 4 (PROPOSITION 14)
### (Resolution Chapter 2, Statutes of 2009)

| | | |
|---|---|---|
| Senate: | Ayes 27 | Noes 12 |
| Assembly: | Ayes 54 | Noes 20 |

---

## ANALYSIS BY THE LEGISLATIVE ANALYST

### BACKGROUND

***Primary and General Elections.*** California generally holds two statewide elections in even-numbered years to elect candidates to state and federal offices—a primary election (in June) and a general election (in November). These elections (such as those for Governor and Members of Congress) are partisan, which means that most candidates are associated with a political party. For these partisan offices, the results of a primary election determine each party's nominee for the office. The candidate receiving the most votes in a party primary election is that party's nominee for the general election. In the general election, voters choose among all of the parties' nominees, as well as any independent candidates. (Independent candidates—those not associated with a party—do not participate in primary elections.) The winner of the general election then serves a term in that office.

***Ballot Materials Under Current Primary System.*** For every primary election, each county prepares a ballot and related materials for each political party. Those voters affiliated with political parties receive their party's ballot. These party ballots include partisan offices, nonpartisan offices, and propositions. Voters with no party affiliation receive ballots related only to nonpartisan offices and propositions. Parties, however, may allow voters with no party affiliation to receive their party's ballot.

PROP
# 14

**ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.**

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                    **CONTINUED**

***Partisan Statewide Elections in California.*** Partisan elections for state office include those for the Governor, Lieutenant Governor, Controller, Secretary of State, Treasurer, Insurance Commissioner, Attorney General, the 120 members of the Legislature, and four members of the State Board of Equalization. (The Superintendent of Public Instruction is a nonpartisan state office.) Partisan elections also are held for federal offices including President, Vice President, and Members of Congress.

## PROPOSAL

This measure, which amends the State Constitution, changes the election process for most state and federal offices. Its provisions and related legislation would take effect for elections after January 1, 2011.

***Creates a Top-Two Primary Election.*** This measure creates a single ballot for primary elections for those congressional and state elective offices shown in Figure 1. Candidates would indicate for the ballot either their political party (the party chosen on their voter registration) or no party preference. All candidates would be listed—including independent candidates, who now would appear on the primary ballot. Each voter would cast his or her vote using this single primary ballot. A voter registered with the Republican Party, for example, would be able to vote in the primary election for a candidate registered as a Democrat, a candidate registered as a Republican, or any other candidate. The two candidates with the highest number of votes in the primary election—regardless of their party preference—would advance to compete in the general election. In fact, the two candidates in the general election could have the same party preference.

---

**Figure 1**
**Offices Affected by Proposition 14**

**Statewide Officials**
Governor
Lieutenant Governor
Secretary of State
Treasurer
Controller
Insurance Commissioner
Attorney General

**Other State Officials**
State Senators
State Assembly Members
State Board of Equalization Members

**Congressional Officials**
United States Senators
Members of the U.S. House of Representatives

---

*For text of Proposition 14, see page 65.*                          *Analysis* | **15**

PROP
**14**

ELECTIONS.  INCREASES RIGHT TO
PARTICIPATE IN PRIMARY ELECTIONS.

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                      CONTINUED

Figure 2 illustrates how a ballot for an office might appear if voters approve this measure and shows how this is different from the current system.



**Figure 2**

**Example of How Ballots Would Change if Voters Approve Proposition 14**

ELECTIONS.  INCREASES RIGHT TO
PARTICIPATE IN PRIMARY ELECTIONS.

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                              **CONTINUED**

***Does Not Affect Presidential Elections and Political Party Leadership Positions.*** Under this measure, there would still be partisan primary elections for presidential candidates and political party offices (including party central committees, party officials, and presidential delegates).

## FISCAL EFFECTS

***Minor Costs and Savings.*** This measure would change how elections officials prepare, print, and mail ballot materials. In some cases, these changes could increase these state and county costs. For instance, under this measure, all candidates—regardless of their party preference—would be listed on each primary election ballot. This would make these ballots longer. In other cases, the measure would reduce election costs. For example, by eliminating in some instances the need to prepare different primary ballots for each political party, counties sometimes would realize savings. For general election ballots, the measure would reduce the number of candidates (by only having the two candidates who received the most votes from the primary election on the ballot). This would make these ballots shorter. The direct costs and savings resulting from this measure would be relatively minor and would tend to offset each other. Accordingly, we estimate that the measure's fiscal effects would not be significant for state and local governments.

***Indirect Fiscal Effects Impossible to Estimate.*** In some cases, this measure would result in different individuals being elected to offices than under current law. Different officeholders would make different decisions about state and local government spending and revenues. These indirect fiscal effects of the measure are unknown and impossible to estimate.

---

**PROP**

# 14

ELECTIONS. INCREASES RIGHT TO
PARTICIPATE IN PRIMARY ELECTIONS.

---

### ★ ARGUMENT IN FAVOR OF PROPOSITION 14 ★

Our economy is in crisis.

Unemployment in California is over 12%.

The Legislature, whose members were all elected under the current rules, repeatedly fails to pass the state budget on time, or close the state's gaping $20+ billion fiscal deficit.

Our state government is broken.

But the politicians would rather stick to their rigid partisan positions and appease the special interests than work together to solve California's problems.

In order to change government we need to change the kind of people we send to the Capitol to represent us.

IT'S TIME TO END THE BICKERING AND GRIDLOCK AND FIX THE SYSTEM

The politicians won't do it, but Proposition 14 will.

• Proposition 14 will open up primary elections. You will be able to vote for any candidate you wish for state and congressional offices, regardless of political party preference. It will reduce the gridlock by electing the best candidates.

• Proposition 14 will give independent voters an equal voice in primary elections.

• Proposition 14 will help elect more practical office-holders who are more open to compromise.

"The best part of the open primary is that it would lessen the influence of the major parties, which are now under control of the special interests." (*Fresno Bee,* 2/22/09.)

PARTISANSHIP IS RUNNING OUR STATE INTO THE GROUND

Non-partisan measures like Proposition 14 will push our elected officials to begin working together for the common good.

Join AARP, the California Alliance for Jobs, the California Chamber of Commerce and many Democrats, Republicans, and independent voters who want to fix our broken government. Vote YES on Proposition 14.

Vote Yes on 14—for elected representatives who are LESS PARTISAN and MORE PRACTICAL.

*www.YESON14OPENPRIMARY.com*

**JEANNINE ENGLISH,** AARP
California State President
**JAMES EARP,** Executive Director
California Alliance for Jobs
**ALLAN ZAREMBERG,** President
California Chamber of Commerce

---

### ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 14 ★

Politicians wrote Proposition 14 to change the law so they can conceal their party affiliation on the election ballot. Voters won't know whether they are choosing a Democrat, Republican, Libertarian, or Green Party candidate.

The proponents claim their measure will stop partisan politics. But how is allowing politicians to hide their party affiliation going to fix partisanship? Proposition 14 is politicians trying to trick voters into thinking they are "independent."

What the proponents don't tell you is that special interests are raising hundreds of thousands of dollars to pass Proposition 14, including money from health insurance corporations, developers and financial institutions, because Proposition 14 will make it easier for them to elect candidates they "choose." But you won't know which political party the candidate belongs to.

Proposition 14 will decrease voter choice. It prohibits write-in candidates in general elections. Only the top two vote getters advance to the general election regardless of political party. Special interests with money will have the advantage in electing candidates they support.

Currently, only two states use "top-two" elections. In 2008, Washington State had 139 races and only ONE incumbent lost a primary. Proposition 14 will protect incumbents.

California Nurses, Firefighters and Teachers have joined with groups like the Howard Jarvis Taxpayers Association to oppose Proposition 14. These organizations don't usually agree on political issues. But this time they do.

Candidates who ask for your vote shouldn't be allowed to conceal their political party.

Stop the special interest tricks. No on Proposition 14.

**ED COSTANTINI,** Professor Emeritus of Political Science
University of California, Davis
**NANCY J. BRASMER,** President
California Alliance of Retired Americans
**STEVE CHESSIN,** President
Californians for Electoral Reform

---

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

**PROP**
# 14

ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

---

## ★ ARGUMENT AGAINST PROPOSITION 14 ★

Proposition 14 was written in the middle of the night and put on the ballot by a couple of politicians and Arnold Schwarzenegger. They added their own self-serving little twist.

They call it an "open primary" but CANDIDATES WILL BE ALLOWED TO CONCEAL THEIR PARTY AFFILIATION FROM VOTERS. The current requirement that candidates list their party on the ballot is abolished.

Proposition 14 will also decrease voter choice and make elections more expensive:

• The general election will not allow write-in candidates.

• Elections will cost more money at a time when necessary services like firefighters, police and education are being cut. County election officials predict an increased cost of 30 percent.

• Voter choice will be reduced because the top two vote getters advance to the general election regardless of political party.

• This means voters may be forced to choose between two candidates from the same political party. Democrats could be forced to choose between two Republicans, or not vote at all. Republicans could be forced to choose between two Democrats, or not vote at all.

• Independent and smaller political parties like Greens and Libertarians will be forced off the ballot, further reducing choice.

Can't politicians ever do anything without scheming something that's in their self-interest?

Here's the zinger they stuck in Proposition 14 . . .

"Open Candidate Disclosure. At the time they file to run for public office, all candidates shall have the choice to declare a party preference. The names of candidates who choose not to declare a party preference shall be accompanied by the designation 'No Party Preference' on both the primary and general election ballots."

Very clever! They're making it look like they are "independents" while actually remaining in their political party. *Business as usual disguised as "reform."*

POLITICIANS ARE CHANGING THE LEGAL REQUIREMENT THAT MAKES THEM DISCLOSE THEIR POLITICAL PARTY.

Democrats will end up voting for Republican imposters. Republicans will end up voting for Democratic imposters.

Will you be voting for a member of the Peace and Freedom Party? The Green Party? The Libertarian Party? You won't really know.

Special interest groups will pump money into trick candidates . . . imposters with hidden agendas we can't see.

Currently, when a rogue candidate captures a nomination, voters have the ability to write-in the candidate of their choice in the general election. But a hidden provision PROHIBITS WRITE-IN VOTES from being counted in general elections if Prop. 14 passes.

That means if one of the "top two" primary winners is convicted of a crime or discovered to be a member of an extremist group, voters are out of luck because Prop. 14 ends write-in voting.

Firefighters have joined with teachers, nurses and the Howard Jarvis Taxpayers Association opposing this initiative.

"The politicians behind Prop. 14 want to raise taxes without being held accountable. Vote NO."— Jon Coupal, President Howard Jarvis Taxpayers Association

We need "Open Primaries" to be "Open." That means full disclosure on the ballot and no tricks. No on Proposition 14.

**KEVIN R. NIDA,** President
California State Firefighters' Association
**ALLAN CLARK,** President
California School Employees Association
**KATHY J. SACKMAN, RN,** President
United Nurses Associations of California /
Union of Health Care Professionals

---

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 14 ★

Proposition 14 is supported by people like you who are sick of the mess in Sacramento and Washington D.C. and want to do something about it.

The opponents of Proposition 14 are primarily special interests who helped create this mess and benefit from the way things are.

Their claims are deceptive and absurd.

FACT: If Proposition 14 passes, every candidate's party registration for the past decade will be posted publicly. This means no candidate will be able to mislead voters about their party registration history. And it's more disclosure than is required of candidates today.

FACT: Proposition 14 will have no significant financial impacts whatsoever.

Why do opponents of reform make these false charges? Because they benefit from a system that is broken.

Vote yes on 14 to:

• Reduce gridlock by electing the best candidates to state office and Congress, regardless of political party;

• Give independent voters an equal voice in primary elections; and

• Elect more practical individuals who can work together for the common good.

Vote Yes on 14. We've had enough.
*www.YESON14OPENPRIMARY.com*

**JEANNINE ENGLISH,** AARP
California State President
**CARL GUARDINO,** President
Silicon Valley Leadership Group
**ALLAN ZAREMBERG,** President
California Chamber of Commerce

---

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

PROPOSITION
# 15

## CALIFORNIA FAIR ELECTIONS ACT.

---

**OFFICIAL TITLE AND SUMMARY**            **PREPARED BY THE ATTORNEY GENERAL**

---

## CALIFORNIA FAIR ELECTIONS ACT.

- This act repeals the ban on public funding of political campaigns.
- Creates a voluntary system for candidates for Secretary of State to qualify for a public campaign grant if they agree to limitations on spending and private contributions.
- Candidates would have to qualify before receiving the grant.
- Candidates who demonstrate sufficient public support would receive the same amount.
- Participating candidates would be prohibited from raising or spending money beyond the grant.
- There would be strict enforcement and accountability with published reports open to the public.
- Funded by voluntary contributions and a biennial fee on lobbyists, lobbying firms, and lobbyist employers.

### Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:

- Increased revenues (mostly from charges on lobbyists, lobbying firms, and lobbyist employers) totaling over $6 million every four years.  These funds would be spent on public financing for campaigns of Secretary of State candidates for the 2014 and 2018 elections.

---

### FINAL VOTES CAST BY THE LEGISLATURE ON AB 583 (PROPOSITION 15)
### (Chapter 735, Statutes of 2008)

| | | |
|---|---|---|
| Senate: | Ayes 21 | Noes 18 |
| Assembly: | Ayes 42 | Noes 32 |

---

## ANALYSIS BY THE LEGISLATIVE ANALYST

### BACKGROUND

***Ban on Public Funds to Pay for Campaigns.*** State law bans the use of public funds for political candidates' campaigns. This ban extends to all elected offices at the state level and most elected offices at the local level. (Using powers that they already have under the State Constitution, a small number of charter cities have created programs for the public financing of candidates for certain local offices.)

***Entities That Oversee Campaign Finance Laws.*** The state's campaign finance laws are administered by the Fair Political Practices Commission (commission) and the Secretary of State. Under state law, individuals and groups must disclose how much money has been given, received, and spent on political campaigns. This information is available to the public on the Secretary of State's Web site. The commission monitors candidates and donors, and it can assess fines on candidates and donors who violate election laws.

***Lobbyist Registration Administered by Secretary of State.*** The Secretary of State is elected statewide every four years and serves as the state's chief elections official. The Secretary of State also has other duties, such as monitoring activities of lobbyists. Lobbying is the act of communicating directly with public officials in order to influence governmental actions on behalf of the lobbyist's employer or client. Every two years, lobbyists, lobbying firms, and lobbyist employers must register with the Secretary of State. There is currently a $25 fee related to each lobbyist to cover the administrative expenses of registration.

### PROPOSAL

As shown in Figure 1, this measure:
- Lifts the ban on public funding for political campaigns.
- Establishes a public funding system for campaigns for the office of Secretary of State.
- Requires lobbyists to pay higher charges for this public campaign funding.

### Lifts the Ban on Public Funding for Political Campaigns

This measure eliminates the ban on using public funding for political campaigns for elected office. This would allow the Legislature—and, in some cases, city, county, and other local elected policy makers—to create public financing programs in the future. As described below, this measure creates a public financing program only for the office of Secretary of State.

**PROP**
# 15

CALIFORNIA FAIR ELECTIONS ACT.

**ANALYSIS BY THE LEGISLATIVE ANALYST**    **CONTINUED**

---

**Figure 1**
## Main Provisions of Proposition 15

 **Lifts the Ban on Public Funding for Political Campaigns**

 **Establishes Public Funding for Secretary of State Campaigns**
- The Secretary of State—the state's chief elections officer—is elected on the statewide ballot every four years.
- A candidate for Secretary of State meeting certain requirements could receive state funds to pay for the costs of a political campaign.
- The amount of state funds that a candidate would receive would go up if an opponent spent more private funds.
- The measure expires on January 1, 2019—meaning it would apply to Secretary of State campaigns in 2014 and 2018. The Legislature could extend this expiration date by a majority vote.

 **Higher Charges Related to Lobbyists**
- Increases charges related to lobbyists to $700 every two years.
- Raises more than $6 million every four years from these increased charges and other sources to implement the measure.

---

## Establishes Public Funding System for Secretary of State Campaigns

### Public Funding Levels and Requirements for Primary Election Campaigns

***$5 Qualifying Contributions.*** To receive public funds for a *primary election* campaign, a candidate for Secretary of State would have to collect a certain number of $5 contributions ("qualifying contributions") from registered voters. Candidates seeking a nomination from a major party (that is, a party that earned at least 10 percent of the votes in the last gubernatorial or Secretary of State election) must collect 7,500 qualifying contributions (a total of $37,500). Candidates in other parties must collect 3,750 qualifying contributions (a total of $18,750). (The Democratic Party and the Republican Party currently count as major parties under this measure. Other parties now count as "minor parties," but could become major parties based on performance in future elections.) Candidates choosing not to participate would fund campaigns from private sources under existing rules.

***Funding for Eligible Candidates in Primary Elections.*** Figure 2 summarizes funding amounts and other requirements under this measure for Secretary of State campaigns. Participating candidates competing for a major party's nomination would receive a base level of funding of $1 million for the primary election. These candidates would receive additional funds ("matching funds") to equal the money spent by nonparticipating candidates or outside groups trying to influence the election. Participating

candidates could receive up to an additional $4 million of these matching funds for the primary. For example, if a nonparticipating candidate were to raise and spend $3 million and another interest group were to spend $2 million in favor of the nonparticipating candidate, the participating candidate would be eligible to receive $5 million—$1 million in base funding, and $4 million in matching funds. Eligible candidates from minor parties would receive $200,000 in base funding. These minor party candidates also could receive the matching funds described above—up to an additional $800,000—if they demonstrate broader support by collecting 15,000 qualifying contributions (a total of $75,000) instead of 3,750.

### Public Funding Levels and Requirements for General Election Campaigns

***Winning a Party's Primary Election.*** In order to receive public financing for a *general election* campaign, a party candidate must have participated in the public financing program in the primary election campaign. Candidates who participate in the public financing program in the primary election must follow program rules if they proceed to the general election.

***Independent Candidates.*** Independent candidates—that is, those not affiliated with any party—would not have participated in a primary election. These candidates must collect 15,000 qualifying contributions to receive the same level of public financing in the general election as major party candidates who participate.

---

PROP
**15**
CALIFORNIA FAIR ELECTIONS ACT.

---

ANALYSIS BY THE LEGISLATIVE ANALYST                                      CONTINUED

**Figure 2**

**Proposed Qualifying Requirements and Public Funding Levels for Secretary of State Candidates**

|  | Qualifying $5 Contributions Needed | Primary Election Funds | | General Election Funds | |
|---|---|---|---|---|---|
|  |  | Base Level | Maximum Level of Matching Funds | Base Level | Maximum Level of Matching Funds |
| Candidates from major political parties | 7,500 | $1,000,000 | $4,000,000 | $1,300,000 | $5,200,000 |
| Candidates from minor parties | 3,750 | 200,000 | Not eligible | 325,000 | Not eligible |
| Candidates from minor parties demonstrating broader support | 15,000 | 200,000 | 800,000 | 1,300,000 | 5,200,000 |
| Independent candidates | 15,000 | Not applicable[a] | Not applicable[a] | 1,300,000 | 5,200,000 |

[a] Currently, independent candidates do not participate in primary elections.

***Funding for Eligible Candidates in General Election.*** The base level of funding for major party candidates and independent or minor party candidates demonstrating broader support is $1.3 million for the general election campaign. Similar to the primary election campaign, eligible candidates would receive additional matching funds to equal the money spent by nonparticipating candidates or outside groups trying to influence the election. Eligible candidates could receive up to an additional $5.2 million of these matching funds. Other eligible candidates from minor parties would only receive $325,000 in base funding.

**Other Requirements to Receive Public Funds for Campaigns**

To receive public funds for the primary or general election campaign, candidates for Secretary of State would have to follow new rules and requirements described below.

***Private Contributions Restricted.*** To receive public funding, a candidate could not accept private campaign funding, with four main exceptions:

- First, candidates must collect the $5 qualifying contributions. (These qualifying contributions would be deposited into the fund supporting the public financing program, as described below.)

- Second, beginning 18 months prior to a primary election, candidates could collect and spend start-up contributions, or "seed money." (These funds could be spent, for example, to pay costs for collecting the qualifying contributions.) The measure restricts seed money contributions to $100 for each registered voter, and total contributions would be limited to $75,000 per campaign.

- Third, candidates could accept a certain amount of contributions from political parties—5 percent of the

base level of public funds in each of the primary election and the general election—that is, up to $50,000 for the primary election campaign, and $65,000 for the general election campaign.

- Fourth, in the event that the program did not have enough funds to give to eligible candidates, candidates could raise from private donors the difference between what they were entitled to receive from the state and what they actually received.

***Use of Funds.*** The public funds could only be used for direct campaign expenses. The measure contains various restrictions to prevent funds from being used for other purposes.

***Other Requirements.*** Publicly funded candidates also would be subject to other requirements. For example, they would have to participate in debates with other candidates before each election and submit campaign expenditure records to the commission. In addition, aside from initial seed money, candidates could not use their personal funds to pay for campaign costs or raise funds for other candidates in other campaigns or for political parties.

**Other Provisions**

***Smaller Awards if There Are Insufficient Funds.*** If the commission determines that there is not enough money in the program to fund all eligible candidates, the commission would reduce the grants proportionally to all eligible candidates. If there are insufficient funds, participating candidates would be allowed to raise money up to the amount that they were entitled to receive from the public financing program.

***Rules for Those Not in the Public Funding Program.*** Secretary of State candidates could choose not to participate

**PROP**
# 15
CALIFORNIA FAIR ELECTIONS ACT.

**ANALYSIS BY THE LEGISLATIVE ANALYST**    **CONTINUED**

in the public funding program. As soon as a nonparticipating candidate begins to spend more than the base amount of funding for participating candidates, the nonparticipating candidate must report his or her campaign spending to the commission electronically within 24 hours. Other individuals or groups that spend more than $2,500 in a year to influence the outcome of the Secretary of State's race also must report such spending within 24 hours.

***Amounts Adjusted by Inflation.*** Every four years, the commission would adjust seed money limitations and public funding amounts for the program by the rate of inflation.

***Expires January 1, 2019.*** This measure would end public financing for Secretary of State campaigns on January 1, 2019. Public financing, therefore, would be in place for the 2014 and 2018 elections. The Legislature, however, could extend this expiration date by passing a bill signed by the Governor.

***Interaction With Other Measure on the June 2010 Ballot.*** Proposition 14 on this ballot would change the primary and general election process for state offices, including for the Secretary of State. The nearby box discusses how this measure interacts with Proposition 14.

---

### Proposition 14 and This Measure

If approved, Proposition 14—a constitutional amendment also on this ballot—would change the primary and general election system for state offices, including Secretary of State. Proposition 14 makes changes that could conflict with the proposed statutory provisions of the public campaign funding system under this measure. For example, a potential conflict is this measure's linking of certain funding decisions to participation in a *partisan* primary election, which would no longer exist if Proposition 14 were to pass.

If both measures pass, conflicting provisions of these two measures would have to be reconciled through additional legislation, judicial action, or a future ballot measure.

---

## Requires Lobbyists to Pay Higher Charges

***Fair Elections Fund Established.*** The public funds for Secretary of State campaigns would be paid out of a new Fair Elections Fund, which would be funded by increased charges on lobbyists, qualifying contributions, potential voluntary tax check-off donations (on state personal income tax forms), and other sources.

***Increases Charges Related to Lobbyists.*** This measure requires charges for lobbyists, lobbyist firms, and lobbyist employers of $700 every two years. The measure requires that these charges be adjusted by the rate of inflation in the future. These charges likely would be the main source of money for the public funding program. As of January 2010, over 4,300 individuals and groups were registered as lobbyists, lobbying firms, or lobbyist employers. If similar numbers of registrations were to occur in the future, this source of revenue would raise about $6 million every four-year election cycle.

***Administrative Costs.*** The measure allows up to 10 percent of all money deposited to the Fair Election Fund every four years to pay for administering the public funding program. Such funds would be paid to the Secretary of State's office, the commission, and other departments with new duties under this measure.

## FISCAL EFFECTS

***New State Revenues.*** We estimate that this measure would raise more than $6 million every four years. This includes funds from the lobbyist charge, as well as qualifying contributions. This amount would grow with inflation in future years. It is possible that other revenues would be generated from voluntary tax check-off donations and other sources.

***New State Costs.*** The new funds would pay for costs associated with the measure. The costs paid from the new Fair Elections Fund to administer this measure could not exceed 10 percent of moneys deposited into the fund— about $600,000 every four years. The remaining funds would be available for candidates for Secretary of State who choose to receive public funds for their political campaigns. The amount of spending on the public funding of Secretary of State election campaigns would depend on a number of factors and vary from election to election. Among the factors affecting this spending would be:

- The number of candidates accepting public funds.
- The amount of money spent by candidates not receiving public funds (which would be a factor in determining the level of any additional matching funds payments).

Based on the amount of campaign spending for Secretary of State candidates in recent elections, total costs would most likely be between $5 million and $8 million per campaign. If there are not sufficient funds available to provide all candidates with the amounts envisioned under the measure, public funding provided to the candidates would have to be reduced so that overall expenses do not exceed the funds available to the program.

PROP
**15**
CALIFORNIA FAIR ELECTIONS ACT.

---

## ★ ARGUMENT IN FAVOR OF PROPOSITION 15 ★

Special interest campaign contributors have too much influence over our state government and must be stopped.

California government is broken. The state budget crisis is crippling our economy. Education funding is at a historic low. Vital services for seniors and people with disabilities are being decimated. Businesses are closing their doors while middle class families struggle to make ends meet.

But rather than solving California's problems, politicians are busy raising money for their campaigns. We need to get politicians out of the fundraising game so that they will focus on our priorities.

THE AMOUNT OF MONEY IN POLITICS IS OUTRAGEOUS AND CORRUPTING THE SYSTEM

According to the Fair Political Practices Commission, *over $1 billion has been raised by California politicians since 2000.* All this fundraising buys access for the special interests, shutting out the rest of us.

We need to change the way we finance election campaigns so politicians stay focused on the job we sent them to accomplish.

Prop 15 creates a voluntary pilot program to provide limited public financing for Secretary of State candidates in the 2014 and 2018 elections.

UNDER PROP 15:
• Candidates who agree to use public funds *MUST PROVE THEY HAVE SUBSTANTIAL SUPPORT* by getting signatures and $5 contributions from 7,500 registered voters.

• *PARTICIPATING CANDIDATES ARE BANNED FROM RAISING OR SPENDING MONEY BEYOND THE LIMITED FUNDS.*

• *SPENDING LIMITS AND REPORTING REQUIREMENTS ARE STRICTLY ENFORCED.* Candidates can only spend on legitimate expenses. Violators would face fines, possible jail time, and prohibitions from running for office in the future.

• *TAXPAYERS AND PUBLIC FUNDS ARE PROTECTED.* It will not increase taxes or take away from other important programs.

POLITICIANS SPEND TOO MUCH TIME RAISING MONEY

We have many serious problems to fix in California, from our schools to the state budget to the economy, but our elected officials spend too much time in fundraisers and not enough time doing what they are elected to do.

The League of Women Voters of California says:

*"We need to eliminate Big Money's unfair influence on elected officials who ultimately decide the public policies that affect us most. Passing Prop 15 will allow elected officials to start focusing on the public's interests, instead of returning political favors to their campaign donors."*

The California Nurses Association says:

*"Insurance and pharmaceutical companies undermine healthcare reform through massive spending to influence candidates. Prop 15 helps to get big money out of important public policy."*

There are plenty of qualified Californians with good ideas who can't compete in today's money-driven elections. PROP 15 WILL OPEN UP THE PROCESS SO OUR SECRETARY OF STATE IS THE PERSON WITH THE BEST IDEAS AND EXPERIENCE, NOT JUST THE BEST FUNDRAISER.

Join the bipartisan coalition of nurses, teachers, small business owners, good government experts, public safety officials, consumer groups, seniors, investors, environmentalists, faith communities, Democrats, Republicans and Independents in voting Yes on Prop 15.

VOTE YES ON PROP 15, BECAUSE CAMPAIGNS SHOULD BE WON, NOT BOUGHT BY THE SPECIAL INTERESTS.

For more information, please visit *www.YesonProp15.org*

**JEANNINE ENGLISH,** California State President, AARP
**ZENAIDA T. CORTEZ, RN,** President
California Nurses Association
**REVEREND DR. RICK SCHLOSSER,** Executive Director
California Church IMPACT

---

## ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 15 ★

Proposition 15 doesn't do anything to solve California's problems. What it DOES DO is give taxpayer money to politicians to pay for negative ads and junk mailers.

NO ACCOUNTABILITY

Under Prop 15, there's almost no restriction on how candidates spend our tax money. As has happened elsewhere, they could even put relatives or friends on the campaign payroll at taxpayer expense!

Worse, if there isn't enough money to pay for every eligible candidate's campaign, the politicians can take money intended for important existing programs and divert it to fund their political campaigns.

NO VOTER APPROVAL NEEDED TO EXPAND PROP 15

Prop 15 is specifically written to allow the politicians to expand this measure WITHOUT VOTER APPROVAL to cover every state campaign. This tricky provision could result in the SAME POLITICIANS who have FAILED to solve California's problems being rewarded with our tax dollars to fund their campaigns.

POLITICIANS CAN CONTINUE TO RAISE SPECIAL INTEREST MONEY AND ALSO GET TAX DOLLARS

Prop 15 cynically claims to hurt special interests. In fact, under Prop 15 politicians will be able to get taxpayer dollars to run their campaign AND ALSO RAISE unlimited funds from special interest groups for a variety of purposes. That's outrageous!

PROP 15 RAISES TAXES

The backers of Prop 15 want you to think it's a free lunch. In fact, Prop 15 raises over $6 million in NEW TAXES to pay for the campaigns of politicians.

Don't be fooled. Prop 15 is NOT effective campaign reform. Please vote NO.

**T. ANTHONY QUINN, Ph.D,** Former Commissioner
Fair Political Practices Commission
**COLLEEN C. MCANDREWS,** Former Commissioner
Fair Political Practices Commission
**WILLIAM HAUCK,** Former Commissioner
Fair Political Practices Commission

---

**PROP**
# 15
CALIFORNIA FAIR ELECTIONS ACT.

## ★ ARGUMENT AGAINST PROPOSITION 15 ★

California has many serious needs, but giving taxpayer money to politicians to fund their campaigns isn't one of them. Here are five good reasons to vote NO ON PROPOSITION 15:

*PROPOSITION 15 IS A TRICK*

Over 20 years ago, voters PROHIBITED taxpayer funds from being given to politicians for their political campaigns. Proposition 15 is a sneaky attempt by those same politicians to undo that prohibition. The text of Proposition 15 says "Section 85300 of the Government Code is repealed" but the politicians who wrote Proposition 15 don't want you to know what that means. Here's what Proposition 15 *repeals:*

" . . . *no candidate shall accept any public moneys for the purpose of seeking elective office.*"

This tricky maneuver gives the LEGISLATURE power to EXPAND taxpayer financing for their own campaigns WITHOUT GETTING VOTER APPROVAL!

*PROPOSITION 15 DOES NOT STOP THE INFLUENCE OF SPECIAL INTEREST MONEY*

Proposition 15 doesn't do what it promises. It claims to curb the influence of special interests and lobbyists. Lobbyists are already PROHIBITED from contributing to candidates. Cynically, Prop. 15 actually forces lobbyists to fund the campaigns of candidates for Secretary of State, the same official who regulates lobbyists!

*"It would have been wrong for my campaign to have been funded by the very special interests I regulated as Secretary of State."*
Bill Jones, Former Secretary of State

*PROPOSITION 15 IS FULL OF HIDDEN LOOPHOLES*

Proposition 15 has a giant loophole that lets these same candidates raise money from special interests for their own legal defense (including criminal defense) AND even the candidate's own Inaugural party!

*"You just can't trust politicians to write the campaign laws."*
Gabriella Holt, President, Citizens for California Reform

*TAXPAYER FINANCING OF POLITICAL CAMPAIGNS IS A BAD IDEA*

Proposition 15 gives millions of taxpayer dollars to any eligible candidate no matter who the candidate is or what the candidate stands for. In fact, there's almost *no restriction* on how candidates spend the money. Do you really want your taxpayer dollars being used to pay for negative ads and junk mail?

*"We need less negative campaigning, and we certainly don't need taxpayers to pay for it."* Colleen McAndrews, Former Commissioner, Fair Political Practices Commission

*PROPOSITION 15 RAISES TAXES*

Just last year, the Legislature raised taxes by *$12 billion* and they still couldn't balance the state budget. Now, they want you to approve even more NEW TAXES—Over $6 million in new taxes on small businesses, non-profits, and even charities.

But that's not all—a hidden provision in Proposition 15 says that if the new taxes aren't enough to fund every eligible candidate's political campaign, then the Legislature can use "any other sources of revenue from the General Fund or from other sources as determined by the Legislature." You know what that means—MORE TAXES!

*"The last thing California needs is more taxes to fund unnecessary programs."* Jon Coupal, President, Howard Jarvis Taxpayers Association

No more tricks. No more loopholes. No more taxes. *NO ON PROPOSITION 15.*

**DEBORAH HOWARD,** Executive Director
California Senior Advocates League
**JACK STEWART,** President
California Manufacturers and Technology Association
**PAUL WEBER,** President
Los Angeles Police Protective League

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 15 ★

*DON'T BE MISLED BY SPECIAL INTEREST LOBBYISTS!*
PROPOSITION 15 WAS WRITTEN BY INDEPENDENT, NONPARTISAN CITIZEN GROUPS AND CONSTITUTIONAL LAW EXPERTS. It repeals restrictions on public financing written 20 years ago that stop Californians from changing the way we finance election campaigns. Prop 15 frees the Secretary of State—the referee of our elections—from the influence of special interest money.

YOU CAN'T TRUST OPPONENTS' CLAIMS. They say Proposition 15 is funded by "taxes" when it is actually funded by voluntary donations and an annual $350 registration fee on lobbyists and interest groups that hire them. Currently, lobbyists pay only $12.50 per year!

*LOBBYISTS DON'T WANT TO SEE CANDIDATES RUN FOR OFFICE WITHOUT BEGGING FOR CONTRIBUTIONS FROM THE SPECIAL INTERESTS THEY REPRESENT. PROP 15 TAKES AWAY THEIR POWER—THAT IS THE REAL REASON LOBBYISTS OPPOSE PROP 15.*

*"Proposition 15 WON'T RAISE TAXES or take funds from other programs. It simply places reasonable fees on lobbyists to get Secretary*

*of State candidates out of the fundraising game."*—Richard Holober, Executive Director, Consumer Federation of California

*PROP 15 IS TOUGH*

It imposes strict new limits on how much money participating candidates can spend and what they spend it on. Politicians and special interests who violate the law will face possible jail time.

Prop 15 will end the dominance of wealthy candidates and donors, so politicians are accountable to their constituents—not their contributors.

DON'T BE FOOLED BY LOBBYISTS HIDING BEHIND NICE SOUNDING FRONT GROUPS AND FORMER POLITICIANS. *VOTE YES ON PROP 15.*

**JANIS R. HIROHAMA,** President
League of Women Voters of California
**TRENT LANGE,** President
California Clean Money Campaign
**KATHAY FENG,** Executive Director
California Common Cause

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

PROPOSITION

# 16

## IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

---

**OFFICIAL TITLE AND SUMMARY**                    **PREPARED BY THE ATTORNEY GENERAL**

---

## IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

- Requires local governments to obtain the approval of two-thirds of the voters before providing electricity service to new customers or expanding such service to new territories using public funds or bonds.
- Requires same two-thirds vote to provide electricity service through a community choice program using public funds or bonds.
- Requires the vote to be in the jurisdiction of the local government and any new territory to be served.
- Provides exceptions to the voting requirements for a limited number of identified projects.

**Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:**

- **Unknown net impact on state and local government costs and revenues due to uncertainty as to the measure's effects on public electricity providers and on electricity rates. These effects are unlikely to be significant in the short run.**

---

ANALYSIS BY THE LEGISLATIVE ANALYST

## BACKGROUND

### Provision of Electricity Service in California

*California Electricity Providers.* Californians generally receive their electricity service from one of three types of providers: investor-owned utilities (IOUs), local publicly owned electric utilities, or electric service providers (ESPs). These provide 68 percent, 24 percent, and 8 percent, respectively, of retail electricity service in the state.

*Investor-Owned Utilities.* The IOUs are owned by private investors and provide electricity service for profit. The three largest electricity IOUs in the state are Pacific Gas and Electric (PG&E), Southern California Edison, and San Diego Gas and Electric. Each IOU has a unique, defined geographic service area and is required by law to serve customers in that area. The California Public Utilities Commission (CPUC) regulates the rates charged by IOUs and how they provide electricity service to their customers.

*Publicly Owned Utilities.* Publicly owned electric utilities are public entities that provide electricity service to residents and businesses in their local area. While not regulated by CPUC, publicly owned electric utilities are governed by locally elected boards which set their own terms of service, including the rates charged to their customers. Electricity service is currently provided by local governments through several different governmental structures authorized under state law, including:

- Utility departments of cities, such as the Los Angeles Department of Water and Power.
- Municipal utility districts, such as the Sacramento Municipal Utility District (SMUD).
- Public utility districts, such as the Truckee Donner Public Utility District.
- Irrigation districts, such as the Imperial Irrigation District.

PROP
**16**

IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL
PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                      **CONTINUED**

*Electric Service Providers.* The ESPs provide electricity to customers who have chosen not to receive electricity from the IOU or publicly owned utility that would otherwise serve their geographic area. Under this approach, an electricity customer enters into what is termed a "direct access" contract with an ESP that delivers electricity to the customer through the local utility's transmission and distribution system.

### The Creation and Expansion of Publicly Provided Electricity Services

*Community Choice Aggregation.* In addition to the ESP arrangements discussed above, state law allows a city or a county, or a combination of the two, to arrange to provide electricity within their jurisdiction through a contract with an electricity provider other than the IOU that would otherwise serve that local area. This is referred to as "community choice aggregation." Although only one community choice aggregator (CCA) currently exists to provide electricity in California, several communities are exploring this option. A CCA could get its electricity from an ESP, using the transmission and distribution system of the IOU serving that local area. Electricity customers within that area would automatically get their electricity from the CCA unless they elected to continue to receive service from the IOU.

*Proposals to Create and Expand Public Electricity Providers.* In recent years, a limited number of local governments in the state have explored the idea of creating new public providers of electricity or expanding publicly owned utilities into new territory currently served by an IOU. For example, the City and County of San Francisco has considered creating a CCA that would include territory currently served by PG&E. As another example, Yolo County explored having SMUD provide electricity service to territory within the county currently served by PG&E. In some cases, these proposals have been put before the voters for their approval, under provisions of state law discussed below.

*Voter Approval Requirements for Publicly Owned Electricity Providers.* As noted above, publicly owned utilities can be organized under several different types of government structures. Each type of local government entity that is authorized to provide electricity service, and that is considering either the start-up of electricity service or the expansion of existing service beyond its current service area, is subject to certain state requirements.

Various statutes specify whether voter approval is required for the *start-up* of electricity service by authorized local government entities. Under state law, if a local government intends to *expand* its electricity service into a new territory, that new area must be annexed and, in certain cases, a majority of the voters in the area proposed for annexation must approve the expansion. In such cases, however, no vote of the public is generally required within the existing service territory of the local governmental entity that is proposing the expansion. (In some cases, a local commission requires such a vote as a condition of approving the annexation.) In contrast, local agency action to *create and begin implementation of a CCA* may be undertaken upon a vote of the local agency governing board and does not require local voter approval.

### PROPOSAL

The measure places new voter approval requirements on local governments before they can use "public funds"—defined broadly in the measure to include tax revenues, various forms of debt, and ratepayer funds—to start up electricity service, expand electricity service into a new territory, or implement a CCA.

- First, before an authorized local government entity can start up electricity service, it must receive approval by two-thirds of the voters in the area proposed to be served.
- Second, before an existing publicly owned utility can expand its electric delivery service

PROP
# 16
IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL
PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                        **CONTINUED**

into a new territory, it must receive approval by two-thirds of the voters in the area currently served by the utility and two-thirds of the voters in the new area proposed to be served.

*   Third, the measure requires two-thirds voter approval for a local government to implement a CCA.

The measure provides three exemptions to local governments from these voter approval requirements:

*   If the use of public funds has been previously approved by the voters both within the existing local jurisdiction and the territory proposed for expansion.

*   If the public funds would be used solely to purchase, provide, or supply specified types of electricity from renewable sources, such as wind or solar power.

*   If the public funds would be used only to provide electric delivery service for the local government's own use.

## FISCAL EFFECTS

*Local Administrative Costs for Elections.* Because this measure requires voter approval for specified local government actions that can currently be accomplished without such votes, it would result in additional elections costs. These costs would primarily be related to preparing and mailing election-related materials. In most cases, the balloting could be consolidated with already scheduled elections. As a result, the increased election-related costs due to this measure would probably be minor.

*Potential Impact on State and Local Government Costs and Revenues.* This measure could affect local government costs and revenues due to its potential effects on the operation of publicly owned utilities and CCAs. It could also affect the finances of state and local government agencies in California because of its potential impact on electricity rates. These effects would largely depend upon future actions of voters and local governments. We discuss these potential effects in more detail below.

First, the new public voter approval requirements for the start-up or expansion of publicly owned utilities or the implementation of CCAs could result in public disapproval of such changes. Also, the existence of these new voter approval requirements could deter some local government agencies from proceeding with such plans. To the extent that this occurred, these local government agencies would be somewhat smaller in size and have fewer customers than would otherwise be the case. As a result, they would have lower total revenues and costs.

Second, the enactment of this measure could also affect the finances of state and local government agencies in California due to its potential impact on electricity rates. As noted above, some local government agencies might not start up or expand a publicly owned utility into a new territory or implement a CCA as a result of the measure's new voter approval requirements. In this event, the rates paid by electricity customers in that and neighboring jurisdictions could be higher or lower than would otherwise have been the case. For example, if this measure prevented

PROP
**16**

**IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.**

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                              **CONTINUED**

the expansion of publicly provided electrical service that depended upon the construction of new energy infrastructure, rates might be held lower than might otherwise occur. On the other hand, if this measure lessened the competitive pressures on private electricity providers by reducing the opportunities for expansion of publicly provided electrical service, the rates charged to electricity customers might eventually be higher than otherwise. These impacts could affect state and local government costs, since many public agencies are themselves large consumers of electricity. To the extent that changes in electricity rates affect business profits, sales, and taxable income, these factors could also affect state and local tax revenues.

In the short run, the net fiscal effect of all of these factors on the finances of state and local government agencies is unlikely to be significant on a statewide basis. This is due to the relatively limited number of local government agencies considering the start-up or expansion of electricity services into new territory. In the long run, the net fiscal effect of the measure is unknown and would depend on future actions of local governments and voters.

*For text of Proposition 16, see page 75.*                                              *Analysis* | 29

**PROP**
# 16

IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL
PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

## ★ ARGUMENT IN FAVOR OF PROPOSITION 16 ★

Vote YES on Proposition 16, the Taxpayers Right to Vote Act.

Proposition 16, the Taxpayers Right to Vote Act, does one simple thing: It requires voter approval before local governments can spend public money or incur public debt to get into the electricity business. And like most local special tax and bond decisions in California, two-thirds voter approval will be required.

In tough economic times like these, local voters have every right to have the final say on an issue as important as who provides them with local electric service, and how much it will cost.

Two-thirds voter approval is our best protection against costly and risky government schemes to take over local electric service.

Several local governments in California are trying to take over private electric businesses—often using eminent domain—and are refusing to let local voters have the final say in the decision, because state law doesn't require it. This measure establishes clear voter approval requirements before local governments can spend public money or incur public debt to go into the local electricity business.

These days, with government spending out of control and mounting government debt—the best financial safeguard for taxpayers is to give voters the final say in these decisions.

Supporters of Proposition 16, the Taxpayers Right to Vote Act, including the California Taxpayers' Association, the California Chamber of Commerce and Pacific Gas and Electric Company, believe that the voters should decide. It is our electric service, our public money and, in the end, it is everyone's problem if a government-run electricity business fails. We, the voters, deserve the right to have the final say about how our money is spent.

Vote YES on Proposition 16, the Taxpayers Right to Vote Act.

www.taxpayersrighttovote.com

**TERESA CASAZZA,** President
California Taxpayers' Association
**ALLAN ZAREMBERG,** President
California Chamber of Commerce

## ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 16 ★

Vote No on Proposition 16 to stop the worst case yet of a big special interest—this time it's PG&E, the giant, for-profit private utility—misusing the initiative process.

Don't let PG&E fool you. Proposition 16 doesn't touch your taxes one way or the other. It's all about PG&E maintaining its monopoly and eliminating its competition. That could mean higher electric bills and poorer service for all Californians—regardless of where you live.

PG&E is making up a threat that doesn't exist to distract you. What's really bothering PG&E is many communities are now choosing to purchase renewable energy at wholesale prices. We believe that residents should be allowed to have the choice of buying electricity at lower cost without requiring a 2/3 supermajority vote. But that choice is what PG&E designed Proposition 16 to stop.

So when you see TV ads for Proposition 16, remember that most of the money for each one came from people's utility bills. The Utility Reform Network says, "It's just wrong for

PG&E to take money from families, and then spend it on a political campaign to benefit itself." Especially considering that PG&E recently paid big bonuses to its executives after going bankrupt—just like Wall Street.

The League of Women Voters of California urges you to Vote NO, joining AARP, every newspaper that's reviewed it, and groups representing California's consumers, taxpayers, environmentalists and farmers. Vote NO to give local, nonprofit utilities the chance to compete for your service—with low-cost, renewable energy.

**MICHAEL BOCCADORO,** Executive Director
Agricultural Energy Consumers Association
**LENNY GOLDBERG,** Executive Director
California Tax Reform Association
**JANIS R. HIROHAMA,** President
League of Women Voters of California

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

**PROP**
# 16

IMPOSES NEW TWO-THIRDS VOTER APPROVAL REQUIREMENT FOR LOCAL PUBLIC ELECTRICITY PROVIDERS. INITIATIVE CONSTITUTIONAL AMENDMENT.

## ★ ARGUMENT AGAINST PROPOSITION 16 ★

Proposition 16 does two things:

First, it drastically limits your choices on who provides you with electricity.

Second, it makes it easier for the for-profit utilities in California to raise your electricity rates.

It's cleverly written, because the backers of Proposition 16 want to fool the voters. They say this measure is about protecting taxpayers. But what it really protects is the monopoly enjoyed by a giant, for-profit electric utility.

You should be allowed to have more choices in who provides your electricity, if those choices would give you lower cost and better service. Vote No on Proposition 16.

Most people would agree that if a local nonprofit organization wants to buy green power at wholesale rates, and sell it to communities at an affordable cost, it should be allowed to do so. But Proposition 16 makes it just about impossible.

Severely limiting your choice in the source of your electricity. No lower cost green energy. Fewer choices and higher costs. That's what Proposition 16 does to you.

Who's the *sole* sponsor of Proposition 16?

PG&E, the largest for-profit utility in the state. When this argument was written, PG&E had contributed $6.5 million to the "yes" campaign and signaled they're prepared to spend tens of millions more. PG&E was the *only* contributor to put this proposition on the ballot.

Why? Again, PG&E wants to protect its monopoly. Proposition 16 isn't about protecting taxpayers—it's about protecting PG&E's for-profit monopoly on electricity.

Just read the ballot title and summary, and you'll see.

As the Fresno Bee put it, "The PG&E ballot measure (Proposition 16) is another example of the initiative process going awry in California, of a powerful special interest seizing the initiative process for its own narrow benefit."

AARP urges No on Proposition 16 because by restricting competition, Proposition 16 could mean higher electricity costs for you. A No vote protects you against the potential for crippling rate hikes.

In fact, PG&E and other for-profit utilities already charge higher rates than municipal, nonprofit utilities. And now they want to increase rates another $5 billion.

The Consumer Federation of California says VOTE NO because like Wall Street, PG&E paid huge bonuses to its executives, even after it went bankrupt and ratepayers bailed it out. Now PG&E wants to lock-in its monopoly once and for all—so smaller, local nonprofit utilities are not allowed to compete.

Sierra Club says VOTE NO because Proposition 16 requires a 2/3 supermajority vote before communities can purchase clean power and other power at competitive prices. These community choice programs are voluntary and do not raise taxes.

Proposition 16 "is a dagger aimed directly at a movement to enable municipalities to offer renewable green power to their residents in competition with private utilities," said Michael Hiltzik, a columnist for the Los Angeles Times.

Say NO to another wasteful initiative that says one thing but really does something very different. Vote No on Proposition 16 to keep money in your pocket and to protect your utility choices.

**JEANNINE ENGLISH,** California State President
AARP
**ANDY KATZ,** Chair
Sierra Club California
**RICHARD HOLOBER,** Executive Director
Consumer Federation of California

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 16 ★

Why are the opponents of Proposition 16 afraid to give taxpayers the right to vote? Voting gives you the ultimate choice on how government spends your money. Opponents of Proposition 16 want to deny you that right.

Opponents of Proposition 16 are not telling the truth. Let's be clear:

• Proposition 16 does NOT affect electric rates.
• Proposition 16 does NOT threaten green power.

Yes on Proposition 16 simply gives taxpayers the right to vote before local governments spend your money or go deeper into debt to get into the retail electricity business.

The last time government thought they knew more about the electricity business than the electric utility companies,

we had the 2001 energy crisis. Rates skyrocketed and we had rolling blackouts. The cost to consumers was devastating and it created chaos throughout California.

Yes on Proposition 16. Voter approval is everyone's best protection against costly and risky local government schemes to get into the retail electricity business.

www.taxpayersrighttovote.com

**TERESA CASAZZA,** President
California Taxpayers' Association
**ALLAN ZAREMBERG,** President
California Chamber of Commerce

---

PROPOSITION

# 17

## ALLOWS AUTO INSURANCE COMPANIES TO BASE THEIR PRICES IN PART ON A DRIVER'S HISTORY OF INSURANCE COVERAGE. INITIATIVE STATUTE.

---

**OFFICIAL TITLE AND SUMMARY**                    **PREPARED BY THE ATTORNEY GENERAL**

---

### ALLOWS AUTO INSURANCE COMPANIES TO BASE THEIR PRICES IN PART ON A DRIVER'S HISTORY OF INSURANCE COVERAGE. INITIATIVE STATUTE.

- Changes current law to permit insurance companies to offer a discount to drivers who have continuously maintained their auto insurance coverage, even if they change their insurance company, and notwithstanding the ban on using the absence of prior insurance for purposes of pricing.
- Will allow insurance companies to increase cost of insurance to drivers who do not have a history of continuous insurance coverage.
- Establishes that lapses in coverage due to nonpayment of premiums may prevent a driver from qualifying for the discount.

**Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:**

- **Probably no significant fiscal effect on state insurance premium tax revenues.**

---

**PROP**

# 17

ALLOWS AUTO INSURANCE COMPANIES TO BASE THEIR PRICES IN PART
ON A DRIVER'S HISTORY OF INSURANCE COVERAGE. INITIATIVE STATUTE.

---

## ANALYSIS BY THE LEGISLATIVE ANALYST

### BACKGROUND

Automobile insurance is one of the major types of insurance purchased by California residents. It accounted for about $19.7 billion (36 percent) of all premiums collected by California insurers in 2008. Among the types of automobile insurance coverage available is bodily injury liability, which provides protection in the event a motorist physically injures someone else.

***State Regulation of Automobile Insurance.*** In 1988, California voters passed Proposition 103, which requires the Insurance Commissioner to review and approve rate changes for certain types of insurance, including automobile insurance, before changes to the rates can take effect. Proposition 103 also requires that rates and premiums for automobile insurance policies be set by applying the following rating factors in decreasing order of importance: (1) the insured's driving safety record, (2) the number of miles they drive each year, and (3) the number of years they have been driving.

The Insurance Commissioner may adopt additional rating factors to determine automobile rates and premiums. Currently, 16 optional rating factors may be used for these purposes. For example, insurance companies may provide discounts to individuals for being long-term customers of theirs. Insurance companies are prohibited, however, from offering this kind of discount to new customers who switch to them from other insurers.

In addition, Proposition 103 contains a provision related to individuals who were previously uninsured. Specifically, Proposition 103 prohibits insurance companies from using the information that an individual did not previously have automobile insurance to: (1) determine whether the individual is eligible for coverage or (2) decide the premiums charged for coverage.

***Insurance Premium Tax.*** Insurance companies doing business in California currently pay an insurance premium tax instead of the state corporate income tax. The tax is based on the amount of insurance premiums earned in the state each year for automobile insurance as well as for other types of insurance coverage. In 2008, insurance companies paid about $247 million in premium tax revenues on automobile policies in California. These revenues are deposited into the state General Fund.

### PROPOSAL

This measure amends Proposition 103 to allow an insurance company to offer a "continuous coverage" discount on automobile insurance policies to new customers who switch their coverage from another insurer. If an insurance company chooses to provide such a discount, it must be based on the length of time the customer continuously had bodily injury liability coverage. Customers would generally be eligible for this discount so long as their coverage had not lapsed for more than 90 days in the past five years, except if any lapse was the result of a failure to pay the premium. Also, customers would still be eligible for this kind of discount under the measure if a lapse in coverage was due to military service in another country. Children residing with a parent could qualify for the discount based on their parent's eligibility.

### FISCAL EFFECTS

This measure could result in a change in the total amount of automobile insurance premiums earned by insurance companies in California and, therefore, the amount of premium tax revenues received by the state for the reasons discussed below.

On the one hand, the provision of continuous coverage discounts could reduce premium tax revenues received by the state. This would depend, however, on the extent to which insurers choose to offer such discounts to their customers, and the size of the discounts provided. On the other hand, insurers offering such discounts could make up for some or all of these discounts by charging higher premiums to some of its other customers.

The net impact on state premium tax revenues from this measure would probably not be significant. This is because overall premiums are predominately determined by other factors—such as driver safety, the number of miles driven, and years of driving experience—which are unaffected by the measure.

---

*For text of Proposition 17, see page 76.*

**PROP**
# 17
ALLOWS AUTO INSURANCE COMPANIES TO BASE THEIR PRICES IN PART ON A DRIVER'S HISTORY OF INSURANCE COVERAGE. INITIATIVE STATUTE.

## ★ ARGUMENT IN FAVOR OF PROPOSITION 17 ★

*PROPOSITION 17 CAN SAVE YOU MONEY ON CAR INSURANCE*

California's economy has taken a toll on all of us—lost jobs, businesses closing and our savings getting smaller. Families need to save money wherever they can. Prop. 17 can help. Under current law, drivers who have maintained auto insurance with the same company are eligible for a continuous coverage discount.

However, a flaw in existing law prohibits drivers from taking this continuous coverage discount with them if they switch insurance companies to get lower rates.

The 80% of responsible drivers who maintain automobile insurance should not be penalized and lose their discount just because they change insurance companies.

Proposition 17 is simple and straightforward: You are eligible for the continuous coverage discount even if you change insurers.

Yes on 17 means:
* Your family could save HUNDREDS OF DOLLARS PER YEAR
* Increased COMPETITION
* More CHOICES AND OPTIONS for consumers

*"If you have auto insurance, Proposition 17 can save your family as much as $250 a year. It rewards responsible drivers by allowing them to shop for the lowest rate while keeping their continuous coverage discount."*

—Harvey Larsen, Secretary-Treasurer, Consumers Coalition of California

*CONSUMERS AND SMALL BUSINESSES SAY YES ON PROP. 17*
* California Alliance for Consumer Protection
* California Chamber of Commerce
* California Senior Advocates League
* Small Business Action Committee
* California Hispanic Chambers of Commerce
* Consumers First, among others.

Many businesses and organizations support this measure, including Mercury Insurance, because it means increased competition in the insurance marketplace and new customers. Providing additional discounts is one way an insurance company can compete. More competition means lower rates for consumers!

*PROPOSITION 17: MORE COMPETITION, LOWER RATES*
Drivers don't lose their good driver discount when they change insurers. They shouldn't lose their continuous coverage discount just because they change insurers.

*"Just like some stores honor their competitors' coupons, Prop. 17 allows drivers to shop around for the best price and keep their continuous coverage discount, resulting in more choices, more competition and more savings."*

—Tom Hudson, Executive Director, California Taxpayer Protection Committee

*DON'T FALL FOR OPPONENTS' SCARE TACTICS*
* Opponents are fighting a discount that will benefit the 80% of drivers who follow the law and maintain insurance.
* Current law (Section 1861.02) requires that insurance rates be based primarily on your driving safety record, miles driven annually and years of driving experience. *This measure does not change that!*
* Section 1861.024 (b) of the measure specifically protects drivers who must cancel coverage for economic hardship, illness, job-loss or any reason other than non-payment for a minimum of 90 days. They are still eligible for the discount.
* And lower income consumers will still be eligible for California's Low Cost Auto insurance program.

*"Prop. 17 protects the continuous coverage discount for soldiers that cancel insurance when they are sent overseas to serve our country."*

—Willie Galvan, State Commander, American GI Forum of California

*READ IT FOR YOURSELF.*
*THEN VOTE YES ON 17: LOWER INSURANCE RATES, MORE COMPETITION AND CHOICE.*
*www.yesprop17.org*

**JIM CONRAN,** Former Director
California Department of Consumer Affairs
**ALLAN ZAREMBERG,** President
California Chamber of Commerce
**JOEL FOX,** President
Small Business Action Committee

## ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 17 ★

The proponents of Proposition 17, funded by Mercury Insurance Company, are trying to put one over on you. All they talk about is "discounts" and "competition." Here's what they don't want you to know:

FACT: Prop. 17 will *increase* car insurance premiums for millions of Californians who have done nothing wrong. It forces you to buy insurance—even if you stop driving—or you will get hit with surcharges of up to $1,000/year (based on Mercury's numbers) when you start driving again . . . even if you are a good driver.

FACT: If you have a break in coverage for 91 days or more during the past five years, you'll be charged more, no matter how legitimate the reason: illness, attending college, lost your job, even military service.

That's why USAA, which serves our troops and their families, says: "Based on the potential harm to military personnel, we

cannot support Prop. 17. They're doing their duty to their country. But they could get pounded by this kind of law."

FACT: 17 overturns a law passed by California voters in 1988 to make insurers compete fairly for customers.

FACT: Prop. 17 is 99% funded by Mercury, which was caught "charging discriminatory rates to motorists who were not at fault in accidents, were members of the armed forces or worked in certain professions." (Los Angeles Times, 2/15/10)

When was the last time an insurance company put something on the ballot to lower your rates? Never.

For your own protection, vote NO on 17.

**JOHN GARAMENDI,** former Insurance Commissioner
State of California
**JOHN VAN DE KAMP,** former Attorney General
State of California

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

**PROP**

# 17

ALLOWS AUTO INSURANCE COMPANIES TO BASE THEIR PRICES IN PART ON A DRIVER'S HISTORY OF INSURANCE COVERAGE. INITIATIVE STATUTE.

## ★ ARGUMENT AGAINST PROPOSITION 17 ★

Consumer advocates agree: Vote NO ON PROPOSITION 17—It's a deceptive insurance company initiative to raise auto insurance premiums for millions of California's struggling middle class families.

Proposition 17 changes our laws to favor big insurance companies like Mercury Insurance, the initiative's sponsor, while *hurting responsible drivers who have done nothing wrong.*

The insurance backers of Prop 17 won't tell you the whole story, but the California Department of Insurance does. It says Prop 17 *"will result in a surcharge"* for California drivers.

That's why Consumers Union, nonprofit publisher of *Consumer Reports,* opposes Prop 17.

Prop 17 requires Californians who cancel auto insurance to pay a financial penalty to restart their coverage.

-> *No on 17: It penalizes responsible drivers.*

Prop 17 allows insurance companies to raise rates on customers with perfect driving records, just because they canceled insurance for as little as ninety-one days over the past five years. Drivers must pay this unfair penalty even if they did not own a car or need insurance in the past.

-> *No on 17: It punishes our troops, among others.*

This initiative raises rates on Californians who stop their insurance, including military serving stateside. PENALIZING THESE DRIVERS BY FORCING THEM TO PAY MORE when they restart their insurance is wrong.

-> *No on 17: It hurts California's middle class families.*

In these tough times, many Californians are being forced to choose between driving and other necessities. If someone with a perfect driving record is late on just one payment, Prop 17 allows insurance companies to CHARGE DRIVERS HUNDREDS OF DOLLARS MORE when they restart coverage.

-> *No on 17: Californians will pay more for car insurance.*

Proposition 17's penalties are currently illegal in California, but in states where insurance companies are allowed to surcharge drivers, the result is HIGHER PREMIUMS:

• Nevadans can pay 73% more.
• Texans, 84% more.
• Floridians, 227% more.

-> *No on 17: It leads to more uninsured motorists, costing us all more.*

Because of the recession, insurance experts predict almost 20% more uninsured motorists on the road. According to the California Department of Insurance, Prop 17's financial penalty: *"discourages [people] from buying insurance, which may add to the number of uninsured motorists and ultimately drives up the cost of the uninsured motorist coverage for every insured."*

MORE UNINSURED DRIVERS hurts the bottom line for taxpayers and the state.

-> *No on Prop 17: It's an insurance company bailout.*

The San Francisco Chronicle reports that Mercury's Prop 17 is "a controversial insurance measure" from a company that "engaged in practices that may be illegal, including deceptive pricing and discrimination against consumers such as active members of the military."

State courts stopped Mercury from overcharging motorists in 2005. But Prop. 17 would legalize those surcharges. That's why Mercury has already spent $3.5 million on 17—so it can increase profits at the expense of California's middle class.

We shouldn't give insurance companies more power to raise our rates, especially during a recession.

*VOTE NO on PROP 17*

Learn more at *http://www.StopTheSurcharge.org*

**HARVEY ROSENFIELD,** Founder
Consumer Watchdog
**ELISA ODABASHIAN,** Director, West Coast Office
and State Campaigns Consumers Union
**JON SOLTZ,** Chairman
VoteVets.org

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 17 ★

*YES ON 17 ELIMINATES AN EXISTING SURCHARGE FOR CHANGING INSURANCE COMPANIES*

Currently, if you're a responsible driver who maintains insurance coverage, you could pay a surcharge of hundreds of dollars if you switch insurance companies because you lose your continuous coverage discount.

*PROP. 17 WILL SAVE DRIVERS AS MUCH AS $250*

17 would allow drivers to take your continuous coverage discount with you if you change insurers, saving you hundreds of dollars a year and increasing competition and choice.

*OPPONENTS WANT 80% OF DRIVERS TO CONTINUE TO PAY A SURCHARGE*

Opponents of 17 want to continue penalizing the more than 80% of drivers who follow the law and maintain coverage. They are intentionally misleading voters. No one is worse off with Prop 17. It provides ADDITIONAL GRACE PERIODS AND PROTECTIONS YOU DON'T GET NOW.

• FACT: 17 ADDS protections for soldiers to maintain their continuous coverage discount if they cancel insurance when serving overseas or in another state. *Currently, they lose their discount.*

• FACT: 17 ADDS protections for middle class families that have lapses in coverage for job losses, illnesses, or other reasons during tough economic times. *Currently, they lose their discount.*

• FACT: 17 preserves strong consumer protection laws. Insurers will still be required to base rates primarily on driving safety record, miles driven annually and driving experience. The Department of Insurance must still review and approve ALL rate increases or decreases.

• FACT: 17 encourages more people to maintain insurance, not fewer!

*YES ON 17 = LOWER RATES*
*www.yesprop17.org*

**JOHN T. KEHOE,** President
California Senior Advocates League
**WILLIE GALVAN,** State Commander
American GI Forum of California
**TOM HUDSON,** Executive Director
California Taxpayer Protection Committee

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

# POLITICAL PARTY STATEMENTS OF PURPOSE

## ★ REPUBLICAN PARTY ★

Republicans are proud of the leadership provided to our state by Governor Arnold Schwarzenegger and we are boldly confident about California's future and hold dearly all that is good about California's people.

This is an exciting time for our party, filled with unprecedented opportunity and unequaled enthusiasm. Republicans around the Golden State are rallying together to celebrate our common values of economic prosperity, cutting taxes and government waste, and a return to educational superiority. We look forward to working with you to restore America's principles and renew America's promise.

The Republican Party represents your best chance to ensure freedom and opportunity for every Californian and with your help, we can have confident, practical and accountable leadership in both Sacramento and Washington, D.C.

Electing Republican candidates will help ensure schools that are safe and accountable; hold the line on taxes; and keep growing California's economy. Join us in helping build a better California that provides opportunity for our families today, and for future generations.

**The California Republican Party**
**Ron Nehring,** *Chairman*
**Ronald Reagan California Republican Center**
**1903 West Magnolia Boulevard, Burbank, CA 91506**

**(818) 841-5210**
**Website: www.cagop.org**

## ★ GREEN PARTY ★

Californians need living-wage jobs, affordable housing, sustainable energy, single-payer health care and progressive taxation. Greens support vibrant economically sustainable communities, preserving environments, withdrawing from Iraq and Afghanistan, and developing safe clean energy sources. Greens oppose bailouts and corporate personhood.

Greens advocate:

Sustainable Economics:
- Supporting workplace representation, creating living-wage jobs, affordable housing, public transportation, and sustainable energy.
- Implementing fair graduated taxation on one's ability to pay, eliminating government subsidies to corporations, and implementing carbon taxes.
- Ending government indebtedness and deficit spending.

Constitutional Rights:
- Supporting habeas corpus, repealing mandatory sentencing, and amending the Three Strikes Law.

- Repealing the Patriot Act, withdrawing from Iraq and ending preemptive wars.
- Requiring presidential election by popular vote, equal access to debates and state ballots, ranked choice voting and reliable counting methods.

Environment protection:
- Promoting public-owned safe, clean renewable energy.
- Reducing global warming through efficiency, conservation and fossil fuel taxes.
- Protecting endangered species, agricultural land, and opposing sprawl developments.

Social justice:
- Supporting single-payer healthcare and free public education.
- Supporting undocumented immigrants' right to work.
- Ending torture and unwarranted surveillance.

Greens want government accountability, a vibrant economy, sustainable environments, social justice and Constitutional rights for all.

**Green Party of California**
**P.O. Box 2828, Sacramento, CA 95812**

**(916) 448-3437**
**Website: www.cagreens.org**

## ★ AMERICAN INDEPENDENT PARTY ★

The American Independent Party is the party of ordered liberty in a nation under God. We believe in strict adherence to written law. We believe the Constitution is the contract America has with itself. Its willful distortion has led to the violation of our Tenth Amendment guaranteed right to limited government–which inevitably requires oppressive taxation. Its faithful application will lift that burden.

Freed from the lawless oppression of Liberal rule, we may then compassionately and justly use our energy and ingenuity to provide for ourselves and our families. We will then establish truly free and responsible enterprise and reassert the basic human right to property.

We believe in protecting all human life however weak, defenseless, or disheartened; endorse the family as the essential bulwark of liberty, compassion, responsibility, and industry; and declare the family's right and responsibility to nurture, discipline, and educate their children.

We assert the absolute, concurrent Second Amendment guaranteed individual right to self defense coupled with a strong common defense, a common defense which requires a national sovereignty not damaged by imprudent treaties. We oppose all illegal immigration.

We support secure borders and immigration policies inviting the best of the world to join us in freedom.

**American Independent Party**
**Markham Robinson,** *State Chairman*
**476 Deodara St., Vacaville, CA 95688**

**(707) 359-4884**
**(707) 222-6040 Fax**
**E-mail: mark@masterplanner.com**

*The order of the statements was determined by lot. Statements on this page were supplied by political parties and have not been checked for accuracy by any official agency.*

# POLITICAL PARTY STATEMENTS OF PURPOSE

## ★ DEMOCRATIC PARTY ★

The Democratic Party is building a healthier future for our state and improving the quality of life for all of our residents.

Democrats have long fought to create a vibrant economy, improve education, ensure public safety and national security, expand access to health care, protect a woman's right to choose, and help the struggling middle class.

California Democrats strongly supported President Obama's American Recovery and Reinvestment Act which generated $21.5 billion in additional federal funding for California, creating nearly 71,000 new jobs and helping thousands of others remain employed.

We believe in rewarding hard work and expanding opportunity for all Californians in order to build stronger and healthier communities.

Democrats welcome decline to state voters to vote in our primary. We understand the need to work together so we can put California's economy back on track through responsible economic stimulation and a focus on creating good jobs.

In 2010, Democrats will work hard to elect a Democratic governor, re-elect Senator Barbara Boxer, and elect Democratic candidates to Congress and the legislature.

Join us as we build a stronger California—sign up at www.cadem.org/signup.

**California Democratic Party**
**Senator John Burton (Ret.),** *Chairman*
**1401 21st Street #200, Sacramento, CA 95811**

**(916) 442-5707 / 5715 Fax**
**E-mail: info@cadem.org**
**Website: www.cadem.org**

## ★ PEACE AND FREEDOM PARTY ★

The Peace and Freedom Party of California stands for democracy, cooperation, and sharing. We want to organize and educate the public to work together to meet human needs.

The party believes the role of government should be to make sure that everyone has jobs, housing, education, health care, a clean environment, and equal rights. We support marriage equality, immigration rights, organized labor, and universal single-payer health care. We oppose the current U.S. military actions in Iraq and Afghanistan. We

favor sharply increasing taxes on the wealthiest Americans who are best able to pay, and reducing the tax burden on working people.

Our top priorities are:

1. Bring all troops home now.
2. Double the minimum wage.
3. One system of free, quality health care for all.

More information about the Peace and Freedom Party can be found at *www.peaceandfreedom.org*

**Peace and Freedom Party of California**
**20212 Harvard Way, Riverside, CA 92507**

**(510) 465-9414**
**(323) 759-9737**

## ★ LIBERTARIAN PARTY ★

Libertarians are the only Party that won't legislate your personal morality or economic equality. We are the only party free of the left-right gridlock of entrenched politicians.

- Let parents control tuition dollars so that schools improve through competition.
- Recognize marriage equality, as the Civil Marriage Protection Act would have done.
- Increase the number of healthcare options by tax incentives and reviewing regulations.
- Enable patients' use of medical marijuana by enforcing Prop 215.
- Defend your right to keep and bear arms.
- Protect the environment with green pricing and

congestion fees rather than bureaucratic regulations written by industry lobbyists.
- Join the nine other states that passed the Liberty Amendment, which sets a timetable for repealing the income tax, and restricts federal power to constitutional boundaries.
- Oppose ill-advised foreign interventionism.

Vote Libertarian for practical solutions based on principles of individual freedom, personal responsibility, voluntary cooperation, customer choice, and market incentives. Stand up for the Bill of Rights and limiting the federal government to its Constitutional role of protecting liberty and justice for all–on American soil. Vote Libertarian, and win a free country.

**Libertarian Party**
**Kevin Takenaga,** *State Chairperson*
**14547 Titus Street, Suite 214**
**Panorama City, CA 91402-4935**

**(818) 782-8400**
**E-mail: office@ca.lp.org**
**Website: www.ca.lp.org**

*The order of the statements was determined by lot. Statements on this page were supplied by political parties and have not been checked for accuracy by any official agency.*

*Political Party Statements of Purpose* | 37

# Statewide Elective Office Descriptions

## U.S. Senator
- One of two Senators who represent California's interests in the United States Senate.
- Proposes and votes on new national laws.
- Votes on confirming federal judges, U.S. Supreme Court Justices, and many high-level presidential appointments to civilian and military positions.

## Governor
- As the state's chief executive officer, oversees most state departments and agencies and appoints judges.
- Proposes new laws and approves or vetoes legislation.
- Prepares and submits the annual state budget.
- Mobilizes and directs state resources during emergencies.

## Lieutenant Governor
- Assumes the office and duties of Governor in the case of impeachment, death, resignation, removal from office, or absence from the state.
- Serves as president of the State Senate and has a tie-breaking vote.
- Chairs the Economic Development Commission, is a member of the State Lands Commission, and sits on the boards of the California university systems.

## Secretary of State
- As the state's chief elections officer, oversees statewide elections and provides public access to campaign and lobbying financial information.
- Supports California business by registering and authenticating certain types of businesses and trademarks, regulating notaries public, and enabling secured creditors to protect their financial interests.
- Preserves California's history by acquiring, safeguarding, and sharing the state's historical treasures.
- Registers domestic partnerships and advance health care directives, and protects the identities of domestic violence victims and certain others entitled to confidential addresses.

## Controller
- As the state's chief fiscal officer, serves as the state's accountant and bookkeeper of all public funds.
- Administers the state payroll system and unclaimed property laws.
- Serves on numerous boards and commissions including the Board of Equalization and the Board of Control.
- Conducts audits and reviews of state operations.

## Treasurer
- As the state's banker, manages the state's investments.
- Administers the sale of state bonds and notes, and is the investment officer for most state funds.
- Chairs or serves on several commissions, most of which are related to the marketing of bonds.
- Pays out state funds when spent by the Controller and other state agencies.

## Attorney General
- As the state's chief law officer, ensures that the laws of the state are uniformly and adequately enforced.
- Heads the Department of Justice, which is responsible for providing state legal services and support for local law enforcement.
- Acts as the chief legal counsel in state litigation.
- Oversees law enforcement agencies, including county district attorneys and sheriffs.

## Insurance Commissioner
- Oversees and directs all functions of the Department of Insurance.
- Licenses, regulates, and examines insurance companies.
- Answers public questions and complaints regarding the insurance industry.
- Enforces California insurance laws and adopts regulations to implement the laws.

## Superintendent of Public Instruction
- As the state's chief public schools official, provides education policy and direction to local school districts.
- Directs all functions of the Department of Education and executes policies set by the State Board of Education.
- Serves as an ex-officio member of governing boards of the state's higher education system.
- Works with the educational community to improve academic performance.

## Member of the Board of Equalization
Serves on the Board of Equalization, the state's elected tax commission, which:
- Oversees the administration of over two dozen tax and fee programs including those for sales and use, cigarette and tobacco, alcohol and fuels.
- Serves as the appellate body for California income and franchise tax cases.
- Oversees the administration of property tax statewide.

# California Board of Equalization Districts

## Counties in Each Board of Equalization District



### District 1
Alameda, Colusa, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, San Francisco, San Luis Obispo, San Mateo, Santa Barbara, Santa Clara, Santa Cruz, Solano, Sonoma, Trinity, Yolo

### District 2
Alpine, Amador, Butte, Calaveras, El Dorado, Fresno, Glenn, Inyo, Kern, Kings, Lassen, Los Angeles, Madera, Mariposa, Merced, Modoc, Mono, Nevada, Placer, Plumas, Sacramento, San Joaquin, Santa Barbara, Shasta, Sierra, Siskiyou, Stanislaus, Sutter, Tehama, Tulare, Tuolumne, Ventura, Yuba

### District 3
Imperial, Los Angeles, Orange, Riverside, San Bernardino, San Diego

### District 4
Los Angeles

# List of Candidates for Statewide Elective Office

Proposition 34, approved by voters in November 2000, established voluntary spending limits for candidates running for statewide office. Candidates for Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Insurance Commissioner, Superintendent of Public Instruction, and Board of Equalization who choose to keep their campaign expenses under specified dollar amounts may purchase space in this guide for a 250-word candidate statement.

The expenditure limit for candidates running for Governor in the June 8, 2010, Statewide Direct Primary Election is $7,768,000. The expenditure limit for candidates running for Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, lnsurance Commissioner, and Superintendent of Public Instruction in the June 8, 2010, Statewide Direct Primary Election is $5,178,000. The expenditure limit for candidates running for the Board of Equalization in the June 8, 2010, Statewide Direct Primary Election is $1,295,000.

The following list of candidates for statewide elective office is current through March 18, 2010. For a current list of candidates go to, *www.sos.ca.gov/elections/elections_cand.htm.* An asterisk (*) designates candidates who have accepted the Proposition 34 campaign spending limits.

## Governor
|   |   |   |
|---|---|---|
| * | Richard William Aguirre | Democratic |
|   | S. Deacon Alexander | Green |
| * | Stewart A. Alexander | Peace & Freedom |
| * | Carlos Alvarez | Peace & Freedom |
|   | Mohammad Arif | Peace & Freedom |
|   | Edmund G. "Jerry" Brown | Democratic |
| * | Bill Chambers | Republican |
| * | Lowell Darling | Democratic |
| * | Vibert Greene | Democratic |
| * | Douglas R. Hughes | Republican |
| * | Ken J. Miller | Republican |
| * | Lawrence "Larry" Naritelli | Republican |
| * | Robert C. Newman II | Republican |
| * | Chelene Nightingale | American Independent |
| * | Dale F. Ogden | Libertarian |
| * | Charles "Chuck" Pineda, Jr. | Democratic |
|   | Steve Poizner | Republican |
| * | Markham Robinson | American Independent |
|   | Peter Schurman | Democratic |
| * | Joe Symmon | Democratic |
|   | David Tully-Smith | Republican |
| * | Laura Wells | Green |
|   | Meg Whitman | Republican |

## Lieutenant Governor
|   |   |   |
|---|---|---|
| * | Sam Aanestad | Republican |
|   | Pamela J. Brown | Libertarian |
| * | James "Jimi" Castillo | Green |
|   | Bert Davis | Republican |
| * | Yvonne R. Girard | Republican |
| * | Janice Hahn | Democratic |
| * | Dave Harris | Republican |
| * | Jim King | American Independent |
| * | Eric Korevaar | Democratic |
| * | Scott L. Levitt | Republican |
| * | Abel Maldonado | Republican |
| * | Gavin Newsom | Democratic |
| * | C.T. Weber | Peace & Freedom |

## Secretary of State
|   |   |   |
|---|---|---|
| * | Debra Bowen | Democratic |
| * | Marylou Cabral | Peace & Freedom |
| * | Damon Dunn | Republican |
| * | Ann Menasche | Green |
|   | Merton D. Short | American Independent |
| * | Orly Taitz | Republican |
| * | Christina Tobin | Libertarian |

## Controller
|   |   |   |
|---|---|---|
|   | Lawrence G. Beliz | American Independent |
| * | John Chiang | Democratic |
| * | David Evans | Republican |
| * | Andrew "Andy" Favor | Libertarian |
| * | Ross D. Frankel | Green |
|   | Nathan E. Johnson | American Independent |
| * | Karen Martinez | Peace & Freedom |
|   | Tony Strickland | Republican |

## Treasurer
|   |   |   |
|---|---|---|
| * | Charles "Kit" Crittenden | Green |
| * | Robert Lauten | American Independent |
|   | Bill Lockyer | Democratic |
| * | Debra L. Reiger | Peace & Freedom |
|   | Edward M. Teyssier | Libertarian |
| * | Mimi Walters | Republican |

# List of Candidates for Statewide Elective Office

## Attorney General
* Peter Allen                         Green
* Steve Cooley                        Republican
  Rocky Delgadillo                    Democratic
* John Eastman                        Republican
* Robert J. Evans                     Peace & Freedom
* Timothy J. Hannan                   Libertarian
* Tom Harman                          Republican
  Kamala D. Harris                    Democratic
  Chris Kelly                         Democratic
* Ted W. Lieu                         Democratic
* Pedro Nava                          Democratic
* Mike Schmier                        Democratic
* Diane Beall Templin                 American Independent
* Alberto Torrico                     Democratic

## Insurance Commissioner
* William Balderston                  Green
  Richard S. Bronstein                Libertarian
* Hector De La Torre                  Democratic
* Brian Fitzgerald                    Republican
* Dave Jones                          Democratic
* Dina Josephine Padilla              Peace & Freedom
  Clay Pedersen                       American Independent
* Mike Villines                       Republican

## Board of Equalization
### District 1
* Sherill Borg                        Peace & Freedom
* Ted Ford                            Democratic
  G. Alan Montgomery                  Democratic
* Kevin R. Scott                      Republican
* Kennita Watson                      Libertarian
* Rae Williams                        Republican
* Betty T. Yee                        Democratic

### District 2
* Barbara Alby                        Republican
* Paul Vincent Avila                  Democratic
* Willard D. Michlin                  Libertarian
* Toby Mitchell-Sawyer                Peace & Freedom
* Alan Nakanishi                      Republican
* Chris Parker                        Democratic
* George Runner                       Republican
  Mark L. Stebbins                    Democratic
* Edward C. Streichman                Republican

### District 3
* Vic Baker                           Republican
* Mary Christian-Heising              Democratic
* Jerry L. Dixon                      Libertarian
  Mary Lou Finley                     Peace & Freedom
* Terri Lussenheide                   American Independent
* Michelle Steel                      Republican

### District 4
* Peter "Pedro" De Baets              Libertarian
  Shawn Hoffman                       American Independent
* Jerome E. Horton                    Democratic
  Nancy Lawrence                      Peace & Freedom

## Superintendent of Public Instruction
* Larry Aceves                        Nonpartisan
* Karen Blake                         Nonpartisan
* Alexia L. Deligianni                Nonpartisan
* Lydia A. Gutierrez                  Nonpartisan
* Diane A. Lenning                    Nonpartisan
* Leonard James Martin                Nonpartisan
* Grant McMicken                      Nonpartisan
* Daniel M. Nusbaum                   Nonpartisan
* Gloria Romero                       Nonpartisan
* Faarax Dahir Sheikh-Noor            Nonpartisan
* Tom Torlakson                       Nonpartisan
* Henry Williams, Jr.                 Nonpartisan

# REPUBLICAN PARTY CANDIDATE STATEMENTS

---

| | | |
|---|---|---|
| AL RAMIREZ | P.O. Box 3002 | (310) 985-0645 |
| *U.S. Senator* | Santa Monica, CA 90408-3002 | info@ramirez2010.com |
| | | www.alramirez.com |

For information visit  *www.alramirez.com*

---

| | | |
|---|---|---|
| TOM CAMPBELL | | www.campbell.org |
| *U.S. Senator* | | |

When I worked for President Reagan, he asked Americans, "If not us, who? If not now, when?" Now we are the ones who must protect America's greatness by reversing the dangerous economic course President Obama and Congress are steering. America is $14 trillion in debt, more than half the money owed to China and other foreign investors, putting America's future in their hands, not ours. If we stopped borrowing today, it would take 300 years to repay what we owe. This staggering debt is immoral—dangerous to our national security and a shameful legacy for our children. As a conservative economist and business professor, I know the urgency of stopping this reckless spending and debt, and understand how it's killing job growth, eroding pensions and threatening our freedom. Because of my fierce opposition to wasteful spending, the National Taxpayers Union Foundation gave me highest marks when I served in Congress, twice rating me "the most frugal" representative. When I served in the State Senate, the California Journal named me "most ethical," "best problem solver" and "best overall Senator." In 2005, California's budget was balanced without gimmicks or new taxes when I was State Finance Director. Tom McClintock praised my work, calling me "clear, straight-forward and honest." Now I have a specific plan for cutting over $750 billion from this year's federal budget. Please review my plan and record at campbell.org. No one will fight harder to stop federal waste and debt, defend liberty and bring new life to America's economy.

---

| | | |
|---|---|---|
| CHUCK DEVORE | 4790 Irvine Blvd., Suite 105-191 | (714) 768-2010 |
| *U.S. Senator* | Irvine, CA 92620 | info@chuckdevore.com |
| | | www.chuckdevore.com |

I'm running for the U.S. Senate because, as a lawmaker and lieutenant colonel in the U.S. Army Reserve, I take seriously the oath I have sworn to support and defend the Constitution of the United States; and, as a father, I am deeply concerned about the impact our soaring national debt will have on our children's future. Please join Congressman Tom McClintock; U.S. Senator Jim DeMint; and the Howard Jarvis Taxpayers Association in supporting my campaign. I am not backed by the business-as-usual Establishment, but I do have the support of hard-working Californians. My conservative principles have led me to oppose: big government, higher taxes, and more regulations; massive Wall Street bailouts; wasteful Federal stimulus programs; government healthcare takeovers; amnesty; and cap-and-trade energy tax schemes. I support: the Constitution; lower taxes, smaller government, and less spending and debt; drilling for America's oil and gas; modern nuclear power; more water for California; secure borders and applying rule of law in our immigration policies. Government's purpose is, as the Founders wrote in the Declaration of Independence, to secure our "unalienable rights" to "life, liberty, and the pursuit of happiness"; not try to buy us happiness with billions of dollars borrowed from China. Before being elected to the state Assembly in 2004, I worked in the aerospace industry for 13 years. I also served President Ronald Reagan as a White House appointee in the Department of Defense. To truly change Washington, D.C., volunteer online:  www.ChuckDeVore.com. I would be honored to have your vote.

---

| | | |
|---|---|---|
| CARLY FIORINA | 915 L Street, Suite C-378 | (877) 664-6676 |
| *U.S. Senator* | Sacramento, CA 95814 | contact@carlyforca.com |
| | | www.carlyforca.com |

I started my business career as a secretary, earned my MBA and became the first and only woman to lead a Fortune 20 company. From that experience I understand the problems people face and what it takes to create jobs. Today our prosperity is threatened by Congress' runaway federal spending and mushrooming federal deficit, which, unless reversed, will burden our children and grandchildren with overwhelming debt and stunt the growth of our economy for a generation. I'm a tough fiscal conservative, running for the U.S. Senate to ensure economic growth and opportunity for all Americans. That's why I signed the no new taxes pledge and will fight to cut federal spending and reduce the deficit. It's time for a political outsider like me who's not tied to the old politics and culture of political payoffs to go to Washington and fight to reform our government. I'll fight to ban all congressional earmarks and political pork that costs us, the taxpayers, so much. We are at war with terrorists who seek to destroy America and our way of life. Now, more than ever, California needs a U.S. Senator who knows firsthand how to keep America safe. My experience as a national security advisor to the State Department and Pentagon gives me a solid understanding of how we can keep America secure. I'll work for a tougher U.S. policy in dealing with terrorists and oppose the Administration's policy to try terrorists in civilian court. I'm Carly Fiorina. I'm asking for your vote.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# REPUBLICAN PARTY CANDIDATE STATEMENTS

---

**ROBERT C. NEWMAN II**     P.O. Box 7465     (909) 422-3707
*Governor*     Redlands, CA 92375     info@newman4governor.org
     newman4governor.org

I am a Christian living by principles in God's Word. I speak the truth and am responsible, reliable, and dependable. Likewise, government must be accountable to the people. I am not a politician but a public servant. I am qualified with an AA, BA (zoology/chemistry), MA (theoretical/research) and Ph.D. (clinical psychology). I published scientific articles, worked in private practice, taught at the university level, Police and Fire Academy, and served on educational committees. I am the March AFB hazardous clean-up co-chair. I own a small farm; work with FFA and 4H. I participate at water agency meetings and have traveled the state studying the water crisis. Two offspring, two grandchildren, married 49 years and we worship at Eagle's Nest Ministries. California endangered species are small business owners, working people, farmers, teachers, and the family. These need commonsense protection. Government needs to get out of the way.  www.Newman4governor.org   info@Newman4governor.org

---

**BILL CHAMBERS**     P.O. Box 6019     (530) 823-3262
*Governor*     Auburn, CA 95604-6019     chambers4governor@sbcglobal.net
     www.billchambers4governor.com

Stop the control that corporations, special interest groups, unions, and individuals have on our politicians and restore the power to California's voters. Less taxes, less spending, and less government.

---

**DOUGLAS R. HUGHES**     9828 Petunia Ave.     (714) 531-5353
*Governor*     Fountain Valley, CA 92701     drhughes@hughes4governor.com
     www.hughes4governor.com

As your Governor, I will ensure all pedophiles will leave the State or volunteer to live confined to Santa Rosa Island, at no cost to Californians, as they will have their own self-supporting village, away from children. I believe all life is precious and must be protected. My prayer and promise to you is to secure the safety of our children. I will lower taxes to bare bones so that Californians will have more money to spend. As Californians spend, businesses will flourish. In addition, I will eliminate some taxes altogether and cut government bureaucracy in half. I had my own corporation for 35 years and I know in depth what it means to have a job, expand business, and how taxes and regulations can keep a business from growing. I will encourage large corporations to do business in California by eliminating regulations and offering "no-tax" incentives. Those large corporations will need workers, which means jobs for Californians. My "Cal Patent Act" will encourage small businesses and entrepreneurs by providing protection of inventions created by "start-ups" and promoting manufacturing in our state. Entrepreneurs will be able to apply for subsidy start-up money to manufacture those newly invented products, thereby creating jobs. When elected, I'll tri-fence our borders from Arizona to the Pacific Ocean. I have lived in California 55 years. I have no desire for monetary gain. I will make California a successful thriving state that its residents can again be proud of.  *Hughes4Governor.com*

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# REPUBLICAN PARTY CANDIDATE STATEMENTS

---

**ABEL MALDONADO**          P.O. Box 2205              (831) 759-2577
*Lieutenant Governor*       Salinas, CA 93902          abel@abelmaldonado2010.com
                                                       www.abelmaldonado2010.com

Angered by the mess in Sacramento? Then, join my crusade to clean it up. I am a *conservative Republican* business owner and state senator who is fighting to stop the excessive spending and corruption in Sacramento. To *stop the spending addicts*, I fought to tie politicians' hands by enacting a strict cap on state spending and requiring a rainy day reserve. *To save billions of dollars, I support efforts to secure the border and deport violent illegal immigrant prisoners back to jails in their home countries.* I cut my own pay, and wrote the constitutional amendment you passed making *pay raises for politicians illegal* when the state has a budget deficit. I publicly pressured a politician not to waste tax dollars on new furniture and saved taxpayers millions of dollars. By exposing exorbitant salaries of high-ranking officials who misused tax dollars to fix up their mansions, I helped save millions more. *I authored legislation to establish the Office of the Independent Auditor and require a comprehensive audit of state government.* Fighting Sacramento's big spenders has earned me some powerful enemies. It has also earned me a 100% rating from the California Taxpayers Association and honors as "Hero of the Taxpayer" from Americans for Tax Reform. As Lieutenant Governor, I'll work to turn California's economy around while continuing my fight to protect taxpayers against waste, fraud and corruption. *Join Senate and Assembly Republican Leaders, the California Professional Firefighters and the California Republican Taxpayers Association* in supporting my campaign by visiting: www.abelmaldonado2010.com.

---

**YVONNE R. GIRARD**          (951) 965-3943
*Lieutenant Governor*        girard.yc@charter.net
                             facebook—girard for lt governor

As a military veteran I bring immeasurable experience of the needs and problems military members and their families face.

---

**SAM AANESTAD**          2150 River Plaza Dr., Suite 150          (916) 473-8866
*Lieutenant Governor*     Sacramento, CA 95833                    www.voteforsam.com

My candidacy is endorsed by the Howard Jarvis Taxpayers Association and Congressman Tom McClintock, two names synonymous with fighting taxes and battling outrageous government overspending. Our next Lieutenant Governor must watch out for the taxpayer first. I will hold the Governor and Legislature accountable, speak out when they are wrong—regardless of what political party they belong to—and fight to protect you against any attempt to raise taxes and grow government. My background as an Oral and Maxillofacial Surgeon has taught me to never overlook the details. I've brought that same attention to detail when exposing waste and overspending in the liberal majority's state budget proposals. It has earned me the reputation of being one of the strongest voices in Sacramento against higher taxes and against overspending. In fact, I strongly opposed budgets that increased taxes and grossly overspent, because I believed we shouldn't spend money that we simply didn't have. It turns out that I was right. I will bring that same conservative, tax-fighting attitude to the job as your next Lieutenant Governor. Please join the Howard Jarvis Taxpayers Association and Congressman Tom McClintock in supporting me for Lieutenant Governor.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

44  |  *Candidate Statements*

# REPUBLICAN PARTY CANDIDATE STATEMENTS

---

DAMON DUNN                    P.O. Box 984                    damon@damondunn.com
*Secretary of State*           Willows, CA 95988               www.damondunn.com

California's government isn't working, and families and small businesses are paying the price. It's time to fix California. That's why Damon Dunn is running for Secretary of State. Born to a 16 year-old single mother, and struggling through deep poverty, Damon graduated from Stanford University, played in the NFL, and became a successful small business owner. Through his work with the Latino Educational Attainment Initiative, the Make a Wish Foundation, Fighting Giants Ministry, St. Augustine Soup Kitchen, and the Cops-N-Kids programs, Damon has provided hope and assistance to communities across our state. After retiring from professional football, Damon started his own successful business. However, as a businessman Damon quickly learned that government is often a barrier to economic growth and new jobs. As Secretary of State, Damon will focus on two areas: 1) improving California's business climate and 2) protecting ballot integrity as the chief elections officer. Businesses are leaving California and taking jobs to other states. The Secretary of State is in the unique position to meet with these businesses and learn what is causing them to leave. Damon will work to make the necessary changes in California law to keep jobs from leaving our state. In order to expand voter participation, Californians must have faith in the electoral process. Damon will work to pass the simple reform of requiring voter identification. People have to show identification to rent a movie; voters should be required to identify themselves when they vote.  www.DamonDunn.com.

---

MIMI WALTERS                                              www.mimiwalters.com
*Treasurer*

Years of reckless spending and irresponsible budgets have driven our state to near bankruptcy. The career politicians are out of touch and out of ideas. This election is our opportunity to fix California's finances. Coming from a background in Business and Finance, I am appalled at the cavalier way our money is treated in Sacramento. As your new State Treasurer, I will *Oppose Tax Increases* and insist the legislature *Balance the Budget*, *Stop Wasteful Spending,* and get our fiscal house in order. As Chair of the Senate Ethics Committee, I've worked to restore accountability and integrity to state government. As Vice-Chair of the Senate Revenue and Taxation Committee, I've strongly opposed *every* irresponsible state budget that has come out of the legislature, budgets that have put our state into a financial crisis. I've fought *every* attempt to raise taxes. My tough stand on taxes and the budget has earned me the trust and support of the Howard Jarvis Taxpayers Association and the National Tax Limitation Committee. My professional career includes serving as an Investment Finance Executive for seven years, Mayor of my city, and member of the Senate. I'm a founder of the California Women's Leadership Association and have served on the Boards of the National Association of Women Business Owners and the American Cancer Society. As California Treasurer *I will protect you, the taxpayer, not the Sacramento politicians and special interests.* You can find out more at  *www.MimiWalters.com.* I would be honored to receive your vote.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# REPUBLICAN PARTY CANDIDATE STATEMENTS

---

**STEVE COOLEY**　　　　　　　　10153½ Riverside Drive, #155　　　　(213) 598-5058
*Attorney General*　　　　　　　　Toluca Lake, CA 91602　　　　　　info@stevecooley.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　www.stevecooley.com

I'm District Attorney Steve Cooley. It's time we had a *professional prosecutor—not a politician*—as our Attorney General. As Attorney General, I will challenge the status quo, crack down on government fraud, corruption and abuse of power while fighting to restore integrity and fiscal conservatism to Sacramento. As L.A. County's Chief Prosecutor, I created the *Public Integrity Division* to prosecute crimes committed by politicians, government officials and corrupt lawyers. My office has prosecuted over 1,000 dangerous criminals under "Three Strikes and You're Out" and obtained more death penalty convictions than any other district attorney in California. I created a *Victim Impact Program* to assure special protection and assistance for the most vulnerable—the elderly and victims of child and sexual abuse. I'm the *only* candidate for Attorney General with experience as both a frontline police officer and prosecutor who has personally put murderers, rapists, gang members and child molesters behind bars. I received national recognition for my leadership in bringing escaped killers back from Mexico who fled to escape justice—including the murderer of Deputy Sheriff David March. The California Narcotic Officers' Association calls me the "toughest district attorney in California." Former Republican Governors Pete Wilson and George Deukmejian, and law enforcement organizations representing thousands of police officers, support me. As your Attorney General, I will be the People's Lawyer to make government more accountable to taxpayers and citizens while relentlessly fighting violent crime and aggressively prosecuting white collar criminals and government officials who betray our trust.

---

**JOHN EASTMAN**　　　　　　　　3553 Atlantic Avenue, #362　　　　(562) 426-8126
*Attorney General*　　　　　　　　Long Beach, CA 90807-5605　　　　info@eastmanforag.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　www.eastmanforag.com

California's Attorney General must protect our basic constitutional rights and freedoms. *First is our fundamental right to be free from violent crime.* Californians have passed tough laws like "Three Strikes" to guarantee that repeat, violent criminals are locked up for a long time, and that the rights of victims are held above those of criminals. *I strongly support these laws and will oppose all efforts to water them down.* When California's District Attorneys needed advanced training for criminal prosecutors, they came to me as Dean of Chapman University Law School. We established programs to help improve their performance and put criminals away. Illegal immigrants are crowding our prisons, costing us billions. As Attorney General, *I'll challenge the federal government* for its failure to control our borders, making it pay the bill for these prisoners. *I will fight liberal, activist judges* who have invented new "rights" for prisoners, causing the potential release of thousands of violent criminals from prison. *I will also fight for taxpayers, small businesses and voters.* I have defended taxpayers from illegal attempts to raise taxes and businesses from unconstitutional regulations. I'll stand up for voters when they pass ballot initiatives. I've argued cases at the highest courts, including the U.S. Supreme Court. I've fought for the Boy Scouts, the Pledge of Allegiance, religious freedoms, property rights, and against eminent domain. For more about my positions, please visit www.EastmanForAG.com. I hope to earn your support. Together, we can "secure the blessings of liberty for ourselves and our posterity."

---

**TOM HARMAN**　　　　　　　　2150 River Plaza Dr., Suite 150　　　　(916) 473-8866 Ext. 7
*Attorney General*　　　　　　　　Sacramento, CA 95833　　　　　　www.harman4ag.com

California's "Three-Strikes-and-You're-Out" law is under attack, which is one reason the authors of "Three Strikes"— Mike Reynolds and former Republican Secretary of State Bill Jones—are endorsing me for Attorney General. They know I am the only Republican candidate with a consistent public voting record supporting "Three Strikes" instead of opposing it. I'm also the only Republican candidate with a consistent voting record opposing the early release of felons back into our communities. Dumping prisoners into our communities before they have served their time is not a solution to our budget problems. Instead, we should eliminate the absurdly expensive health coverage California currently gives inmates. California prisoners receive better health care than most Californians. This will end on my watch as Attorney General. I have sponsored laws to keep hardened criminals behind bars, to streamline the Death Penalty and to protect crime victims and their families. As a young attorney, I began my legal career at the law firm of Lucas and Deukmejian. In my forty years of law, I've defended small business owners, sponsored death penalty legislation and helped prosecute violent crime. Above all else, I've fought to protect and defend our State Constitution. The Attorney General is the people's lawyer and advocate; I will defend our laws and end politics as usual in this office. Let's defend "Three Strikes", put public safety first and take back our neighborhoods. Thank you and I respectfully ask for your vote.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# REPUBLICAN PARTY CANDIDATE STATEMENTS

---

**MIKE VILLINES**                   P.O. Box 606                    staff@mikevillines.com
*Insurance Commissioner*            Fresno, CA 93709               mikevillines.com

Former Governor Pete Wilson said Mike Villines is "someone who can bring people together and solve problems" and former Governor George Deukmejian stated "he's an experienced leader we need for these challenging times." As our Insurance Commissioner, businessman Mike Villines has two main priorities . . . protecting consumers and re-building our economy. For example, he favors letting people carry their health insurance between jobs and making sure consumers have the peace of mind that their insurance will protect them. Mike Villines knows the insurance industry comprises one-tenth of California's economy, so he'll fight to streamline government regulations and create new jobs, not drive them to other states. Additionally, he believes insurance rates can be more affordable by promoting greater competition between insurance companies. A past Assembly Republican Leader, Mike Villines understands that insurance fraud costs Californians an average of $500 per resident . . . he'll crack down on the fraud causing a staggering rise in insurance premiums. A fiscal conservative, Mike Villines will support cost containment measures that keep worker's compensation rates low so we reduce the cost of doing business in California . . . no wonder Larry Higby, Chairman of New Majority California, said, " . . . he understands that the key to job creation is a healthy business climate." Happily married and the father of three children, Mike Villines will also push for common sense solutions that provide health coverage to those individuals with pre-existing conditions who find it difficult to get insurance. Visit *www.mikevillines.com.*

---

**BRIAN FITZGERALD**
*Insurance Commissioner*

Regulation of insurance concerns everyone. As Commissioner I will provide consumers protection and a fair and reasonably regulated marketplace. I am a dedicated public servant of 16 years seeking only to provide a stable Department, not use it for advancement to higher office.

---

**ALAN NAKANISHI**                  1136 Junewood Court            (916) 473-8866
*Board of Equalization, District 2*  Lodi, CA 95242                www.alannakanishi.com

As a Jobs/Economy Specialist, it is my job to be the taxpayers' watchdog, and to promote economic growth to create new jobs. My personal three-part pledge to you, the taxpayer, is that above all else I will always stand true to my fiscal conservative values. The second part of that pledge is that I will defend taxpayers and fight against government regulators who destroy jobs. Lastly, I will eliminate wasteful spending. I got to where I am the same way many of you did, through hard work and perseverance. I was born and raised in California. My parents worked in a local cannery and I worked in the fields and orchards to pay for my education. I went to medical school, became a physician and was a Major in the United States Army during Viet Nam. I served in the state legislature and coauthored the Workers' Compensation Reform bill that saved jobs. Now I serve as a Jobs/Economy Specialist at the Board of Equalization where I am fighting every day on behalf of hard-pressed taxpayers. Yes, I am a Republican, but I am more than that. I am a conservative, dedicated to cutting wasteful government and defending taxpayers. I ask that you allow me the privilege of serving you, the taxpayer, on this important taxpayer board. Thank you and I appreciate your vote.

---

**GEORGE RUNNER**                   P.O. Box 984                   info@georgerunner.com
*Board of Equalization, District 2*  Willows, CA 95988             www.georgerunner.com

The *Howard Jarvis Taxpayers Association* is supporting me because I have a passion for fighting against tax increases on California families and businesses. My extensive experience as a *Taxpayer Advocate* with a statewide taxpayer watchdog organization, as a businessman and as a state senator (who kept a no-tax pledge) uniquely qualifies me to protect the interests of you, the taxpayer. Politicians in Sacramento and Washington are killing job growth with regulation and red tape. They are worried that if I am elected to the Board I will challenge the status quo. They are right. That is exactly what I will do. Unlike most of the people in Sacramento, I welcome and support the Tea Party activities because it echoes what I have been saying for years: Government is too large. Unfortunately, liberals don't understand this concept. My tax philosophy is simple: Do not overtax the People. When the People are excessively taxed their liberty is lost. I authored Jessica's Law, which created the toughest sexual predator laws in the nation. We had to take Jessica's Law to the ballot because the Legislature failed to act. I also created California's Amber Alert, which has resulted in nearly 200 reunions of abducted children with their parents. Visit www.GeorgeRunner.com to learn more about my mission to change California and protect the taxpayers of our state.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# REPUBLICAN PARTY CANDIDATE STATEMENTS

**BARBARA ALBY**                                      barbara@barbaraalby.com
*Board of Equalization, District 2*                   www.barbaraalby.com

Sick of politicians and taxes? That's why I'm running for Board of Equalization—to protect taxpayers and defend the Constitution. As author of "Megan's Law," requiring public notification when sexual predators move into your neighborhood, I saved thousands of children from molestation. *The ACLU said "No," but we won!* I'm proud to be an official proponent of Proposition 13, lowering property taxes. With rampant mismanagement and wasteful spenders in Sacramento, I will fight all tax increases. The BOE can do more damage to your wallet than the Legislature! As Board Member Bill Leonard's Chief-Deputy and taxpayer advocate, I have effectively fought the abusive government bureaucracy, saving taxpayers millions of dollars. I'm a rock-solid, effective conservative who believes Californians are over-taxed and under-served! National Tax Limitation Committee repeatedly named me "Taxfighter of the Year." Howard Jarvis Taxpayers Association's Jon Coupal says, "We have great respect for Barbara and she has excellent conservative credentials." California Taxpayers Committee: "You're a great conservative and our *best* taxpayers' advocate." California Small Business Association: "You do a great job representing small business as the taxpayers' best defender at BOE." I'm endorsed by Republican clubs, volunteers, and taxpayer groups. Representing you is not a career, it's a public service. *You can reach me at barbara@barbaraalby.com.* As a business owner, wife and mother I know how tough it is to make ends meet. I'll never forget who I work for: *you*. I'd be honored to have your vote!

**EDWARD C. STREICHMAN**        734 E. Serena Avenue        (559) 273-6518
*Board of Equalization, District 2*    Fresno, CA 93720        ed@streichmanforboe.com
                                                               www.streichmanforboe.com

I've spent the last 25 years interpreting and applying Sales Tax laws as a tax auditor for the State Board of Equalization. My qualifications and experience make me your best choice for making this agency better for taxpayers. You deserve a representative who has expertise with Sales Tax laws and who will fight for common-sense reforms within the agency. Taxpayers who appeal their state tax liabilities will have confidence that decisions will be correct and fair. I would be honored to serve you on the State Board of Equalization.

**VIC BAKER**                  P.O. Box 2618              (800) 533-1396
*Board of Equalization, District 3*    Spring Valley, CA 91979-2618    info@vicbakerforboe.com
                                                               www.vicbakerforboe.com

Keeping it *simple* and *fair*

**MICHELLE STEEL**             27520 Hawthorne Blvd., #270    (310) 697-9000
*Board of Equalization, District 3*    Palos Verdes, CA 90274    michellesteel@shawnsteel.com
                                                               www.steelforboe.com

Taxpayers should always come first! On the Board of Equalization, I've worked to protect taxpayers from overly aggressive state tax agencies. I've also fought for the cause of small business owners, and I opposed every attempt to raise taxes on hard working Californians. Over the past four years, I was able to defeat efforts to create a $500 million tax on digital Internet downloads—the so-called I-Tax. I also began auditing state government and discovered that the state had delayed the return of $42 million in tax deposits owed to more than 5,500 small businesses. My husband and I own a small business, and we worry about our children's future, especially when businesses are leaving California every day because of high taxes and endless regulations. Now more than ever, our state must help small businesses by lowering taxes and reducing regulations. I'll never forget watching my mother nearly three decades ago when, as a small business owner, she went before the Board of Equalization to contest an unfair tax bill. She was so frustrated that Board Members didn't even listen as she told her story. In the end, she didn't have the means to fight the massive state agency, and she ended up paying a tax bill she didn't owe. No taxpayer should be treated like that. As long as I am on the Board of Equalization, I will be a strong advocate for taxpayers, ensuring their voice is heard. I would be honored to have your support. *www.SteelforBOE.com.*

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# GREEN PARTY CANDIDATE STATEMENTS

| | | |
|---|---|---|
| **LAURA WELLS** | P.O. Box 10727 | (510) 225-4005 |
| *Governor* | Oakland, CA 94610 | info@laurawells.org |
| | | www.laurawells.org |

Values—that's why I registered Green. I've served as your State Controller candidate twice, to "follow the money," receiving the most California Green Party partisan votes ever: over 400,000. Now I'm running for Governor to "fix the money!" Hundreds of Greens, including over 50 elected mayors, city council, county council, and school board members are endorsing my campaign to spread the message: *yes*, California has problems, and *yes*, proven and innovative solutions exist. We can have a State Bank, to invest in California not Wall Street. We, our children, and grandchildren can preserve the good of Prop 13: keep people in their homes—and fix the bad: eliminate the two-thirds majority votes that safeguard only the richest of the rich. This is a great year to spread our message and build the Green Party. I'm asking for your support:  www.LauraWells.org

| | | |
|---|---|---|
| **JAMES "JIMI" CASTILLO** | 305 N. Second Avenue, #225 | ltgov@jimicastillo.org |
| *Lieutenant Governor* | Upland, CA 91786 | www.jimicastillo.org |

*See www.jimicastillo.org for candidate information.*

| | | |
|---|---|---|
| **ANN MENASCHE** | 1228 26th Street | (619) 702-5856 |
| *Secretary of State* | San Diego, CA 92102 | ann@voteann.org |
| | | www.voteann.org |

For clean publicly funded elections. *People power, not corporate power!*  www.voteann.org.

| | |
|---|---|
| **ROSS D. FRANKEL** | www.electross.com |
| *Controller* | |

*www.electross.com*

| | | |
|---|---|---|
| **CHARLES 'KIT' CRITTENDEN** | 11300 Foothill Blvd., #19 | (818) 899-1229 |
| *Treasurer* | Lake View Terrace, CA 91342 | ccrittenden@csun.edu |
| | | crittendenforstatetreasurer.com |

See crittendenforstatetreasurer.com

| | |
|---|---|
| **PETER ALLEN** | www.peterallenforag.com |
| *Attorney General* | |

Please see:  www.peterallenforag.com.

| | | |
|---|---|---|
| **WILLIAM BALDERSTON** | 2321 Humboldt Ave. | (510) 436-5138 |
| *Insurance Commissioner* | Oakland, CA 94601 | bbalderston@earthlink.net |
| | | healthforall2010.net |

*See* healthforall2010.net

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# AMERICAN INDEPENDENT PARTY CANDIDATE STATEMENTS

---

DON J. GRUNDMANN                     425 E. Merle Ct.                      (510) 895-6789
*U.S. Senator*                        San Leandro, CA 94577                stoptheirs@hotmail.com
                                                                          truthusa.org

Dear Citizen: Please read "The Restoration of America" at truthusa.org or call me at (510) 760-0968.

---

CHELENE NIGHTINGALE                  P.O. Box 901115                      contact@nightingaleforgovernor.com
*Governor*                            Palmdale, CA 93590                   www.nightingaleforgovernor.com

Public benefits for illegal immigrants costs Californians $12,000,000 yearly. Central Valley agriculture loses $2,000,000 annually protecting smelt. Schwarzenegger's global warming "solution" decimated California business. Let's "We the People" take back California from full-time legislators, special interests, and big money spenders. As a homeschooling mother I will fight for our children's future. This business woman will create sound money solutions for our fiscal crisis. Campaigning for liberty, state, and individual rights!  www.nightingaleforgovernor.com

---

MARKHAM ROBINSON                     476 Deodara St.                      (707) 448-7062
*Governor*                            Vacaville, CA 95688                  mark@masterplanner.com
                                                                          www.markhamrobinson4gov.com

www.MarkhamRobinson4Gov-2010.com

---

ROBERT LAUTEN                        P.O. Box 121                         robertlauten.com
*Treasurer*                           Brea, CA 92822

For California's, America's, and Humanity's economic survival I support: President Obama's impeachment *www.LaRouchePAC.com.* The ballot initiative *www.suspendAB32.org*

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# DEMOCRATIC PARTY CANDIDATE STATEMENTS

---

**BARBARA BOXER**
*U.S. Senator*

P.O. Box 411176
Los Angeles, CA 90041

(323) 254-1001
info@barbaraboxer.com
www.barbaraboxer.com

California is the most dynamic state in the nation, and it's been a great honor for me to be your Senator. During these very tough times for our state and country, I am doing everything I can to create jobs and make life better for you and your family. As Chair of the Senate Environment and Public Works Committee, I've helped create thousands of new jobs improving our roads and transit systems. Now I'm working to create even more jobs by expanding transportation priorities, helping small businesses thrive and making California the biggest job creator in the new clean energy economy. But our work is far from done. As I focus on getting our economy back on track, I am also working for affordable health care, better schools, and to protect our communities, our environment and our fundamental rights and freedoms. I am proud to be supported by police, firefighters, business leaders, workers, nurses and many others across California who know that I will always stand up for our families, no matter how difficult the challenge.

---

**RICHARD WILLIAM AGUIRRE**
*Governor*

4564 Leon Street
San Diego, CA 92107

(619) 226-6279
richard@aguirreforgovernor.com
www.aguirreforgovernor.com

Build Solar Panel Factories. Install Solar panels on 10 million homes. *Energy Profits $3 billion/month Invested:* Water Desalination, Education, Healthcare, Transportation. *www.aguirreforgovernor.com*

---

**GAVIN NEWSOM**
*Lieutenant Governor*

4104 24th Street, #766
San Francisco, CA 94114

(415) 963-9240
gavin@gavinnewsom.com
www.gavinnewsom.com

I'm running for Lieutenant Governor because it's time for us to finally shake up Sacramento and reform state government. As Mayor and Supervisor of San Francisco I have a proven track record of tackling big problems that others ignore, offering bold ideas and delivering real results. That's why our City is the first in America daring to provide quality health care for every single resident—regardless of pre-existing medical conditions. On public education, we are valuing our schools, students and teachers and raising our test scores. While others lay off teachers, we're giving ours more resources to succeed. On the environment, we have the nation's most aggressive local solar incentives, highest recycling rates and strongest green building standards. We're investing in comprehensive job training and putting people back to work in the new green economy. Under the Jobs Now initiative, we've placed more than 2,000 people into jobs, generated $35 million in local wages and allowed local businesses to succeed during difficult times. And we've done it all with balanced budgets and sound fiscal policies that protect taxpayer dollars. I am fired up and ready to change state government. With great optimism and humility, I ask for your vote.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# DEMOCRATIC PARTY CANDIDATE STATEMENTS

---

**ERIC KOREVAAR**  1720 Torrey Pines Road  (858) 692-0459
*Lieutenant Governor*  La Jolla, CA 92037  www.voteforeric.com
iwillsavetaxpayerstenmilliondollarsbydoingthejobmyself@voteforeric.com

As a Ph.D. scientist rather than a career politician, I will bring needed analytical capabilities and new thinking to Sacramento. As the father of young children, I feel adamantly that schoolteachers' jobs should not be sacrificed before seriously cutting government overhead. As a successful small business owner wearing many hats, I can fulfill the Lieutenant Governor's limited responsibilities myself without the budgeted staff of 30, thereby saving California taxpayers $10 million over 4 years. Owing no favors from past political office, I will put the long term interests of all Californians before the short term interests of lobbyists while serving on the State Lands Commission and the Boards of California's University Systems. I request your vote so that I can serve you independently without staff, setting a strong example of fiscal restraint.

---

**JANICE HAHN**  janicehahnforlg@gmail.com
*Lieutenant Governor*  www.janicehahn.com

I'm running for Lieutenant Governor because I believe I can help chart a new course for our state—one with good jobs, access to quality education, a cleaner environment and improved public safety. As a former schoolteacher and former businesswoman, I understand the critical link between education and jobs and our economy. That's why the *California Federation of Teachers* supports my candidacy. As a Regent of the UC and Trustee of CSU, I will fight student fee increases. As a Councilwoman, I have protected public safety and made sure our first responders have the tools and resources they need to keep us from harm. That's why the largest law enforcement organization in the state, the *Peace Officers Research Association of California (PORAC)*, representing over 62,000 peace officers across the state, and the *California Professional Firefighters*, have endorsed my candidacy. The Lieutenant Governor chairs the California Commission for Economic Development, and my commitment to providing jobs and supporting working men and women has earned me the endorsements of the *Communications Workers of America* and local affiliates of the *Pipe Trades, Longshore* and *Ironworkers* Unions. The *National Organization for Women* and the *National Women's Political Caucus*, who are excited about electing the first woman Lieutenant Governor in California's 160-year history, also have endorsed my candidacy. This campaign is about standing up for change. I have the experience, energy and determination to help chart a new course for California. I would be honored to have your vote as California's next Lieutenant Governor.

---

**DEBRA BOWEN**  600 Playhouse Alley, #504  (626) 535-9616
*Secretary of State*  Pasadena, CA 91101  info@debrabowen.com
www.debrabowen.com

As your Secretary of State, I am committed to ensuring that every California election is conducted fairly and that every ballot is counted as it was cast. In 2008, I received the John F. Kennedy Profile in Courage Award™ for my national leadership in election integrity. To find out more, please visit me at www.debrabowen.com.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# DEMOCRATIC PARTY CANDIDATE STATEMENTS

---

PEDRO NAVA
*Attorney General*

P.O. Box 90459
Santa Barbara, CA 93190

(805) 899-2600
pedronava@pedronava.com
www.pedronava.com

Pedro Nava is a proven prosecutor and effective crime fighter. He was named *"Outstanding Legislator"* in 2008 and 2009 by the California State Sheriffs' Association. Pedro Nava, a former Deputy District Attorney in Fresno and Santa Barbara counties, has the expertise and tenacity to keep violent criminals, hardened gang members, and drug kingpins off the street. As a local prosecutor, he led Targeted Narcotics Prosecution and the Asset Forfeiture program. He also protected consumers from criminal rip-off artists. Elected to the State Assembly in 2004, Pedro Nava has authored successful legislation to protect victims from violent sexual predators. He serves on the Domestic Violence Program Advisory Council where he leads state efforts to protect victims of domestic violence. Pedro Nava has also worked to protect Californians from natural disasters and terrorist attacks. Nava is Vice Chair of the Joint Legislative Committee on Emergency Management, serves on the California Emergency Council, and has fought to streamline and strengthen California's emergency preparedness and homeland security efforts. Pedro Nava, a former member of the California Coastal Commission, is spearheading the fight to prevent new offshore oil drilling in California. Pedro Nava will be an Attorney General who puts public safety first. He will protect our communities from violent criminals, toxic polluters, and banks and insurance companies that violate the public trust. *Pedro Nava is strongly endorsed for Attorney General by frontline peace officers, deputy sheriffs, and police chiefs and sheriffs.* Pedro Nava. A proven prosecutor for Attorney General. For more information:  www.pedronava.com

---

ALBERTO TORRICO
*Attorney General*

10923 Randall Street
Sun Valley, CA 91352

(916) 492-8781
alberto@albertotorrico.com
www.albertotorrico.com

For the first time in our state's history, the government spent more money on prisons than higher education. We need to reform prisons and recognize that *education* is the key to our future and public safety. *Education* is the best way to shut the revolving door of our prison system—where 70 percent of released inmates return after three years. I'm fighting to reform the prisons by *requiring* inmates to rehabilitate themselves through work, study or treatment *before* they are released. *Education* creates strong communities. That's why I'm working to expand preschool in every neighborhood so kids start school ready to learn. And I'm leading the fight to lower college tuition by taking on big oil with an extraction fee that can't be passed on to consumers. I'm the child of Latino and Asian immigrants who worked as janitors so I could be the first in my family to attend college. I went on to teach college courses to new citizens. I know the true spirit of California opportunity and optimism is nurtured in great schools, not failed prisons. I've earned the overwhelming support of law enforcement because they know with 60 percent of prisoners functionally illiterate—*education* is the best strategy to prevent crime and rehabilitate criminals. Please join seniors, California Professional Firefighters, the California Federation of Teachers and over 60,000 cops and deputy sheriffs who support me because they agree that the best way to protect public safety is to invest in *education*.

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# DEMOCRATIC PARTY CANDIDATE STATEMENTS

| | | |
|---|---|---|
| **MIKE SCHMIER**<br>*Attorney General* | 1475 Powell Street<br>Emeryville, CA 94608 | (510) 919-9327<br>mike@votemikeag.com<br>www.votemikeag.com |

The first constitutional requirement and duty of the Attorney General is "to see that the laws of the state are uniformly and adequately enforced." But California laws, including those related to jobs, education, health care, transportation, environment, housing and others, are not and cannot be enforced uniformly or adequately. California Supreme Court rules forbid the use or mention in future cases of 90% of appellate opinions, decisions ordered "not to be published", even when they would exonerate us from criminal charges. Seven "unpublished opinions" invalidating $500 "red light camera tickets" aren't protecting others. Different results arise from similar situations. Predictability, reliability and trust are destroyed, and lives devastated by arbitrary, random opinions. Our Supreme Court lobbied the Legislature and defeated several bills to return citizens' rights to cite these opinions, even though the United States Supreme Court restored these rights in federal courts, and most states followed. Your right to free speech is severely limited by this misuse of power. Two California Supreme Court justices are running now for re-election to twelve year terms. We voters need to ask them why we are not allowed to use all opinions and rulings as precedent or examples in future cases? Why won't they return our historical right to exonerate and defend ourselves? Without this freedom, there can be no real reform of our courts, criminal justice system, legal processes, and financial markets that our society desperately needs. I will work to see that all laws are uniformly and adequately enforced. See:  www.NonPublication.com

| | | |
|---|---|---|
| **TED W. LIEU**<br>*Attorney General* | 1510 J Street, Suite 210<br>Sacramento, CA 95814 | (916) 443-7817<br>info@tedlieu.com<br>www.tedlieu.com |

I am running for Attorney General because I believe California, despite its challenges, is still the best state in the best country the world has ever seen. My parents immigrated to America and we lived in the basement of a stranger's house. We sold gifts at flea markets to make ends meet. After several years, we scraped up enough money to open our own gift store. After several more years we expanded to six stores. Through hard work and perseverance, my parents achieved the American Dream. My parents' sacrifices took us from poverty to the middle-class, and gave my brother and me an amazing education: Stanford University and Georgetown Law. I joined the United States Air Force on active duty to give back to this country that has given so much to us. I continue to serve in the reserves as a Judge Advocate General and Prosecutor. As Attorney General, I will ensure all Californians have the opportunity to achieve the American Dream, regardless of gender, age, race, sexual orientation, or social-economic status—and to do so safely and securely. In my many years of public service, I have consistently stood up to powerful interests on behalf of the people of California. Fighting the good fight, improving our economy, and keeping people safe are what get me up every morning. Along with my wonderful wife Betty, a former Deputy Attorney General, and our two rambunctious sons, I humbly ask for your vote.

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

54    |    *Candidate Statements*

# DEMOCRATIC PARTY CANDIDATE STATEMENTS

HECTOR DE LA TORRE                    5015 Eagle Rock Blvd., #100          (323) 254-5700 Ext. 25
*Insurance Commissioner*              Los Angeles, CA 90041                hector@delatorre2010.com
                                                                          www.delatorre2010.com

Personal experience taught me what it's like to deal with health insurance companies. I'm running for Insurance Commissioner to make sure what happened to my family won't happen to yours. When a rare infection put my 5-month old daughter on an intensive care respirator, my wife and I had to fight the health insurance company, while our baby fought for her life. Against our doctor's wishes, they transferred her to another hospital in rush hour traffic, hooked-up to the respirator. Ignoring our doctor again, they sent her home with a feeding tube. As Insurance Commissioner, I'll make sure Californians get the healthcare we pay for. When I found out insurance companies were taking away coverage after people got sick, I stood up to their lobbyists, writing a bill to stop them. I will protect doctor patient relationships—preventing insurance company bureaucrats from making medical decisions. I will work to stop insurers from denying coverage based on pre-existing conditions. I will protect senior citizens from rip-offs by life insurance and annuity companies. I can stand up to special interests because I *refuse contributions from insurance companies.* I am a proven fighter—even after my colleague was shot in the head, I led the recall of corrupt officials in my Southern California hometown and helped put their leader behind bars. I am proud to be *endorsed by California's doctors, firefighters, police and small businesses.* I ask for your vote, so I can stand up to heartless insurance companies for all of us.

DAVE JONES                            1005 12th St., Ste. H                (916) 349-4236
*Insurance Commissioner*              Sacramento, CA 95814                 assemblymemberjones@gmail.com
                                                                          www.davejones2010.com

We need an Insurance Commissioner with the courage, integrity and independence to take on the insurance companies and fight to protect consumers. We need Dave Jones. *The Consumer Federation of California named Dave Jones the legislature's "Consumer Champion."* Dave Jones will fight to hold insurance companies accountable. Assemblymember Dave Jones has passed over 70 bills demonstrating his commitment to children and families, affordable housing, education, consumer and environmental protection, healthcare, privacy rights, workers' rights, civil rights, equal access to the courts, and economic development. Dave Jones is leading the fight to stop discrimination by insurance companies and to regulate health insurance premium increases. Dave Jones passed crucial legislation to prevent dependent seniors from being ripped-off by abusive conservators. Dave Jones secured over $2.4 billion annually in new funding to provide healthcare for California families. *In fact, Dave Jones was honored as California's "Most Effective Legislator" by the Capitol Weekly.* Before his election to the Assembly, Dave Jones worked as a legal aid lawyer, providing free representation to seniors, low income families, tenants and consumers. In 1995, Dave Jones was one of only 13 Americans selected as a White House Fellow, where he served in the Clinton Administration as a Counsel to Attorney General Janet Reno. As a candidate for Insurance Commissioner, Dave Jones refuses to accept contributions from insurance companies. He will have the independence to put consumers first. Dave Jones fights for us. Vote for Democrat Dave Jones for Insurance Commissioner. For more information: *www.davejones2010.com*

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# DEMOCRATIC PARTY CANDIDATE STATEMENTS

---

**BETTY T. YEE**
*Board of Equalization, District 1*

601 Van Ness Avenue, #E3-438
San Francisco, CA 94102

(415) 759-8355
info@bettyyee.com
www.bettyyee.com

I am proud to be serving the interests of the residents of my district by helping to create jobs and revitalize our state's economy at this difficult time for all of us. As a child of immigrant parents who started and operated for over 30 years a small business laundry in my native San Francisco, I vividly remember the difficulties my parents faced to keep this business running during good and bad economic times. Working families have never had it tougher than right now, and they need the help of government to create jobs and to get our economy back on track. Providing free taxpayer services and assistance, ensuring fair and open hearings for taxpayers who are appealing State tax determinations, and protecting the State's revenues to ensure they are spent wisely remain my top priorities as a member of the Board. I have over 25 years of experience in making state government work for hard-working Californians, and we have much more that must be accomplished during these tough times. Californians deserve the best, most efficient service from their government. My experience in making wise decisions with your tax dollars, my strong sense of fairness for everyone in how to interpret and apply California's tax laws, and my unblemished track record of integrity make me your best choice to continue my service and leadership on the Board. I would be honored to have the privilege of continuing to represent and serve you on the Board of Equalization.

---

**CHRIS PARKER**
*Board of Equalization, District 2*

P.O. Box 161527
Sacramento, CA 95816

(916) 208-2136
chris@parkerforboe.com
www.parkerforboe.com

My name is Chris Parker. I'm running for the Board of Equalization because I want our economy moving again. Professional politicians spend too much time fighting each other rather than solving the problems facing California's families and seniors. A struggling economy, job losses, and the housing market collapse have all contributed to a statewide financial crisis. Now, more than ever, we need experienced leaders with fiscal expertise to get California back on track. As a seasoned tax expert, I bring a breadth of experience in catching cheaters and rooting out fraud and abuse that costs our state billions in lost revenue. I have delivered millions of dollars in uncollected taxes back to the state to help pay for education, public safety and other vital services. My work has been recognized by business leaders, teachers, farmers, seniors, firefighters, government reformers and nurses who have called me an innovative problem solver who can cut through red tape, reduce government waste, and save taxpayers' money while continuing the work to make our tax system more efficient and fair. On the Board, I'll give small businesses the tools they need to succeed, attract 21st century industries that will generate good middle class jobs, and help create a highly skilled, well educated workforce; I'll hold accountable those who try to cheat California of tax revenue. Please visit www.ParkerforBOE.com to learn more about my experience. My name is Chris Parker and I'm a problem solver, not a politician. I would be honored to earn your support.

---

**JEROME E. HORTON**
*Board of Equalization, District 4*

P.O. Box 90932
Los Angeles, CA 90009

(310) 672-2992
jehorton@sbcglobal.net
www.voteforhorton.com

Jerome E. Horton, Vice Chairperson of the California State Board of Equalization, has twenty-two years of Board of Equalization experience protecting the rights of California taxpayers and fighting for fairness and equity in government. Jerome's background in accounting, finance, and real-estate and business tax law has enhanced the Board of Equalization's reputation as one of California's most productive, responsive, and efficient governmental agencies, generating over $53 billion for schools, public safety, and other vital services. Recently, Jerome expanded the Joint Enforcement Criminal Task Force and initiated other programs credited with prosecuting illegal businesses who cheat California taxpayers. He launched an anti-human trafficking initiative to help eradicate the moral and financial abuse of workers. Jerome also played an important role in establishing the Board of Equalization's "Taxpayers Bill of Rights" making government more accountable to California taxpayers. His programs have recaptured millions of dollars for public services, protected California jobs, and helped eliminate inequities in tax administration. As a former California Medical Assistance Commissioner, Legislator, and member of the California Work Force Investment Board, United Job Creation Council, and the Cultural Endowment Board, Jerome is known as a pragmatic problem solver who cares about the people he serves. As a husband, parent, and grandfather, Jerome remains confident that we can build the coalitions, to find solutions, and meet the challenges of the future. Please vote for Jerome E. Horton, Member State Board of Equalization, who has the demonstrated experience, skill, and proven ability to achieve positive results. Thank you!

---

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# PEACE AND FREEDOM PARTY CANDIDATE STATEMENTS

| | | |
|---|---|---|
| MARSHA FEINLAND<br>*U.S. Senator* | 2124 Kittredge St., No. 66<br>Berkeley, CA 94704 | (510) 845-4360<br>m_feinland@igc.org<br>www.feinlandforsenate.org |

Withdraw all troops from Iraq and Afghanistan now. Provide free health care for everyone. Regulate corporations and expand public transportation to protect the environment. Let's decide what we need and use our country's wealth to pay for it. Register Peace and Freedom before May 24. Vote Feinland for Senate June 8.

| | | |
|---|---|---|
| CARLOS ALVAREZ<br>*Governor* | 137 N. Virgil Ave., #203<br>Los Angeles, CA 90004 | (323) 810-3380<br>carlos4gov@votepsl.org<br>www.votepsl.org |

Bailout working people—not banks. Fund human needs—not war!

| | | |
|---|---|---|
| C.T. WEBER<br>*Lieutenant Governor* | 1403 Los Padres Way<br>Sacramento, CA 95831-2837 | (916) 422-5395<br>ctwebervoters@att.net<br>ctweberforlieutenantgovernor.org |

Proposition 14 limits your choices. No independent, third party, or write-in candidates. Vote No on Proposition 14.

| | | |
|---|---|---|
| DINA JOSEPHINE PADILLA<br>*Insurance Commissioner* | 7564 Watson Way<br>Citrus Heights, CA 95610 | (916) 725-2673<br>dinajpadilla@gmail.com<br>www.padilla4insurancecommissioner.com |

Dina Padilla as Insurance Commissioner would be the Insurance Industry's worst nightmare. We need healthcare, not insurance companies.  www.padilla4insurancecommissioner.com

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# SUPERINTENDENT OF PUBLIC INSTRUCTION (NONPARTISAN OFFICE)

| | | |
|---|---|---|
| **DANIEL M. NUSBAUM** | 174 N. Almont Drive, Apt. 102 | (310) 271-8048 |
| *Superintendent of Public Instruction* | Beverly Hills, CA 90211 | danielm.nusbaum@sbcglobal.net |

I have been a teacher for 40 years. If elected I will establish California Independent Public Schools, Equal Funding Per Pupil, Community Teacher Corps, Musicians and Artists in Schools, UC/CSU Public School Assistant Teachers, High School Child Care Centers, Seniors Helping Youth.

| | | |
|---|---|---|
| **TOM TORLAKSON** | P.O. Box 21636 | (925) 682-9998 |
| *Superintendent of Public Instruction* | Concord, CA 94521 | tom@tomtorlakson.com |
| | | tomtorlakson.com |

Teaching has been my life—and my passion—for the past 37 years. As a classroom teacher, coach, legislator and parent, I know our policies must be based on a simple question: *What is in the best interest of our children?* Not bureaucrats and not politicians. It's time we had a teacher who will put children first and fundamentally reform our schools. First, I will demand real accountability through a comprehensive fiscal and performance audit to cut waste and mismanagement and put those savings into new textbooks and computers. Second, I'll make sure all our neighborhood schools are safe and expand after school, job training and mentorship programs. I'm proud to have received the endorsement of virtually *every major public safety organization* in California including the *California Professional Firefighters* along with local classroom teachers. Third, we need involved parents to support teaching that character counts while promoting trustworthiness, respect, responsibility, caring and good citizenship. Fourth, I'll expand *career technical education* for high school students. Finally, I'll make the health and fitness of students a top priority. As *Chair and Founder of the California Task Force on Youth and Workplace Wellness,* I led the effort to ban junk food from school campuses and expand physical education requirements. We can do this. We must do this. Our kids only get one chance at a good education. As a teacher, I have the experience, energy and ideas to transform our schools. Let's do this together. I'd be honored to earn your support.

| | | |
|---|---|---|
| **GRANT McMICKEN** | 116 2nd Street, #5 | (916) 792-5970 |
| *Superintendent of Public Instruction* | Pacific Grove, CA 93950-3044 | gmcmicken1@att.net |
| | | www.rescue-california-education.com |

It's time to do something different in California politics and education. First, reject the idea that the candidate who raises the most money is best suited to win the election. Then, elect an honored, active, experienced classroom teacher the next State Superintendent of Public Instruction. Help all our children, teachers and schools. Cast your vote to elect Grant McMicken.

| | | |
|---|---|---|
| **GLORIA ROMERO** | P.O. Box 32398 | (323) 227-1474 |
| *Superintendent of Public Instruction* | Los Angeles, CA 90032 | electgloria2010@yahoo.com |
| | | gloriaromero.org |

Gloria Romero—an Education Professor and State Senator—has been called *"the most prominent advocate of education reform in the Legislature"* by the San Jose Mercury-News. She led the fight to give parents real choices over which schools their children attend. Schools are in crisis. We owe it to our children to transform them. California leads the nation in dropout rates and has fallen behind in educating children for college and quality jobs. *We need to elect Gloria Romero as Superintendent of Public Instruction because she has the courage to put the needs of children ahead of the giant bureaucracy and special interests who've run the education system for too long.* Gloria Romero wrote the new law requiring failing schools to restructure, fire ineffective administrators, revise curriculum, reopen as public charter schools, and allow parents to move their children to better performing schools. Gloria will fight for safer schools, renewed emphasis on the basics, including reading, writing and arithmetic—and *smaller class sizes so children get more individual attention.* She'll prepare students for the changing economy by improving career technical education/training. Professor Gloria Romero trains the teachers of the future. She understands what skills need improvement so that teachers and schools are ready to meet the challenge. Gloria will fight for more resources for classrooms. *But she won't allow tax dollars to be wasted on bureaucracy like usual. She'll be our voice in demanding change and a quality education system we can support.* www.GloriaRomero.org

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# SUPERINTENDENT OF PUBLIC INSTRUCTION (NONPARTISAN OFFICE)

LYDIA A. GUTIÉRREZ
*Superintendent of Public Instruction*

P.O. Box 243
San Pedro, CA 90733

(310) 630-3736
lydiaforkids2010@gmail.com
www.lydiaforkids2010.com

Thirty years ago California led the nation in education standards, but today our state ranks near the bottom in almost every category. Professional politicians have failed, putting our children's futures at risk. *Lydia A. Gutiérrez's* experience in education, local government, and as an aerospace administrator gives *Lydia* a unique perspective to help our schools provide high quality education for our children. *Lydia's* experience: 20+ years as a Public School Teacher in California, Master Teacher for UCLA Mathematics Project X, Administrator for 6 years in aerospace industry, Elected Official of Coastal San Pedro Neighborhood Council, Budget and Finance Committee Chair, Public Safety Committee Vice Chair. *Lydia's* pledge: Make vocational training an alternative career path to college. Guarantee our tax dollars are effectively used to educate our children. Protect our schools from gangs and sexual predators. Ensure students graduate able to read, write, and speak English. Prioritize reading, math, science and other core academic courses with highly qualified teachers and extended classroom time. Affirm accuracy in textbooks in all content areas including our Founding Fathers, the Constitution and the sovereignty of the United States of America. Secure an active role for parents in decision making over their child's academic success. *Children First! Lydia A. Gutiérrez for California State Superintendent of Public Instruction* www.LydiaforKids2010.com

LARRY ACEVES
*Superintendent of Public Instruction*

(408) 288-8181
larry@larryaceves2010.com
www.larryaceves2010.com

As a classroom teacher, I witnessed the impact of crowded classes and a lack of resources on my students. As a school principal, I worked with teachers and parents to improve our classrooms. As a school superintendent, I worked to improve instruction for all students in our district. We expanded preschool programs, set up free medical and dental clinics, started parent training and community centers, and established gang prevention training. I implemented programs to reduce class size and expanded arts, music and technology. During my 15 years as superintendent, I balanced a $70 million budget on time, managed hundreds of teachers and staff and improved accountability in all schools. I was honored to be named "Superintendent of the Year." I'm not a career politician, but a school superintendent with over 30 years of educational experience in California's public schools. I'm running to bring common sense back into our state's broken educational system. It is time to take politics out of our schools! Let's cut the red-tape and let our teachers do the job they are trained to do. I would be honored to have your vote.

DIANE A. LENNING
*Superintendent of Public Instruction*

P.O. Box 4306
Huntington Beach, CA 92605-4306
http://www.dianelenningforcasuptofpublicinstruction2010.vpweb.com

(562) 596-4825
diane@lenning.com

Educators and parents know best how to *fix* our schools! Legislatures and unions brought our schools from *first to worst!* Bring back parents' rights and local control! Now is the time for *reduced drop-out rates* saving $1.1 billion annual crime-related expenses, secured *safe schools,* reined-in mismanaged districts, new local districts, pay incentives attracting highly-qualified educators, *vocational education, teacher empowerment* to bring success to undisciplined students; *restoring education to first again!* Minimum competency requirement in civics/government passes the *torch of liberty* to each generation, preserving our Democratic Republic. As an educator in the trenches for over thirty years in public high schools and the California Youth Authority, Diane will renew focus on *critical thinking skills* for making life-choices, student academic success, and getting *jobs.* Diane will restore our schools to first again! Diane Lenning has a *Masters Degree in Secondary Education,* and *Tier I Administration Credential.* Diane is endorsed by education and community leaders around the state. Diane pursues a law degree to implement sound education programs, and will collaborate with education leaders statewide for assessments and goals. Your vote elects a fifth generation Californian who attended California schools and universities when first in the nation. Winner of *Medal of Freedom Award* and educator in *Eli Broad national award-winning district* with most improved student scores in the nation.   http://www.DianeLenningforCaSuptofPublicInstruction2010.vpweb.com   http://www.DianeLenning.com fax: 562-430-7503   Diane@Lenning.com

*The law requires that the order of candidates be determined by randomized alphabet drawing. Statements on this page were supplied by the candidates and have not been checked for accuracy. Each statement was voluntarily submitted by the candidate and is printed at the expense of the candidate. Candidates who did not submit statements could otherwise be qualified to appear on the ballot.*

# COUNTY ELECTIONS OFFICES

**ALAMEDA COUNTY**
1225 Fallon Street, Room G-1
Oakland, CA 94612
(510) 272-6973
*www.acgov.org/rov*

**ALPINE COUNTY**
99 Water Street
P.O. Box 158
Markleeville, CA 96120
(530) 694-2281
*www.alpinecountyca.gov*

**AMADOR COUNTY**
810 Court Street
Jackson, CA 95642
(209) 223-6465
*www.co.amador.ca.us*

**BUTTE COUNTY**
25 County Center Drive, Suite 110
Oroville, CA 95965-3361
(530) 538-7761 or (800) 894-7761
*http://clerk-recorder.buttecounty.net*

**CALAVERAS COUNTY**
891 Mountain Ranch Road
San Andreas, CA 95249
(209) 754-6376
*www.co.calaveras.ca.us*

**COLUSA COUNTY**
546 Jay Street, Suite 200
Colusa, CA 95932
(530) 458-0500
*www.colusacountyclerk.com*

**CONTRA COSTA COUNTY**
555 Escobar Street
P.O. Box 271
Martinez, CA 94553
(925) 335-7800
*www.cocovote.us*

**DEL NORTE COUNTY**
981 H Street, Suite 160
Crescent City, CA 95531
(707) 465-0383
*www.dnco.org*

**EL DORADO COUNTY**
2850 Fairlane Court
P.O. Box 678001
Placerville, CA 95667
(530) 621-7480
*www.co.el-dorado.ca.us/elections*

**FRESNO COUNTY**
2221 Kern Street
Fresno, CA 93721
(559) 488-3246
*www.co.fresno.ca.us/elections*

**GLENN COUNTY**
516 W. Sycamore Street, 2nd Floor
Willows, CA 95988
(530) 934-6414
*www.countyofglenn.net/elections/
home_page.asp*

**HUMBOLDT COUNTY**
3033 H Street, Room 20
Eureka, CA 95501
(707) 445-7678 or (707) 445-7481
*www.co.humboldt.ca.us/election*

**IMPERIAL COUNTY**
940 West Main Street, Suite 202
El Centro, CA 92243
(760) 482-4226
*www.imperialcounty.net/elections*

**INYO COUNTY**
168 N. Edwards Street
P.O. Box F
Independence, CA 93526
(760) 878-0224
*www.inyocounty.us*

**KERN COUNTY**
1115 Truxtun Avenue
Bakersfield, CA 93301
(661) 868-3590
*http://elections.co.kern.ca.us/elections/*

**KINGS COUNTY**
1400 W. Lacey Blvd.
Hanford, CA 93230
(559) 582-3211 ext. 4401
*www.countyofkings.com/acr/
elections/index.html*

**LAKE COUNTY**
255 N. Forbes Street, Room 209
Lakeport, CA 95453-4748
(707) 263-2372
*www.co.lake.ca.us*

**LASSEN COUNTY**
220 S. Lassen Street, Suite 5
Susanville, CA 96130
(530) 251-8217
*http://lassencounty.org/govt/dept/
county_clerk/default.asp*

**LOS ANGELES COUNTY**
12400 Imperial Highway
Norwalk, CA 90650-8350
(800) 481-8683 or (562) 466-1310
*www.lavote.net*

**MADERA COUNTY**
200 West 4th Street, 1st Floor
Madera, CA 93637
(559) 675-7720
*www.madera-county.com/elections*

**MARIN COUNTY**
3501 Civic Center Drive, Room 121
San Rafael, CA 94903
P.O. Box E
San Rafael, CA 94913
(415) 499-6456
*www.marinvotes.org*

**MARIPOSA COUNTY**
4982 10th Street
P.O. Box 247
Mariposa, CA 95338
(209) 966-2007
*www.mariposacounty.org*

**MENDOCINO COUNTY**
501 Low Gap Road, Room 1020
Ukiah, CA 95482
(707) 463-4371
*www.co.mendocino.ca.us/acr*

**MERCED COUNTY**
2222 M Street, Room 14
Merced, CA 95340
(209) 385-7541
*www.mercedelections.org*

**MODOC COUNTY**
204 S. Court Street
Alturas, CA 96101-0131
(530) 233-6200

**MONO COUNTY**
74 School Street, Annex I
P.O. Box 237
Bridgeport, CA 93517
(760) 932-5537
*www.monocounty.ca.gov*

**MONTEREY COUNTY**
1370-B South Main Street
P.O. Box 4400
Salinas, CA 93912
(831) 796-1499
*www.montereycountyelections.us*

**NAPA COUNTY**
900 Coombs Street, Suite 256
Napa, CA 94559
(707) 253-4321
*www.countyofnapa.org*

**NEVADA COUNTY**
950 Maidu Avenue
Nevada City, CA 95959
(530) 265-1298
*www.mynevadacounty.com/elections*

# COUNTY ELECTIONS OFFICES

**ORANGE COUNTY**
P.O. Box 11298
Santa Ana, CA 92711
(714) 567-7600
*www.ocvote.com*

**PLACER COUNTY**
2956 Richardson Drive
Auburn, CA 95603
(530) 886-5650
*www.placerelections.com*

**PLUMAS COUNTY**
520 Main Street, Room 102
Quincy, CA 95971
(530) 283-6256
*www.countyofplumas.com*

**RIVERSIDE COUNTY**
2724 Gateway Drive
Riverside, CA 92507-0918
(951) 486-7200
*www.voteinfo.net*

**SACRAMENTO COUNTY**
7000 65th Street, Suite A
Sacramento, CA 95823-2315
(916) 875-6451
*www.elections.saccounty.net*

**SAN BENITO COUNTY**
440 Fifth Street, Room 206
Hollister, CA 95023-3843
(831) 636-4016
*www.sbcvote.us*

**SAN BERNARDINO COUNTY**
777 E. Rialto Avenue
San Bernardino, CA 92415
(909) 387-8300
*www.sbcrov.com*

**SAN DIEGO COUNTY**
5201 Ruffin Road, Suite I
San Diego, CA 92123
(858) 565-5800
*www.sdvote.com*

**SAN FRANCISCO COUNTY**
City Hall
1 Dr. Carlton B. Goodlett Place #48
San Francisco, CA 94102
(415) 554-4375
*www.sfelections.org*

**SAN JOAQUIN COUNTY**
44 N. San Joaquin Street, Suite 350
Stockton, CA 95202
(209) 468-2885
*www.sjcrov.org*

**SAN LUIS OBISPO COUNTY**
1055 Monterey Street, D-120
San Luis Obispo, CA 93408
(805) 781-5228
*www.slocounty.ca.gov/clerk*

**SAN MATEO COUNTY**
40 Tower Road
San Mateo, CA 94402
(650) 312-5222
*www.shapethefuture.org*

**SANTA BARBARA COUNTY**
130 E. Victoria Street, Suite 200
P.O. Box 159
Santa Barbara, CA 93102
(800) SBC-VOTE
(805) 568-2200
*www.sbcvote.com*

**SANTA CLARA COUNTY**
1555 Berger Drive, Bldg. 2
San Jose, CA 95112
(408) 299-VOTE or (866) 430-VOTE
*www.sccvote.org*

**SANTA CRUZ COUNTY**
701 Ocean Street, Room 210
Santa Cruz, CA 95060-4076
(831) 454-2060
*www.votescount.com*

**SHASTA COUNTY**
1643 Market Street
Redding, CA 96001
(530) 225-5730
*www.elections.co.shasta.ca.us*

**SIERRA COUNTY**
P.O. Drawer D
Downieville, CA 95936
(530) 289-3295
*www.sierracounty.ws*

**SISKIYOU COUNTY**
510 N. Main Street
Yreka, CA 96097
(530) 842-8084 or
(888) 854-2000 ext. 8084
*www.co.siskiyou.ca.us/clerk/
index.htm*

**SOLANO COUNTY**
675 Texas Street, Suite 2600
Fairfield, CA 94533
(707) 784-6675
*www.solanocounty.com/elections*

**SONOMA COUNTY**
435 Fiscal Drive
P.O. Box 11485
Santa Rosa, CA 95406-1485
(707) 565-6800 or (800) 750-VOTE
*www.sonoma-county.org/regvoter*

**STANISLAUS COUNTY**
1021 I Street, Suite 101
Modesto, CA 95354-2331
(209) 525-5200
*www.stanvote.com*

**SUTTER COUNTY**
1435 Veterans Memorial Circle
Yuba City, CA 95993
(530) 822-7122
*www.suttercounty.org*

**TEHAMA COUNTY**
444 Oak Street, Room C
P.O. Box 250
Red Bluff, CA 96080
(530) 527-8190 or (866) 289-5307
*www.co.tehama.ca.us*

**TRINITY COUNTY**
11 Court Street
P.O. Box 1215
Weaverville, CA 96093
(530) 623-1220
*www.trinitycounty.org*

**TULARE COUNTY**
5951 S. Mooney Blvd.
Visalia, CA 93277
(559) 624-7300
*www.tularecoelections.org*

**TUOLUMNE COUNTY**
2 S. Green Street
Sonora, CA 95370-4696
(209) 533-5570
*www.tuolumnecounty.ca.gov*

**VENTURA COUNTY**
800 S. Victoria Avenue
Ventura, CA 93009-1200
(805) 654-2664 or (805) 654-2781
*http://recorder.countyofventura.org/
elections.htm*

**YOLO COUNTY**
625 Court Street, Room B05
Woodland, CA 95695
(530) 666-8133
*www.yoloelections.org*

**YUBA COUNTY**
915 8th Street, Suite 107
Marysville, CA 95901-5273
(530) 749-7855
*http://elections.co.yuba.ca.us*

## PROPOSITION 13

This amendment proposed by Senate Constitutional Amendment 4 of the 2007–2008 Regular Session (Resolution Chapter 115, Statutes of 2008) expressly amends the California Constitution by amending a section thereof; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

PROPOSED AMENDMENT TO
SECTION 2 OF ARTICLE XIII A

SEC. 2.   (a) The "full cash value" means the county assessor's valuation of real property as shown on the 1975–76 tax bill under "full cash value" or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975–76 full cash value may be reassessed to reflect that valuation. For purposes of this section, "newly constructed" does not include real property that is reconstructed after a disaster, as declared by the Governor, where the fair market value of the real property, as reconstructed, is comparable to its fair market value prior to the disaster. ~~Also~~ *For purposes of this section,* the term "newly constructed" does not include the *that* portion of *an existing structure that consists of the construction or* reconstruction ~~or improvement to a structure, constructed of unreinforced masonry bearing wall construction, necessary to comply with any local ordinance relating to seismic safety during the first 15 years following that reconstruction or improvement~~ *of seismic retrofitting components, as defined by the Legislature.*

However, the Legislature may provide that, under appropriate circumstances and pursuant to definitions and procedures established by the Legislature, any person over the age of 55 years who resides in property that is eligible for the homeowner's exemption under subdivision (k) of Section 3 of Article XIII and any implementing legislation may transfer the base year value of the property entitled to exemption, with the adjustments authorized by subdivision (b), to any replacement dwelling of equal or lesser value located within the same county and purchased or newly constructed by that person as his or her principal residence within two years of the sale of the original property. For purposes of this section, "any person over the age of 55 years" includes a married couple one member of which is over the age of 55 years. For purposes of this section, "replacement dwelling" means a building, structure, or other shelter constituting a place of abode, whether real property or personal property, and any land on which it may be situated. For purposes of this section, a two-dwelling unit shall be considered as two separate single-family dwellings. This paragraph shall apply to any replacement dwelling that was purchased or newly constructed on or after November 5, 1986.

In addition, the Legislature may authorize each county board of supervisors, after consultation with the local affected agencies within the county's boundaries, to adopt an ordinance making the provisions of this subdivision relating to transfer of base year value also applicable to situations in which the replacement dwellings are located in that county and the original properties are located in another county within this State. For purposes of this paragraph, "local affected agency" means any city, special district, school district, or community college district that receives an annual property tax revenue allocation. This paragraph ~~shall apply~~ *applies* to any replacement dwelling that was purchased or newly constructed on or after the date the county adopted the provisions of this subdivision relating to transfer of base year value, but ~~shall~~ *does* not apply to any replacement dwelling that was purchased or newly constructed before November 9, 1988.

The Legislature may extend the provisions of this subdivision relating to the transfer of base year values from original properties to replacement dwellings of homeowners over the age of 55 years to severely disabled homeowners, but only with respect to those replacement dwellings purchased or newly constructed on or after the effective date of this paragraph.

(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction, or other factors causing a decline in value.

(c) For purposes of subdivision (a), the Legislature may provide that the term "newly constructed" does not include any of the following:

(1) The construction or addition of any active solar energy system.

(2) The construction or installation of any fire sprinkler system, other fire extinguishing system, fire detection system, or fire-related egress improvement, as defined by the Legislature, that is constructed or installed after the effective date of this paragraph.

(3) The construction, installation, or modification on or after the effective date of this paragraph of any portion or structural component of a single- or multiple-family dwelling that is eligible for the homeowner's exemption if the construction, installation, or modification is for the purpose of making the dwelling more accessible to a severely disabled person.

~~(4) The construction or installation of seismic retrofitting improvements or improvements utilizing earthquake hazard mitigation technologies, that are constructed or installed in existing buildings after the effective date of this paragraph. The Legislature shall define eligible improvements. This exclusion does not~~

~~apply to seismic safety reconstruction or improvements that qualify for exclusion pursuant to the last sentence of the first paragraph of subdivision (a).~~

~~(5)~~

*(4)* The construction, installation, removal, or modification on or after the effective date of this paragraph of any portion or structural component of an existing building or structure if the construction, installation, removal, or modification is for the purpose of making the building more accessible to, or more usable by, a disabled person.

(d) For purposes of this section, the term "change in ownership" does not include the acquisition of real property as a replacement for comparable property if the person acquiring the real property has been displaced from the property replaced by eminent domain proceedings, by acquisition by a public entity, or governmental action that has resulted in a judgment of inverse condemnation. The real property acquired shall be deemed comparable to the property replaced if it is similar in size, utility, and function, or if it conforms to state regulations defined by the Legislature governing the relocation of persons displaced by governmental actions. ~~The provisions of this~~ *This* subdivision ~~shall be applied~~ *applies* to any property acquired after March 1, 1975, but ~~shall affect~~ *affects* only those assessments of that property that occur after the provisions of this subdivision take effect.

(e) (1) Notwithstanding any other provision of this section, the Legislature shall provide that the base year value of property that is substantially damaged or destroyed by a disaster, as declared by the Governor, may be transferred to comparable property within the same county that is acquired or newly constructed as a replacement for the substantially damaged or destroyed property.

(2) Except as provided in paragraph (3), this subdivision ~~shall apply~~ *applies* to any comparable replacement property acquired or newly constructed on or after July 1, 1985, and to the determination of base year values for the 1985–86 fiscal year and fiscal years thereafter.

(3) In addition to the transfer of base year value of property within the same county that is permitted by paragraph (1), the Legislature may authorize each county board of supervisors to adopt, after consultation with affected local agencies within the county, an ordinance allowing the transfer of the base year value of property that is located within another county in the State and is substantially damaged or destroyed by a disaster, as declared by the Governor, to comparable replacement property of equal or lesser value that is located within the adopting county and is acquired or newly constructed within three years of the substantial damage or destruction of the original property as a replacement for that property. The scope and amount of the benefit provided to a property owner by the transfer of base year value of property

pursuant to this paragraph shall not exceed the scope and amount of the benefit provided to a property owner by the transfer of base year value of property pursuant to subdivision (a). For purposes of this paragraph, "affected local agency" means any city, special district, school district, or community college district that receives an annual allocation of ad valorem property tax revenues. This paragraph ~~shall apply~~ *applies* to any comparable replacement property that is acquired or newly constructed as a replacement for property substantially damaged or destroyed by a disaster, as declared by the Governor, occurring on or after October 20, 1991, and to the determination of base year values for the 1991–92 fiscal year and fiscal years thereafter.

(f) For the purposes of subdivision (e):

(1) Property is substantially damaged or destroyed if it sustains physical damage amounting to more than 50 percent of its value immediately before the disaster. Damage includes a diminution in the value of property as a result of restricted access caused by the disaster.

(2) Replacement property is comparable to the property substantially damaged or destroyed if it is similar in size, utility, and function to the property that it replaces, and if the fair market value of the acquired property is comparable to the fair market value of the replaced property prior to the disaster.

(g) For purposes of subdivision (a), the terms "purchased" and "change in ownership" do not include the purchase or transfer of real property between spouses since March 1, 1975, including, but not limited to, all of the following:

(1) Transfers to a trustee for the beneficial use of a spouse, or the surviving spouse of a deceased transferor, or by a trustee of such a trust to the spouse of the trustor.

(2) Transfers to a spouse that take effect upon the death of a spouse.

(3) Transfers to a spouse or former spouse in connection with a property settlement agreement or decree of dissolution of a marriage or legal separation.

(4) The creation, transfer, or termination, solely between spouses, of any coowner's interest.

(5) The distribution of a legal entity's property to a spouse or former spouse in exchange for the interest of the spouse in the legal entity in connection with a property settlement agreement or a decree of dissolution of a marriage or legal separation.

(h) (1) For purposes of subdivision (a), the terms "purchased" and "change in ownership" do not include the purchase or transfer of the principal residence of the transferor in the case of a purchase or transfer between parents and their children, as defined by the Legislature, and the purchase or transfer of the first one million dollars ($1,000,000) of the full cash value of all other real property between parents and their children, as defined by the Legislature. This subdivision ~~shall apply~~ *applies* to both voluntary transfers and transfers resulting from a court order or judicial decree.

(2) (A) Subject to subparagraph (B), commencing with purchases or transfers that occur on or after the date upon which the measure adding this paragraph becomes effective, the exclusion established by paragraph (1) also applies to a purchase or transfer of real property between grandparents and their grandchild or grandchildren, as defined by the Legislature, that otherwise qualifies under paragraph (1), if all of the parents of that grandchild or those grandchildren, who qualify as the children of the grandparents, are deceased as of the date of the purchase or transfer.

(B) A purchase or transfer of a principal residence shall not be excluded pursuant to subparagraph (A) if the transferee grandchild or grandchildren also received a principal residence, or interest therein, through another purchase or transfer that was excludable pursuant to paragraph (1). The full cash value of any real property, other than a principal residence, that was transferred to the grandchild or grandchildren pursuant to a purchase or transfer that was excludable pursuant to paragraph (1), and the full cash value of a principal residence that fails to qualify for exclusion as a result of the preceding sentence, shall be included in applying, for purposes of subparagraph (A), the ~~one million dollar~~ *one-million-dollar* ($1,000,000) full cash value limit specified in paragraph (1).

(i) (1) Notwithstanding any other provision of this section, the Legislature shall provide with respect to a qualified contaminated property, as defined in paragraph (2), that either, but not both, of the following ~~shall~~ apply:

(A) (i) Subject to the limitation of clause (ii), the base year value of the qualified contaminated property, as adjusted as authorized by subdivision (b), may be transferred to a replacement property that is acquired or newly constructed as a replacement for the qualified contaminated property, if the replacement real property has a fair market value that is equal to or less than the fair market value of the qualified contaminated property if that property were not contaminated and, except as otherwise provided by this clause, is located within the same county. The base year value of the qualified contaminated property may be transferred to a replacement real property located within another county if the board of supervisors of that other county has, after consultation with the affected local agencies within that county, adopted a resolution authorizing an intercounty transfer of base year value as so described.

(ii) This subparagraph applies only to replacement property that is acquired or newly constructed within five years after ownership in the qualified contaminated property is sold or otherwise transferred.

(B) In the case in which the remediation of the environmental problems on the qualified contaminated property requires the destruction of, or results in substantial damage to, a structure located on that property, the term "new construction" does not include the repair of a substantially damaged structure, or the construction of a

structure replacing a destroyed structure on the qualified contaminated property, performed after the remediation of the environmental problems on that property, provided that the repaired or replacement structure is similar in size, utility, and function to the original structure.

(2) For purposes of this subdivision, "qualified contaminated property" means residential or nonresidential real property that is all of the following:

(A) In the case of residential real property, rendered uninhabitable, and in the case of nonresidential real property, rendered unusable, as the result of either environmental problems, in the nature of and including, but not limited to, the presence of toxic or hazardous materials, or the remediation of those environmental problems, except where the existence of the environmental problems was known to the owner, or to a related individual or entity as described in paragraph (3), at the time the real property was acquired or constructed. For purposes of this subparagraph, residential real property is "uninhabitable" if that property, as a result of health hazards caused by or associated with the environmental problems, is unfit for human habitation, and nonresidential real property is "unusable" if that property, as a result of health hazards caused by or associated with the environmental problems, is unhealthy and unsuitable for occupancy.

(B) Located on a site that has been designated as a toxic or environmental hazard or as an environmental cleanup site by an agency of the State of California or the federal government.

(C) Real property that contains a structure or structures thereon prior to the completion of environmental cleanup activities, and that structure or structures are substantially damaged or destroyed as a result of those environmental cleanup activities.

(D) Stipulated by the lead governmental agency, with respect to the environmental problems or environmental cleanup of the real property, not to have been rendered uninhabitable or unusable, as applicable, as described in subparagraph (A), by any act or omission in which an owner of that real property participated or acquiesced.

(3) It shall be rebuttably presumed that an owner of the real property participated or acquiesced in any act or omission that rendered the real property uninhabitable or unusable, as applicable, if that owner is related to any individual or entity that committed that act or omission in any of the following ways:

(A) Is a spouse, parent, child, grandparent, grandchild, or sibling of that individual.

(B) Is a corporate parent, subsidiary, or affiliate of that entity.

(C) Is an owner of, or has control of, that entity.

(D) Is owned or controlled by that entity.

If this presumption is not overcome, the owner shall not receive the relief provided for in subparagraph (A) or (B) of paragraph (1). The presumption may be overcome by presentation of satisfactory evidence to the assessor, who

shall not be bound by the findings of the lead governmental agency in determining whether the presumption has been overcome.

(4) This subdivision applies only to replacement property that is acquired or constructed on or after January 1, 1995, and to property repairs performed on or after that date.

(j) Unless specifically provided otherwise, amendments to this section adopted prior to November 1, 1988, ~~shall be~~ *are* effective for changes in ownership that occur, and new construction that is completed, after the effective date of the amendment. Unless specifically provided otherwise, amendments to this section adopted after November 1, 1988, ~~shall be~~ *are* effective for changes in ownership that occur, and new construction that is completed, on or after the effective date of the amendment.

## PROPOSITION 14

This amendment proposed by Senate Constitutional Amendment 4 of the 2009–2010 Regular Session (Resolution Chapter 2, Statutes of 2009) expressly amends the California Constitution by amending sections thereof; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

First—This measure shall be known and may be cited as the "Top Two Candidates Open Primary Act."

Second—The People of the State of California hereby find and declare all of the following:

(a) Purpose. The Top Two Candidates Open Primary Act is hereby adopted by the People of California to protect and preserve the right of every Californian to vote for the candidate of his or her choice. This act, along with legislation already enacted by the Legislature to implement this act, are intended to implement an open primary system in California as set forth below.

(b) Top Two Candidate Open Primary. All registered voters otherwise qualified to vote shall be guaranteed the unrestricted right to vote for the candidate of their choice in all state and congressional elections. All candidates for a given state or congressional office shall be listed on a single primary ballot. The top two candidates, as determined by the voters in an open primary, shall advance to a general election in which the winner shall be the candidate receiving the greatest number of votes cast in an open general election.

(c) Open Voter Registration. At the time they register, all voters shall have the freedom to choose whether or not to disclose their party preference. No voter shall be denied the right to vote for the candidate of his or her choice in either a primary or a general election for statewide constitutional office, the State Legislature, or the Congress of the United States based upon his or her disclosure or nondisclosure of party preference. Existing voter registrations, which specify a political party affiliation, shall be deemed to have disclosed that party as the voter's political party preference unless a new affidavit of registration is filed.

(d) Open Candidate Disclosure. At the time they file to run for public office, all candidates shall have the choice to declare a party preference. The preference chosen shall accompany the candidate's name on both the primary and general election ballots. The names of candidates who choose not to declare a party preference shall be accompanied by the designation "No Party Preference" on both the primary and general election ballots. Selection of a party preference by a candidate for state or congressional office shall not constitute or imply endorsement of the candidate by the party designated, and no candidate for that office shall be deemed the official candidate of any party by virtue of his or her selection in the primary.

(e) Freedom of Political Parties. Nothing in this act shall restrict the right of individuals to join or organize into political parties or in any way restrict the right of private association of political parties. Nothing in this measure shall restrict the parties' right to contribute to, endorse, or otherwise support a candidate for state elective or congressional office. Political parties may establish such procedures as they see fit to endorse or support candidates or otherwise participate in all elections, and they may informally "nominate" candidates for election to voter-nominated offices at a party convention or by whatever lawful mechanism they so choose, other than at state-conducted primary elections. Political parties may also adopt such rules as they see fit for the selection of party officials (including central committee members, presidential electors, and party officers). This may include restricting participation in elections for party officials to those who disclose a party preference for that party at the time of registration.

(f) Presidential Primaries. This act makes no change in current law as it relates to presidential primaries. This act conforms to the ruling of the United States Supreme Court in Washington State Grange v. Washington State Republican Party (2008) 128 S.Ct. 1184. Each political party retains the right either to close its presidential primaries to those voters who disclose their party preference for that party at the time of registration or to open its presidential primary to include those voters who register without disclosing a political party preference.

Third—That Section 5 of Article II thereof is amended to read:

SEC. 5. (a) *A voter-nomination primary election shall be conducted to select the candidates for congressional and state elective offices in California. All voters may vote at a voter-nominated primary election for any candidate for congressional and state elective office without regard to the political party preference disclosed by the candidate or the voter, provided that the voter is otherwise qualified to vote for candidates for the office in question. The*

candidates who are the top two vote-getters at a voter-nominated primary election for a congressional or state elective office shall, regardless of party preference, compete in the ensuing general election.

*(b) Except as otherwise provided by Section 6, a candidate for a congressional or state elective office may have his or her political party preference, or lack of political party preference, indicated upon the ballot for the office in the manner provided by statute. A political party or party central committee shall not nominate a candidate for any congressional or state elective office at the voter-nominated primary. This subdivision shall not be interpreted to prohibit a political party or party central committee from endorsing, supporting, or opposing any candidate for a congressional or state elective office. A political party or party central committee shall not have the right to have its preferred candidate participate in the general election for a voter-nominated office other than a candidate who is one of the two highest vote-getters at the primary election, as provided in subdivision (a).*

(c) The Legislature shall provide for ~~primary~~ *partisan* elections for ~~partisan offices~~ *presidential candidates, and political party and party central committees*, including an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit of noncandidacy.

~~(b)~~

*(d) A political party that participated in a primary election for a partisan office pursuant to subdivision (c)* has the right to participate in the general election for that office and shall not be denied the ability to place on the general election ballot the candidate who received, at the primary election, the highest vote among that party's candidates.

Fourth—That Section 6 of Article II thereof is amended to read:

SEC. 6.  (a) All judicial, school, county, and city offices*, including the Superintendent of Public Instruction,* shall be nonpartisan.

(b) ~~No~~ *A* political party or party central committee ~~may endorse, support, or oppose~~ *shall not nominate* a candidate for nonpartisan office*, and the candidate's party preference shall not be included on the ballot for the nonpartisan office.*

Fifth—This measure shall become operative on January 1, 2011.

# PROPOSITION 15

This law proposed by Assembly Bill 583 (Statutes of 2008, Chapter 735) is submitted to the people in accordance with the provisions of Article II, Section 10 of the California Constitution.

This proposed law adds sections to the Elections Code; adds and repeals sections of the Government Code; and adds and repeals sections of the Revenue and Taxation Code; therefore, provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

**PROPOSED LAW**

SECTION 1.  Chapter 7 (commencing with Section 20600) is added to Division 20 of the Elections Code, to read:

### Chapter 7.  Fair Elections Fund

*20600.  (a) Each lobbying firm, as defined by Section 82038.5 of the Government Code, each lobbyist, as defined by Section 82039 of the Government Code, and each lobbyist employer, as defined by Section 82039.5 of the Government Code, shall pay the Secretary of State a nonrefundable fee of seven hundred dollars ($700) every two years. Twenty-five dollars ($25) of each fee from each lobbyist shall be deposited in the General Fund and used, when appropriated, for the purposes of Article 1 (commencing with Section 86100) of Chapter 6 of Title 9 of the Government Code. The remaining amount of each fee shall be deposited in the Fair Elections Fund established pursuant to Section 91133 of the Government Code. The fees in this section may be paid in even-numbered years when registrations are renewed pursuant to Section 86106 of the Government Code.*

*(b) The Secretary of State shall biennially adjust the amount of the fees collected pursuant to this section to reflect any increase or decrease in the Consumer Price Index.*

SEC. 2.  Section 85300 of the Government Code is repealed.

~~85300.   No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office.~~

SEC. 3.  Section 86102 of the Government Code is repealed.

~~86102.   Each lobbying firm and lobbyist employer required to file a registration statement under this chapter may be charged not more than twenty-five dollars ($25) per year for each lobbyist required to be listed on its registration statement.~~

SEC. 4.  Chapter 12 (commencing with Section 91015) is added to Title 9 of the Government Code, to read:

### Chapter 12.  California Fair Elections Act of 2008

#### Article 1.  General

*91015.   This chapter shall be known and may be cited as the California Fair Elections Act of 2008.*

*91017.   The people find and declare all of the following:*

(a) The current campaign finance system burdens candidates with the incessant rigors of fundraising and thus decreases the time available to carry out their public responsibilities.

(b) The current campaign finance system diminishes the free speech rights of nonwealthy voters and candidates whose voices are drowned out by those who can afford to monopolize the arena of paid political communications.

(c) The current campaign finance system fuels the public perception of corruption at worst and conflict of interest at best and undermines public confidence in the democratic process and democratic institutions.

(d) Existing term limits place a greater demand on fundraising for the next election even for elected officials in safe seats.

(e) The current campaign finance system undermines the First Amendment right of voters and candidates to be heard in the political process, undermines the First Amendment right of voters to hear all candidates' speech, and undermines the core First Amendment value of open and robust debate in the political process.

(f) Citizens want to ensure the integrity of California's system of electronically reporting lobbyist contributions and the integrity of future Secretaries of State to administer lobbyist disclosure programs. Voters would like the opportunity to elect a Secretary of State who has not accepted any contributions from entities or individuals that employ lobbyists.

(g) In states where the fair elections full public financing laws have been enacted and used, election results show that more individuals, especially women and minorities, run as candidates and growth in overall campaign costs diminish.

91019.   The people enact this chapter to establish a Fair Elections pilot program in campaigns for the office of Secretary of State to accomplish the following purposes:

(a) To reduce the perception of influence of large contributions on the decisions made by state government.

(b) To remove wealth as a major factor affecting whether an individual chooses to become a candidate.

(c) To provide a greater diversity of candidates to participate in the electoral process.

(d) To permit candidates to pursue policy issues instead of being preoccupied with fundraising and allow officeholders more time to carry out their official duties.

(e) To diminish the danger of actual corruption or the public perception of corruption and strengthen public confidence in the governmental and election processes.

(f) To reduce the perception of influence of lobbyist employers upon future Secretaries of State and their administration of the lobbyist disclosure program.

(g) To protect the public's fiscal interest by providing sufficient resources to make the public financing program a viable option for qualified candidates, while not wasting resources by providing candidates with an unnecessarily large initial grant of public funds.

91021.   The people enact this chapter to further

accomplish the following purposes:

(a) To foster more equal and meaningful participation in the political process.

(b) To provide candidates who participated in the program with sufficient resources with which to communicate with voters.

(c) To increase the accountability of the Secretary of State to the constituents who elect him or her.

(d) To provide voters with timely information regarding the sources of campaign contributions, expenditures, and political advertising.

### Article 2.    Applicability to the Political Reform Act of 1974

91023.   Unless specifically superseded by this act, the definitions and provisions of the Political Reform Act of 1974 shall govern the interpretation of this chapter.

### Article 3.    Definitions

91024.   "Address" means the mailing address as provided on the voter registration form.

91025.   For purposes of this chapter, "candidate" means, unless otherwise stated, a candidate for Secretary of State.

91027.   A "coordinated expenditure" means a payment made for the purpose of influencing the outcome of an election for Secretary of State that is made by any of the following methods:

(a) By a person in cooperation, consultation, or concert with, at the request or suggestion of, or pursuant to a particular understanding with a candidate, a candidate's controlled committee, or an agent acting on behalf of a candidate or a controlled committee.

(b) By a person for the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign material prepared by a candidate, a candidate's controlled committee, or an agent of a candidate or a controlled committee.

(c) Based on specific information about the candidate's plans, projects, or needs provided to the person making the payment by the candidate or the candidate's agent who provides the information with a view toward having the payment made.

(d) By a person if, in the same primary and general election in which the payment is made, the person making the payment is serving or has served as a member, employee, fundraiser, or agent of the candidate's controlled committee in an executive or policymaking position.

(e) By a person if the person making the payment has served in any formal policy or advisory position with the candidate's campaign or has participated in strategic or policymaking discussions with the candidate's campaign relating to the candidate's pursuit of nomination for election, or election, to the office of Secretary of State in the same primary and general election as the primary and

*general election in which the payment is made.*

*(f) By a person if the person making the payment retains the professional services of an individual or person who, in a nonministerial capacity, has provided or is providing campaign-related services in the same election to a candidate who is pursuing the same nomination or election as any of the candidates to whom the communication refers.*

*91028. "Effective expenditures" for a nonparticipating candidate means the amount spent plus any independent electioneering expenditures intended to help elect the candidate minus any expenditure treated as an independent electioneering expenditure intended to defeat the candidate. For a participating candidate, it means the amount of Fair Elections funding the candidate has received plus any independent electioneering expenditures intended to help elect the candidate minus any expenditure treated as an independent electioneering expenditure intended to defeat the candidate.*

*91029. "Entity" means any person other than an individual.*

*91031. "Excess expenditure amount" means the amount of funds spent or obligated to be spent by a nonparticipating candidate in excess of the Fair Elections funding amount available to a participating candidate running for the same office.*

*91033. "Exploratory period" means the period beginning 18 months before the primary election and ending on the last day of the qualifying period. The exploratory period begins before, but extends to the end of, the qualifying period.*

*91035. "General election campaign period" means the period beginning the day after the primary election and ending on the day of the general election.*

*91037. "Independent candidate" means a candidate who does not represent a political party that has been granted ballot status for the general election and who has qualified, or is seeking to qualify, to be on the general election ballot.*

*91039. "Independent electioneering expenditure" means any expenditure of two thousand five hundred dollars ($2,500) or more made by a person, party committee, political committee or political action committee, or any entity required to file reports pursuant to Section 84605, during the 45 calendar days before a primary or the 60 calendar days before a general election, which expressly advocates the election or defeat of a clearly identified candidate or names or depicts clearly identified candidates.*

*91043. "Nonparticipating candidate" means a candidate who is on the ballot but has chosen not to apply for Fair Elections campaign funding or a candidate who is on the ballot and has applied but has not satisfied the requirements for receiving Fair Elections funding.*

*91045. "Office-qualified party" means a political party whose gubernatorial or Secretary of State nominee has received 10 percent or more of the votes at the last*

*election.*

*91046. "Office-qualified candidate" is a candidate seeking nomination from an office-qualified party.*

*91049. "Participating candidate" means a candidate who qualifies for Fair Elections campaign funding. These candidates are eligible to receive Fair Elections campaign funding during primary and general election campaign periods.*

*91051. "Party candidate" means a candidate who represents a political party that has been granted ballot status and holds a primary election to choose its nominee for the general election.*

*91053. "Performance-qualified candidate" means either an office-qualified candidate or a candidate who has shown a broad base of support by gathering twice the number of qualifying contributions as is required for an office-qualified candidate. Independent candidates may qualify for funding as performance-qualified candidates.*

*91055. "Petty cash" means cash amounts of one hundred dollars ($100) or less per day that are drawn on the Fair Elections Debit Card and used to pay expenses of no more than twenty-five dollars ($25) each.*

*91059. "Primary election campaign period" means the period beginning 120 days before the primary election and ending on the day of the primary election.*

*91061. "Qualified candidate" means a candidate seeking nomination from a party that is not an office-qualified party.*

*91063. "Qualifying contribution" means a contribution of five dollars ($5) that is received during the designated qualifying period by a candidate seeking to become eligible for Fair Elections campaign funding from a registered voter of the district in which the candidate is running for office.*

*91065. "Qualifying period" means the period during which candidates are permitted to collect qualifying contributions in order to qualify for Fair Elections funding. It begins 270 days before the primary election and ends 90 days before the day of the primary election for party candidates and begins any time after January 1 of the election year and lasts 180 days, but in no event ending later than 90 days, before the general election for performance-qualified candidates who are running as independent candidates.*

*91067. "Seed money contribution" means a contribution of no more than one hundred dollars ($100) made by a California registered voter during the exploratory period.*

### Article 4.    Fair Elections Eligibility

*91071. (a) An office-qualified candidate qualifies as a participating candidate for the primary election campaign period if the following requirements are met:*

*(1) The candidate files a declaration with the commission that the candidate has complied and will comply with all of the requirements of this act, including the requirement that during the exploratory period and the qualifying period the candidate not accept or spend*

private contributions from any source other than seed money contributions, qualifying contributions, Fair Elections funds, and political party funds as specified in Section 91123.

(2) The candidate meets the following qualifying contribution requirements before the close of the qualifying period:

(A) The office-qualified candidate shall collect at least 7,500 qualifying contributions.

(B) Each qualifying contribution shall be acknowledged by a receipt to the contributor, with a copy submitted by the candidate to the county registrar of voters in the county where the candidate files his or her declaration of candidacy. The receipt shall include the contributor's signature, printed name, and address, the date, and the name of the candidate on whose behalf the contribution is made. In addition, the receipt shall indicate by the contributor's signature that the contributor understands that the purpose of the qualifying contribution is to help the candidate qualify for Fair Elections campaign funding, that the contribution is the only qualifying contribution the contributor has provided to a candidate for this office, and that the contribution is made without coercion or reimbursement.

(C) A contribution submitted as a qualifying contribution that does not include a signed and fully completed receipt shall not be counted as a qualifying contribution.

(D) All five-dollar ($5) qualifying contributions, whether in the form of cash, check, or money order made out to the candidate's campaign account, shall be deposited by the candidate in the candidate's campaign account.

(E) All qualifying contributions' signed receipts shall be sent to the county registrar of voters in the county where the candidate files his or her declaration of candidacy and shall be accompanied by a check or other written instrument from the candidate's campaign account for the total amount of qualifying contribution funds received for deposit in the Fair Elections Fund. This submission shall be accompanied by a signed statement from the candidate indicating that all of the information on the qualifying contribution receipts is complete and accurate to the best of the candidate's knowledge and that the amount of the enclosed check or other written instrument is equal to the sum of all of the five-dollar ($5) qualifying contributions the candidate has received. County registrars of voters shall forward these checks or other written instruments to the commission.

(b) A candidate qualifies as a participating candidate for the general election campaign period if both of the following requirements are met:

(1) The candidate met all of the applicable requirements and filed a declaration with the commission that the candidate has fulfilled and will fulfill all of the requirements of a participating candidate as stated in this act.

(2) As a participating party candidate during the primary election campaign period, the candidate had the highest number of votes of the candidates contesting the primary election from the candidate's respective party and, therefore, won the party's nomination.

91073. (a) A qualified candidate shall collect at least one-half of the number of qualifying contributions as required for an office-qualified candidate for the same office. A qualified candidate may show a greater base of support by collecting double the amount of qualifying contributions as required for an office-qualified candidate to become a performance-qualified candidate. The candidate shall also file a declaration with the commission that the candidate has complied and will comply with all of the requirements of this act.

(b) An independent candidate who does not run in a primary may become a performance-qualified candidate by collecting twice as many qualifying contributions as required of an office-qualified candidate. The qualifying period for such candidates shall begin any time after January 1 of the election year and shall last 180 days, except that it shall end no later than 90 days before the general election. An independent candidate shall notify the commission within 24 hours of the day when the candidate has begun collecting qualifying contributions. The candidate shall also file a declaration with the commission that he or she has complied and will comply with all of the requirements of this chapter.

91075. During the first election that occurs after the effective date of this act, a candidate may be certified as a participating candidate, notwithstanding the acceptance of contributions or making of expenditures from private funds before the date of enactment that would, absent this section, disqualify the candidate as a participating candidate, provided that any private funds accepted but not expended before the effective date of this act meet any of the following criteria:

(a) Are returned to the contributor.

(b) Are held in a segregated account and used only for retiring a debt from a previous campaign.

(c) Are submitted to the commission for deposit in the Fair Elections Fund.

91077. A participating candidate who accepts any benefits during the primary election campaign period shall comply with all of the requirements of this act through the general election campaign period whether the candidate continues to accept benefits or not.

91079. (a) During the primary and general election campaign periods, a participating candidate who has voluntarily agreed to participate in, and has become eligible for, Fair Elections benefits, shall not accept private contributions from any source other than the candidate's political party as specified in Section 91123.

(b) During the qualifying period and the primary and general election campaign periods, a participating candidate who has voluntarily agreed to participate in, and has become eligible for, Fair Elections benefits shall

not solicit or receive contributions for any other candidate or for any political party or other political committee.

(c) No person shall make a contribution in the name of another person. A participating candidate who receives a qualifying contribution or a seed money contribution that is not from the person listed on the receipt required by subparagraph (D) of paragraph (2) of subdivision (a) of Section 91071 shall be liable to pay the commission the entire amount of the inaccurately identified contribution, in addition to any penalties.

(d) During the primary and general election campaign periods, a participating candidate shall pay for all of the candidate's campaign expenditures, except petty cash expenditures, by means of a "Fair Elections Debit Card" issued by the commission, as authorized under Section 91137.

(e) Participating candidates shall furnish complete campaign records to the commission upon request. Candidates shall cooperate with any audit or examination by the commission, the Franchise Tax Board, or any enforcement agency.

91081. (a) During the primary election period and the general election period, each participating candidate shall conduct all campaign financial activities through a single campaign account.

(b) Notwithstanding Section 85201, a participating candidate may maintain a campaign account other than the campaign account described in subdivision (a) if the other campaign account is for the purpose of retiring a net debt outstanding that was incurred during a previous election campaign in which the candidate was not a participating candidate.

(c) Contributions for the purposes of retiring a previous campaign debt that are deposited in the "other campaign account" described in subdivision (b) shall not be considered "contributions" to the candidate's current campaign. Those contributions shall only be raised during the six-month period following the date of the election.

91083. (a) Participating candidates shall use their Fair Elections funds only for direct campaign purposes.

(b) A participating candidate shall not use Fair Elections funds for any of the following:

(1) Costs of legal defense or fines resulting from any campaign law enforcement proceeding under this act.

(2) Indirect campaign purposes, including, but not limited to, the following:

(A) The candidate's personal support or compensation to the candidate or the candidate's family.

(B) The candidate's personal appearance.

(C) A contribution or loan to the campaign committee of another candidate for any elective office or to a party committee or other political committee.

(D) An independent electioneering expenditure.

(E) A gift in excess of twenty-five dollars ($25) per person.

(F) Any payment or transfer for which compensating value is not received.

91085. (a) Personal funds contributed as seed money by a candidate seeking to become eligible as a participating candidate or by adult members of the candidate's family shall not exceed the maximum of one hundred dollars ($100) per contributor.

(b) Personal funds shall not be used to meet the qualifying contribution requirement except for one five-dollar ($5) contribution from the candidate and one five-dollar ($5) contribution from the candidate's spouse.

91087. (a) The only private contributions a candidate seeking to become eligible for Fair Elections funding shall accept, other than qualifying contributions and limited contributions from the candidate's political party as specified in Section 91123, are seed money contributions contributed by duly registered voters in the district in which the candidate is running for election prior to the end of the qualifying period.

(b) A seed money contribution shall not exceed one hundred dollars ($100) per donor, and the aggregate amount of seed money contributions accepted by a candidate seeking to become eligible for Fair Elections funding shall not exceed seventy-five thousand dollars ($75,000).

(c) Receipts for seed money contributions shall include the contributor's signature, printed name, address, and ZIP Code. Receipts described in this subdivision shall be made available to the commission upon request.

(d) Seed money shall be spent only during the exploratory and qualifying periods. Seed money shall not be spent during the primary or general election campaign periods, except when they overlap with the candidate's qualifying period. Any unspent seed money shall be turned over to the commission for deposit in the Fair Elections Fund.

(e) Within 72 hours after the close of the qualifying period, candidates seeking to become eligible for Fair Elections funding shall do both of the following:

(1) Fully disclose all seed money contributions and expenditures to the commission.

(2) Turn over to the commission for deposit in the Fair Elections Fund any seed money the candidate has raised during the exploratory period that exceeds the aggregate seed money limit.

91091. Participating candidates in contested races shall agree to participate in at least one public debate during a contested primary election and two public debates during a contested general election, to be conducted pursuant to regulations promulgated by the commission.

91093. (a) No more than five business days after a candidate applies for Fair Elections benefits, the county registrar of voters in the county where the candidate files his or her declaration of candidacy shall certify that the candidate is or is not eligible. Eligibility may be revoked if the candidate violates the requirements of this act, in which case all Fair Elections funds shall be repaid.

(b) The candidate's request for certification shall be

signed by the candidate and the candidate's campaign treasurer under penalty of perjury.

(c) The certification determination of the county registrar of voters is final except that it is subject to a prompt judicial review.

### Article 5. Fair Elections Benefits

91095. (a) Candidates who qualify for Fair Elections funding for primary and general elections shall:

(1) Receive Fair Elections funding from the commission for each election in an amount specified by Section 91099. This funding may be used to finance campaign expenses during the particular campaign period for which it was allocated consistent with Section 91081.

(2) Receive, if a performance-qualified candidate, additional Fair Elections funding to match the effective expenditures of any candidates in the election that exceed the effective expenditures of the performance-qualified candidate.

(b) The maximum aggregate amount of funding a participating performance-qualified candidate shall receive to match independent electioneering expenditures and excess expenditures of nonparticipating candidates shall not exceed four times the base funding amount pursuant to Section 91099 for a particular primary or general election campaign period.

91095.5. (a) An expenditure by a candidate in a primary election against a candidate running for that office in another party's primary shall be treated as an independent electioneering expenditure against that candidate when that candidate's effective expenditures are less than those of the candidate making the expenditure for the purposes of Section 91095.

(b) The commission shall promulgate regulations allocating the share of expenditures that reference or depict more than one candidate for the purposes of Section 91095.

(c) Expenditures made before the general election period that consist of a contract, promise, or agreement to make an expenditure during the general election period resulting in an extension of credit shall be treated as though made at the beginning of the general election period.

91097. (a) An eligible qualified or performance-qualified candidate running in a primary election shall receive the candidate's Fair Elections funding for the primary election campaign period on the date on which the county registrar of voters certifies the candidate as a participating candidate or at the beginning of the primary election period, whichever is later.

(b) An eligible qualified or performance-qualified candidate shall receive the candidate's Fair Elections funding for the general election campaign period within two business days after certification of the primary election results.

91099. (a) For eligible candidates in a primary election:

(1) The base amount of Fair Elections funding for an eligible office-qualified candidate in a primary election is one million dollars ($1,000,000).

(2) The amount of Fair Elections funding for an eligible qualified candidate in a primary election is 20 percent of the base amount that an office-qualified candidate would receive.

(b) For eligible candidates in a general election:

(1) The base amount of Fair Elections funding for a performance-qualified candidate in a general, special, or special runoff election is one million three hundred thousand dollars ($1,300,000).

(2) The amount of Fair Elections funding for an eligible qualified candidate in a contested general election is 25 percent of the base amount a performance-qualified candidate would receive.

### Article 6. Disclosure Requirements

91107. (a) If a nonparticipating candidate's total expenditures or promises to make campaign expenditures exceed the amount of Fair Elections funding allocated to the candidate's Fair Elections opponent or opponents, the candidate shall declare every excess expenditure amount which, in the aggregate, is more than five thousand dollars ($5,000) to the commission online or electronically within 24 hours of the time the expenditure or promise is made, whichever occurs first.

(b) The commission may make its own determination as to whether excess expenditures have been made by nonparticipating candidates.

(c) Upon receiving an excess expenditure declaration or determining that an excess expenditure has been made, the commission shall immediately release additional Fair Elections funding to the opposing performance-qualified candidates pursuant to Section 91095.

91111. (a) In addition to any other report required by this chapter, a committee, including a political party committee, that is required to file reports pursuant to Section 84605 and that makes independent electioneering expenditures of two thousand five hundred dollars ($2,500) or more during a calendar year in connection with a candidate for Secretary of State, shall file online or electronically a report with the Secretary of State disclosing the making of the independent electioneering expenditure. This report shall disclose the same information required by subdivision (b) of Section 84204 and shall be filed within 24 hours of the time the independent electioneering expenditure is made.

(b) The report to the Secretary of State shall include a signed statement under penalty of perjury by the person or persons making the independent electioneering expenditure identifying the candidate or candidates whom the independent electioneering expenditure is intended to help elect or defeat and affirming that the expenditure is independent and whether it is coordinated with a candidate or a political party.

(c) Any individual or organization that fails to file the

required report to the Secretary of State or provides materially false information in a report filed pursuant to subdivision (a) or (b) may be fined up to three times the amount of the independent electioneering expenditure, in addition to any other remedies provided by this act.

(d) The Secretary of State shall provide information received pursuant to subdivision (a) to the commission simultaneously upon receipt. Upon receiving a report that an independent electioneering expenditure has been made or obligated to be made, the commission shall immediately release additional Fair Elections funding pursuant to Section 91095.

91113.  All broadcast and print advertisements placed by candidates or their committees shall include a clear written or spoken statement indicating that the candidate has approved of the contents of the advertisement.

### Article 7.   Legal Defense, Officeholder, and Inaugural Funds

91115.  (a)  Notwithstanding Section 85316, a Secretary of State or candidate for the office of Secretary of State may establish a separate account to defray attorney's fees and other related legal costs incurred for the candidate's or elected state officer's legal defense if the candidate or elected state officer is subject to one or more civil or criminal proceedings or administrative proceedings arising directly out of the conduct of an election campaign, the electoral process, or the performance of the elected state officer's governmental activities and duties. These funds may be used only to defray those attorney's fees and other related legal costs.

(b) A Secretary of State may establish a separate account for expenses associated with holding office that are reasonably related to a legislative or governmental purpose as specified in this subdivision and in regulations of the commission. The total amount of funds that may be deposited in a calendar year into an account established pursuant to this subdivision shall not exceed fifty thousand dollars ($50,000).

(c) A Secretary of State may establish an inaugural account to cover the cost of events, celebrations, gatherings, and communications that take place as part of, or in honor of, the inauguration of the Secretary of State.

(d) The maximum amount of contributions a candidate or elected state officer whose office is covered by these provisions may receive from a contributor in a calendar year for all of the accounts described in subdivisions (a), (b), and (c) combined is five hundred dollars ($500). All contributions, whether cash or in kind, shall be reported in a manner prescribed by the commission. Contributions to such funds shall not be considered campaign contributions.

(e) Once the legal dispute is resolved, the candidate shall dispose of any funds remaining after all expenses associated with the dispute are discharged or after the elected state officer whose office is covered by these provisions leaves office, for one or more of the purposes set forth in paragraphs (1) to (5), inclusive, of subdivision (b) of Section 89519.

### Article 8.   Restrictions on Candidates

91121.  A nonparticipating candidate may accept an otherwise lawful contribution after the date of the election only to the extent that the contribution does not exceed net debts outstanding from the election.

91123.  Participating candidates may accept monetary or in-kind contributions from political parties provided that the aggregate amount of such contributions from all political party committees combined does not exceed the equivalent of 5 percent of the original Fair Elections financing allotment for that office for that election. Such expenditures shall not count against the moneys spent by Fair Elections candidates.

### Article 9.   Ballot Pamphlet Statements

91127.  The Secretary of State shall designate in the state ballot pamphlet and on any Internet Web site listing of candidates maintained by any government agency including, but not limited, to the Secretary of State those candidates who have voluntarily agreed to be participating candidates.

91131.  (a)  A candidate for Secretary of State who is a participating candidate may place a statement in the state ballot pamphlet that does not exceed 250 words. The statement shall not make any reference to any opponent of the candidate. The candidate may also provide a list of up to 10 endorsers for placement in the state ballot pamphlet or sample ballot, as appropriate. This statement and list of endorsers shall be submitted in accordance with timeframes and procedures set forth by the Secretary of State for the preparation of the state ballot pamphlets and by county elections officials for the preparation of sample ballots.

(b)  A nonparticipating candidate for Secretary of State may pay to place a statement in the state ballot pamphlet that does not exceed 250 words. A nonparticipating candidate may also pay to place a list of up to 10 endorsers in the state ballot pamphlet or sample ballot, as appropriate. The statement shall not make any reference to any opponent of the candidate. This statement and list of endorsers shall be submitted in accordance with timeframes and procedures set forth by the Secretary of State for the preparation of the state ballot pamphlets and by county elections officials for the preparation of sample ballots. The nonparticipating candidate shall be charged the pro rata cost of printing, handling, translating, and mailing any ballot pamphlet statement and list of endorsers provided pursuant to this subdivision.

### Article 10.   Appropriations for the Fair Elections Fund

91133.  (a) A special, dedicated, nonlapsing Fair Elections Fund is created in the State Treasury.

Commencing January 1, 2011, the funds collected pursuant to Section 20600 of the Elections Code shall, when appropriated by the Legislature, be available from the Fair Elections Fund to the commission for expenditure for the purpose of providing public financing for the election campaigns of certified participating candidates during primary and general campaign periods.

(b) Funding for the administrative and enforcement costs of the commission related to this act shall be from the Fair Elections Fund and shall be, for each four-year election cycle, no more than 10 percent of the total amount deposited in the Fair Elections Fund during the four-year election cycle.

91135.    Other sources of revenue to be deposited in the Fair Elections Fund shall include all of the following:

(a) The qualifying contributions required of candidates seeking to become certified as participating candidates and candidates' excess qualifying contributions.

(b) The excess seed money contributions of candidates seeking to become certified as participating candidates.

(c) Unspent funds distributed to any participating candidate who does not remain a candidate until the primary or general election for which they were distributed, or funds that remain unspent by a participating candidate following the date of the primary or general election for which they were distributed.

(d) Voluntary donations made directly to the Fair Elections Fund.

(e) Other funds appropriated by the Legislature.

(f) Any interest generated by the Fair Elections Fund.

(g) Any other sources of revenue from the General Fund or from other sources as determined by the Legislature.

### Article 11.    Administration

91137.    (a) Upon a determination that a candidate has met all the requirements for becoming a participating candidate as provided for in this act, the commission shall issue to the candidate a card, known as the "Fair Elections Debit Card," and a "line of debit" entitling the candidates and members of the candidate's staff to draw Fair Elections funds from a commission account to pay for all campaign costs and expenses up to the amount of Fair Elections funding the candidate has received.

(b) Neither a participating candidate nor any other person on behalf of a participating candidate shall pay campaign costs by cash, check, money order, loan, or by any other financial means other than the Fair Elections Debit Card.

(c) Cash amounts of one hundred dollars ($100) or less per day may be drawn on the Fair Elections Debit Card and used to pay expenses of no more than twenty-five dollars ($25) each. Records of all such expenditures shall be maintained and, upon request, made available to the commission.

91139.    If the commission determines that there are insufficient funds in the program to fund adequately all candidates eligible for Fair Elections funds, the commission shall reduce the grants proportionately to all eligible candidates. If the commission notifies a candidate that the Fair Elections funds will be reduced and the candidate has not received any Fair Elections funds, the candidate may decide to be a nonparticipating candidate. If a candidate has already received Fair Elections funds or wishes to start receiving such funds, a candidate who wishes to collect contributions may do so in amounts up to the contribution limits provided for nonparticipating candidates but shall not collect more than the total of Fair Elections funds that the candidate was entitled to receive had there been sufficient funds in the program less the amount of Fair Elections funds that will be or have been provided. If, at a later point, the commission determines that adequate funds have become available, candidates, who have not raised private funds, shall receive the funds owed to them.

91140.    The commission shall adjust the seed money limitations in subdivision (a) of Section 91085 and in subdivision (b) of Section 91087 and the Fair Elections Fund funding amounts in Section 91099 in January after the election of the Secretary of State to reflect any increase or decrease in the Consumer Price Index and the increase or decrease in the number of registered voters in California. The adjustments made pursuant to this section shall be rounded to the nearest ten dollars ($10) for the seed money limitations and one thousand dollars ($1,000) for the Fair Elections funding amounts.

### Article 12.    Enforcement

91141.    (a) If a participating candidate spends or obligates to spend more than the Fair Elections funding the candidate is given, and if it is determined by the commission, subject to court review, not to be an amount that had or could have been expected to have a significant impact on the outcome of the election, then the candidate shall repay to the Fair Elections Fund an amount equal to the excess.

(b) If a participating candidate spends or obligates to spend more than the Fair Elections funding the candidate is given, and if that excess amount is determined by the commission, subject to court review, to be an amount that had or could have been expected to have a significant impact on the outcome of the election, then the candidate shall repay to the Fair Elections Fund an amount up to 10 times the value of the excess.

91143.    It is unlawful for candidates to knowingly accept more benefits than those to which they are entitled, spend more than the amount of Fair Elections funding they have received, or misuse such benefits or Fair Elections funding.

91145.    Any person who knowingly or willfully violates any provision of this chapter is guilty of a misdemeanor. Any person who knowingly or willfully causes any other person to violate any provision of this chapter, or who aids and abets any other person in the violation of any

provision of this chapter shall be liable under this section.

91147.    Prosecution for a violation of any provision of this chapter shall be commenced within four years after the date on which the violation occurred.

91149.    No person convicted of a misdemeanor under this chapter shall act as a lobbyist or state contractor, or run for elective state office, for a period of five years following the date of conviction unless the court at the time of sentencing specifically determines that this provision shall not be applicable.

91157.    This chapter shall remain in effect only until January 1, 2019, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2019, deletes or extends that date.

SEC.   5.    Article 8.6 (commencing with Section 18798) is added to Chapter 3 of Part 10.2 of Division 2 of the Revenue and Taxation Code, to read:

*Article  8.6.    Voters Fair Elections Fund*

18798.    (a) An individual may designate on the tax return that a contribution in excess of the tax liability, if any, be made to the Voters Fair Elections Fund, pursuant to Section 18798.1.

(b) Contributions shall be in full dollar amounts and may be made individually by each signatory on a joint return.

(c) A designation under subdivision (a) shall be made for any taxable year on the individual return for that taxable year and, once made, shall be irrevocable. In the event that payments and credits reported on the return, together with any other credits associated with the individual's account, do not exceed the individual's liability, the return shall be treated as if no designation were made.

(d) The Franchise Tax Board shall revise the forms of the return to include a space labeled "Voters Fair Elections Fund" to allow for the designation permitted under subdivision (a). The forms shall also include instructions that the contribution may be in the amount of one dollar ($1) or more and that the contribution will be used to provide public funding for the campaigns of qualified candidates for Secretary of State who agree to take no private moneys for their campaigns.

(e) Notwithstanding any other provision of law, a voluntary contribution designation for the Voters Fair Elections Fund shall not be added to the tax return until another voluntary contribution is removed.

(f) A deduction shall be allowed under Article 6 (commencing with Section 17201) of Chapter 3 of Part 10 for any contribution made pursuant to subdivision (a).

18798.1.    There is hereby established in the State Treasury the Voters Fair Elections Fund to receive contributions made pursuant to Section 18798. The Franchise Tax Board shall notify the Controller of both the amount of moneys paid by taxpayers in excess of their tax liability and the amount of refund moneys which taxpayers have designated pursuant to Section 18798 to

be transferred to the Voters Fair Elections Fund. The Controller shall transfer from the Personal Income Tax Fund to the Voters Fair Elections Fund an amount not in excess of the sum of the amounts designated by individuals pursuant to Section 18798 for payment into that fund.

18798.2.    All moneys transferred to the Voters Fair Elections Fund, upon appropriation by the Legislature, shall be allocated as follows:

(a) To the Franchise Tax Board and the Controller for reimbursement of all costs incurred by the Franchise Tax Board and the Controller in connection with their duties under this article.

(b) To the Fair Elections Fund established pursuant to Section 91133 of the Government Code.

18798.3.    (a) Except as otherwise provided in subdivision (b), this article shall remain in effect only until January 1 of the fifth taxable year following the first appearance of the Voters Fair Elections Fund on the personal income tax return, and as of that date is repealed, unless a later enacted statute that is enacted before the applicable date deletes or extends that date.

(b) (1) By September 1 of the second calendar year, and by September 1 of each subsequent calendar year that the Voters Fair Elections Fund appears on a tax return, the Franchise Tax Board shall do all of the following:

(A) Determine the minimum contribution amount required to be received during the next calendar year for the fund to appear on the tax return for the taxable year that includes that next calendar year.

(B) Provide written notification to the Fair Political Practices Commission of the amount determined in subparagraph (A).

(C) Determine whether the amount of contributions estimated to be received during the calendar year will equal or exceed the minimum contribution amount determined by the Franchise Tax Board for the calendar year pursuant to subparagraph (A). The Franchise Tax Board shall estimate the amount of contributions to be received by using the actual amounts received and an estimate of the contributions that will be received by the end of that calendar year.

(2) If the Franchise Tax Board determines that the amount of contributions estimated to be received during a calendar year will not at least equal the minimum contribution amount for the calendar year, this article is repealed with respect to taxable years beginning on or after January 1 of that calendar year.

(3) For purposes of this section, the minimum contribution amount for a calendar year means two hundred fifty thousand dollars ($250,000) for the second calendar year after the first appearance of the Voters Fair Elections Fund on the personal income tax return or the adjusted minimum contribution amount adjusted pursuant to subdivision (c).

(c) For each calendar year, beginning with the third calendar year after the first appearance of the Voters Fair Elections Fund on the personal income tax return, the

*Franchise Tax Board shall adjust, on or before September 1, the minimum contribution amount specified in subdivision (b) as follows:*

*(1)  The minimum estimated contribution amount for the calendar year shall be an amount equal to the product of the minimum estimated contribution amount for the calendar year multiplied by the inflation factor adjustment as specified in subparagraph (A) of paragraph (2) of subdivision (h) of Section 17041, rounded off to the nearest dollar.*

*(2)  The inflation factor adjustment used for the calendar year shall be based on the figures for the percentage change in the California Consumer Price Index received on or before August 1 of the calendar year pursuant to paragraph (1) of subdivision (h) of Section 17041.*

*(d)  Notwithstanding the repeal of this article, any contribution amounts designated pursuant to this article prior to its repeal shall continue to be transferred and disbursed in accordance with this article as in effect immediately prior to that repeal.*

SEC. 6.  The provisions of Section 81012 of the Government Code, which allow legislative amendments to the Political Reform Act of 1974, shall apply to all of the provisions of this act that are placed on the June 8, 2010, ballot, except that Section 91157 of the Government Code, and Article 8.6 (commencing with Section 18798) of Chapter 3 of Part 10.2 of Division 2 of the Revenue and Taxation Code, may be amended or repealed by a statute passed in each house of the Legislature, a majority of the membership concurring, and signed by the Governor.

SEC. 8.  The section of this act that adds Chapter 12 (commencing with Section 91015) to Title 9 of the Government Code shall be deemed to amend the Political Reform Act of 1974 as amended and all of the provisions of the Political Reform Act of 1974 as amended that do not conflict with Chapter 12 shall apply to the provisions of that chapter.

# PROPOSITION 16

This initiative measure is submitted to the people in accordance with the provisions of Article II, Section 8 of the California Constitution.

This initiative measure expressly amends the California Constitution by adding a section thereto; therefore, new provisions proposed to be added are printed in *italic type* to indicate that they are new.

**PROPOSED LAW**

Section 1.    FINDINGS AND DECLARATIONS

The People do find and declare:

(a)  This initiative shall be known as "The Taxpayers Right to Vote Act."

(b)  California law requires two-thirds voter approval for tax increases for specific purposes.

(c)  The politicians in local governments should be held to the same standard before using public funds, borrowing,

issuing bonds guaranteed by ratepayers or taxpayers, or obtaining other debt or financing to start or expand electric delivery service, or to implement a plan to become an aggregate electricity provider.

(d)  Local governments often start or expand electric delivery service, or implement a plan to become an aggregate electricity provider, without approval by a vote of the people.

(e)  Frequently the start-up, expansion, or implementation plan requires either construction or acquisition of facilities or other services necessary to deliver the electric service, to be paid for with public funds, borrowing, bonds guaranteed by ratepayers or taxpayers, or other debt or financing.

(f)  The source of the public funds, borrowing, debt, and bond financing is generally the electricity rates charged to ratepayers as well as surcharges or taxes imposed on taxpayers.

(g)  Such use of public funds and many forms of borrowing, debt or financing do not presently require approval by a vote of the people, and where a vote is required, only a majority vote may be required.

Section 2.    STATEMENT OF PURPOSE

(a)  The purpose of this initiative is to guarantee to ratepayers and taxpayers the right to vote any time a local government seeks to use public funds, public debt, bonds or liability, or taxes or other financing to start or expand electric delivery service to a new territory or new customers, or to implement a plan to become an aggregate electricity provider.

(b)  If the start-up or expansion requires the construction or acquisition of facilities or services that will be paid for with public funds, or financed through bonds to be paid for or guaranteed by ratepayers or taxpayers, or to be paid for by other forms of public expenditure, borrowing, liability or debt, then two-thirds of the voters in the territory being served and two-thirds of the voters in the territory to be served, voting at an election, must approve the expenditure, borrowing, liability or debt. Also, if the implementation of a plan to become an aggregate electricity provider requires the use of public funds, or financing through bonds guaranteed by ratepayers or taxpayers, or other forms of public expenditure, borrowing, liability or debt, then two-thirds of the voters in the jurisdiction, voting at an election, must approve the expenditure, borrowing, liability or debt.

Section 3.    Section 9.5 is added to Article XI of the California Constitution to read:

*SEC. 9.5.    (a)  Except as provided in subdivision (h), no local government shall, at any time, incur any bonded or other indebtedness or liability in any manner or use any public funds for the construction or acquisition of facilities, works, goods, commodities, products or services to establish or expand electric delivery service, or to implement a plan to become an aggregate electricity*

*provider, without the assent of two-thirds of the voters within the jurisdiction of the local government and two-thirds of the voters within the territory to be served, if any, voting at an election to be held for the purpose of approving the use of any public funds, or incurring any liability, or incurring any bonded or other borrowing or indebtedness.*

*(b) "Local government" means a municipality or municipal corporation, a municipal utility district, a public utility district, an irrigation district, a city, including a charter city, a county, a city and county, a district, a special district, an agency, or a joint powers authority that includes one or more of these entities.*

*(c) "Electric delivery service" means (1) transmission of electric power directly to retail end-use customers, (2) distribution of electric power to customers for resale or directly to retail end-use customers, or (3) sale of electric power to retail end-use customers.*

*(d) "Expand electric delivery service" does not include (1) electric delivery service within the existing jurisdictional boundaries of a local government that is the sole electric delivery service provider within those boundaries, or (2) continuing to provide electric delivery service to customers already receiving electric delivery service from the local government prior to the enactment of this section.*

*(e) "A plan to become an aggregate electricity provider" means a plan by a local government to provide community choice aggregation services or to replace the authorized local public utility in whole or in part for electric delivery service to any retail electricity customers within its jurisdiction.*

*(f) "Public funds" means, without limitation, any taxes, funds, cash, income, equity, assets, proceeds of bonds or other financing or borrowing, or rates paid by ratepayers. "Public funds" do not include federal funds.*

*(g) "Bonded or other indebtedness or liability" means, without limitation, any borrowing, bond, note, guarantee or other indebtedness, liability or obligation, direct or indirect, of any kind, contingent or otherwise, or use of any indebtedness, liability or obligation for reimbursement of any moneys expended from taxes, cash, income, equity, assets, contributions by ratepayers, the treasury of the local government, or other sources.*

*(h) This section shall not apply to any bonded or other indebtedness or liability or use of public funds that (1) has been approved by the voters within the jurisdiction of the local government and within the territory to be served, if any, prior to the enactment of this section; or (2) is solely for the purpose of purchasing, providing or supplying renewable electricity from biomass, solar thermal, photovoltaic, wind, geothermal, fuel cells using renewable fuels, small hydroelectric generation of 30 megawatts or less, digester gas, municipal solid waste conversion, landfill gas, ocean wave, ocean thermal, or tidal current, or providing electric delivery service for the local government's own end use and not for electric delivery service to others.*

### Section 4.   CONFLICTING MEASURES

A. This initiative is intended to be comprehensive. It is the intent of the people that in the event that this initiative and another initiative relating to the same subject appear on the same statewide election ballot, the provisions of the other initiative or initiatives are deemed to be in conflict with this initiative. In the event this initiative shall receive the greater number of affirmative votes, the provisions of this initiative shall prevail in their entirety, and all provisions of the other initiative or initiatives shall be null and void.

B. If this initiative is approved by voters but superseded by law or by any other conflicting ballot initiative approved by the voters at the same election, and the conflicting law or ballot initiative is later held invalid, this initiative shall be self-executing and given full force of law.

### Section 5.   SEVERABILITY

The provisions of this initiative are severable. If any provision of this initiative or its application is held to be invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

# PROPOSITION 17

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends a section of, and adds a section to, the Insurance Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

### SECTION 1.   Title

This measure shall be known as the Continuous Coverage Auto Insurance Discount Act.

SEC. 2.   The people of the State of California find and declare that:

(a) Under California law, the Department of Insurance regulates insurance rates and determines what discounts auto insurance companies can give drivers.

(b) However, an inconsistency in California's insurance laws allows insurers to provide a discount for drivers who continue with the same insurer, but prohibits them from offering this discount to new customers. Drivers who maintain insurance coverage are not able to keep a continuous coverage discount if they change insurers.

(c) This measure corrects that inconsistency and ensures that all drivers who continually maintain their automobile insurance are eligible for this discount even if they change their insurance company.

(d) This measure does not change the provisions in current law that require insurers to base their rates primarily on driving safety record, miles driven annually,

and driving experience. This measure simply allows all companies to offer the expanded continuous coverage discount to new applicants who have maintained their auto insurance.

(e) Extending the continuous coverage discount to people who change insurance companies will provide drivers with more options and choices, increase competition, and drive down rates for all responsibly insured drivers.

(f) The vast majority of states allow insurers to offer a discount to ALL drivers who maintain ongoing auto insurance. This measure will simply bring California into line with other states like Texas, New York, Oregon, Washington, and Florida.

SEC. 3.   Purpose

The purpose of this measure is to provide an additional discount for drivers who are continuously insured for automobile liability coverage.

SEC. 4.   Section 1861.024 is added to the Insurance Code to read:

*1861.024.   (a) Notwithstanding subdivision (c) of Section 1861.02, and in addition to discounts permitted or required by law or regulation, an insurer may offer applicants or insureds an additional discount for a policy to which subdivision (a) of Section 1861.02 applies, applicable to each coverage provided by the policy, based on the length of time the applicant or insured has been continuously insured for bodily injury liability coverage, with one or more insurers, affiliated or not. The insurer may consider the years of continuous coverage preceding the policy effective or renewal date. This discount is called a continuity discount. Children residing with a parent may be provided the same discount based on their parents' eligibility for a continuity discount.*

*(b) The applicant or insured may demonstrate continuity of coverage, for a policy to which subdivision (a) of Section 1861.02 applies, by providing proof of coverage under the low-cost automobile insurance program pursuant to Article 5.5 (commencing with Section 11629.7) of Chapter 1 of Part 3 of Division 2, or by proof of coverage under the assigned risk plans pursuant to Article 4 (commencing with Section 11620) of Chapter 1 of Part 3 of Division 2, or by proof of coverage from the prior insurer or insurers or other objective evidence. Proof of coverage shall be copies of policies, billings, or other documents evidencing coverage, issued by the prior insurer or insurers or other objective evidence. Continuity of coverage shall be deemed to exist even if there is a lapse of coverage due to an applicant's or insured's absence from the United States while in military service, or if an applicant's or insured's coverage has lapsed for up to 90 days in the last five years for any reason other than nonpayment of premium. This subdivision does not limit an insurer's ability to offer additional grace periods for lapses.*

SEC. 5.   Section 1861.02 of the Insurance Code is amended to read:

(a) Rates and premiums for an automobile insurance policy, as described in subdivision (a) of Section 660, shall be determined by application of the following factors in decreasing order of importance:

(1)  The insured's driving safety record.

(2)  The number of miles he or she drives annually.

(3)  The number of years of driving experience the insured has had.

(4)  Those other factors that the commissioner may adopt by regulation and that have a substantial relationship to the risk of loss. The regulations shall set forth the respective weight to be given each factor in determining automobile rates and premiums. Notwithstanding any other provision of law, the use of any criterion without approval shall constitute unfair discrimination.

(b) (l)  Every person who meets the criteria of Section 1861.025 shall be qualified to purchase a Good Driver Discount policy from the insurer of his or her choice. An insurer shall not refuse to offer and sell a Good Driver Discount policy to any person who meets the standards of this subdivision.

(2)  The rate charged for a Good Driver Discount policy shall comply with subdivision (a) and shall be at least 20% below the rate the insured would otherwise have been charged for the same coverage. Rates for Good Driver Discount policies shall be approved pursuant to this article.

(3) (A)  This subdivision shall not prevent a reciprocal insurer, organized prior to November 8, 1988, by a motor club holding a certificate of authority under Chapter 2 (commencing with Section 12160) of Part 5 of Division 2, and which requires membership in the motor club as a condition precedent to applying for insurance from requiring membership in the motor club as a condition precedent to obtaining insurance described in this subdivision.

(B)  This subdivision shall not prevent an insurer which requires membership in a specified voluntary, nonprofit organization, which was in existence prior to November 8, 1988, as a condition precedent to applying for insurance issued to or through those membership groups, including franchise groups, from requiring such membership as a condition to applying for the coverage offered to members of the group, provided that it an affiliate also offers and sells coverage to those who are not members of those membership groups.

(C)  However, all of the following conditions shall be applicable to the insurance authorized by subparagraphs (A) and (B):

(i)  Membership, if conditioned, is conditioned only on timely payment of membership dues and other bona fide criteria not based upon driving record or insurance, provided that membership in a motor club may not be based on residence in any area within the state.

(ii)  Membership dues are paid solely for and in consideration of the membership and membership benefits and bear a reasonable relationship to the benefits provided. The amount of the dues shall not depend on whether the

member purchases insurance offered by the membership organization. None of those membership dues or any portion thereof shall be transferred by the membership organization to the insurer, or any affiliate of the insurer, attorney-in-fact, subsidiary, or holding company thereof, provided that this provision shall not prevent any bona fide transaction between the membership organization and those entities.

(iii)  Membership provides bona fide services or benefits in addition to the right to apply for insurance. Those services shall be reasonably available to all members within each class of membership.

Any insurer that violates clause (i), (ii), or (iii) shall be subject to the penalties set forth in Section 1861.14.

(c)  The absence of prior automobile insurance coverage, in and of itself, shall not be a criterion for determining eligibility for a Good Driver Discount policy, or generally for automobile rates, premiums, or insurability. ~~However, notwithstanding subdivision (a), an insurer may use persistency of automobile insurance coverage with the insurer, an affiliate, or another insurer as an optional rating factor. The Legislature hereby finds and declares that it furthers the purpose of Proposition 103 to encourage competition among carriers so that coverage overall will be priced competitively. The Legislature further finds and declares that competition is furthered when insureds are able to claim a discount for regular purchases of insurance from any carrier offering this discount irrespective of whether or not the insured has previously purchased from a given carrier offering the discount. Persistency of coverage may be demonstrated by coverage under the low-cost automobile insurance program pursuant to Article 5.5 (commencing with Section 11629.7) and Article 5.6 (commencing with Section 11629.9) of Chapter 1 of Part 3 of Division 2, or by coverage under the assigned risk plans pursuant to Article 4 (commencing with Section 11620) of Chapter 1 of Part 3 of Division 2. Persistency shall be deemed to exist even if there is a lapse of coverage of up to two years due to an insured's absence from the state while in military service, and up to 90 days in the last five years for any other reason.~~

(d)  An insurer may refuse to sell a Good Driver Discount policy insuring a motorcycle unless all named insureds have been licensed to drive a motorcycle for the previous three years.

(e)  This section shall become operative on November 8, 1989. The commissioner shall adopt regulations implementing this section and insurers may submit applications pursuant to this article which comply with those regulations prior to that date, provided that no such application shall be approved prior to that date.

SEC. 6.   Conflicting Ballot Measures

In the event that this measure and another measure or measures relating to continuity of coverage shall appear on the same statewide election ballot, the provisions of the other measures shall be deemed to be in conflict with this measure. In the event that this measure shall receive a greater number of votes, the provisions of this measure shall prevail in their entirety, and the provisions of the other measure or measures shall be null and void.

SEC. 7.   Amendment

The provisions of this act shall not be amended by the Legislature except to further its purposes by a statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring.

SEC. 8.   Severability

It is the intent of the people that the provisions of this act are severable and that if any provision of this act, or the application thereof to any person or circumstance, is held invalid such invalidity shall not affect any other provision or application of this act which can be given effect without the invalid provision or application.

# VOTER BILL OF RIGHTS

1. You have the right to cast a ballot if you are a valid registered voter.

   A valid registered voter means a United States citizen who is a resident in this state, who is at least 18 years of age and not in prison or on parole for conviction of a felony, and who is registered to vote at his or her current residence address.

2. You have the right to cast a provisional ballot if your name is not listed on the voting rolls.

3. You have the right to cast a ballot if you are present and in line at the polling place prior to the close of the polls.

4. You have the right to cast a secret ballot free from intimidation.

5. You have the right to receive a new ballot if, prior to casting your ballot, you believe you made a mistake.

   If at any time before you finally cast your ballot, you feel you have made a mistake, you have the right to exchange the spoiled ballot for a new ballot. Vote-by-mail voters may also request and receive a new ballot if they return their spoiled ballot to an elections official prior to the closing of the polls on election day.

6. You have the right to receive assistance in casting your ballot, if you are unable to vote without assistance.

7. You have the right to return a completed vote-by-mail ballot to any precinct in the county.

8. You have the right to election materials in another language, if there are sufficient residents in your precinct to warrant production.

9. You have the right to ask questions about election procedures and observe the election process.

   You have the right to ask questions of the precinct board and elections officials regarding election procedures and to receive an answer or be directed to the appropriate official for an answer. However, if persistent questioning disrupts the execution of their duties, the board or election officials may discontinue responding to questions.

10. You have the right to report any illegal or fraudulent activity to a local elections official or to the Secretary of State's Office.

---

**If you believe you have been denied any of these rights,
or you are aware of any election fraud or misconduct, please call the
Secretary of State's confidential toll-free Voter Hotline at (800) 345-VOTE (8683).**

---

Information on your voter registration affidavit will be used by elections officials to send you official information on the voting process, such as the location of your polling place and the issues and candidates that will appear on the ballot. Commercial use of voter registration information is prohibited by law and is a misdemeanor. Voter information may be provided to a candidate for office, a ballot measure committee, or other person for election, scholarly, journalistic, political, or governmental purposes, as determined by the Secretary of State. Driver's license and social security numbers, or your signature as shown on your voter registration card, cannot be released for these purposes. If you have any questions about the use of voter information or wish to report suspected misuse of such information, please call the Secretary of State's Voter Hotline at (800) 345-VOTE (8683).

Certain voters facing life-threatening situations may qualify for confidential voter status. For more information, please contact the Secretary of State's Safe at Home program toll-free at (877) 322-5227 or visit the Secretary of State's website at *www.sos.ca.gov*.

**California Secretary of State**
**Elections Division**
1500 11th Street
Sacramento, CA 95814

NONPROFIT
U.S. POSTAGE
PAID
CALIFORNIA
SECRETARY OF STATE



OFFICIAL ELECTION MAIL
*Authorized by the U.S. Postal Service*   ®



CALIFORNIA STATEWIDE DIRECT
# PRIMARY ELECTION

www.voterguide.sos.ca.gov

**OFFICIAL VOTER INFORMATION GUIDE**

Remember to vote!
**Tuesday, June 8, 2010**
Polls are open from 7:00 a.m. to 8:00 p.m.

**Monday, May 24, 2010**
Last day to register to vote.

For additional copies of the Voter Information Guide in any of the following languages, please contact your county elections office or call:

| | |
|---|---|
| **English:** | (800) 345-VOTE (8683) |
| **Español/Spanish:** | (800) 232-VOTA (8682) |
| 日本語 **/Japanese:** | (800) 339-2865 |
| Việt ngữ **/Vietnamese:** | (800) 339-8163 |
| **Tagalog:** | (800) 339-2957 |
| 中文 **/Chinese:** | (800) 339-2857 |
| 한국어 **/Korean:** | (866) 575-1558 |
| **TDD:** | (800) 833-8683 |

To reduce election costs, the State mails only one guide to addresses where more than one voter resides.

OSP 10 117501

# CERTIFICATE OF SERVICE

Case Name:    **Peace and Freedom Party, et al.**    No.    **3:24-cv-08308-MMC**
                    **v. Dr. Shirley N. Weber**

I hereby certify that on <u>January 31, 2025,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>January 31, 2025</u>, at Los Angeles, California.

Beth L. Gratz                          *Beth L. Gratz*
Declarant                                    Signature

SA2024305451
67398147.docx